UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF
CONNECTICUT, STATE OF
DELAWARE, DISTRICT OF
COLUMBIA, STATE OF FLORIDA,
STATE OF GEORGIA, STATE OF
HAWAII, STATE OF ILLINOIS, STATE
OF INDIANA, STATE OF LOUISIANA,
STATE OF MARYLAND,
COMMONWEALTH OF
MASSACHUSETTS, STATE OF
MICHIGAN, STATE OF MINNESOTA,
STATE OF MONTANA, STATE OF
NEVADA, STATE OF NEW
HAMPSHIRE, STATE OF NEW
JERSEY, STATE OF NEW MEXICO,
STATE OF NEW YORK, STATE OF
NORTH CAROLINA, STATE OF
OKLAHOMA, STATE OF RHODE
ISLAND, STATE OF TENNESSEE,
STATE OF TEXAS,
COMMONWEALTH OF VIRGINIA,
AND STATE OF WISCONSIN,
EX REL. ALLISON KELLY,

Plaintiffs,

vs.

NOVARTIS PHARMACEUTICALS
CORPORATION,
NOVARTIS AG,
NOVARTIS CORPORATION,
GENENTECH, INC.,
ROCHE HOLDINGS, INC.,
AND THE ROCHE GROUP,

Defendants.

CIVIL ACTION NO. _____

*FILED UNDER SEAL*

1

## COMPLAINT FOR DAMAGES, CIVIL PENALTIES, AND OTHER RELIEF UNDER THE *QUI TAM* PROVISIONS OF THE FEDERAL CIVIL FALSE CLAIMS ACT AND SIMILAR STATE STATUTES

### INTRODUCTION: SUMMARY OF FALSE CLAIMS AND DAMAGES TO GOVERNMENTS

1.      This is an action brought on behalf of the United States of America, twenty-seven (27) States, and the District of Columbia, by Plaintiff Allison Kelly, under the federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, twenty-seven (27) comparable State False Claims Acts, and the District of Columbia's False Claims Act. Ms. Kelly is a whistleblower—or "relator" in FCA parlance—who alleges that all Defendants, collectively comprising two of the largest pharmaceutical conglomerates in the world, worked hand in hand, from 2003 forward, to cause other health care providers ("HCPs")—principally specialty pharmacies, pulmonologists, allergists, pediatricians, internists (internal medicine physicians), general practitioners, and family doctors—to overbill federal and State health insurance programs.[1] As explained in detail herein, Defendants did so by engaging in at least six schemes (some of which overlap to some degree): by (1) illegally off-label marketing/misbranding the asthma drug, Xolair® (generic name Omalizumab), for unapproved indications; (2) providing an egregious, vast array of illegal kickbacks to HCPs (and offering them to HCPs) in their co-promotion of Xolair; (3) encouraging, aiding, abetting, and causing HCPs and others to falsely represent facts on Statement of Medical Necessity forms ("SMNs") for Xolair; (4) illegally and misleadingly instructing HCPs to upcode for the administration of Xolair; (5) improperly targeting disproportionate share hospitals ("DSHs") and other hospitals to purchase Xolair and receiving government funding with "marketing of the spread", and illegally marketing the spread on Xolair to HCPs in general—all in

---

[1] Although Defendants' marketing of Xolair began in 2003, upon information and belief, their business plans to illegally market Xolair began before the marketing of the drug began, and before FDA approval of Xolair in June 2003.

2

order to increase reimbursement for Xolair from federal and State health insurance programs. Defendants' actions and omissions have caused HCPs around the United States to prescribe and administer Xolair to their patients for illegitimate, off-label purposes; for legitimate purposes that are invalid for reimbursement because they have been tainted by kickbacks; and to inaccurately represent its medical necessity and eligibility for government health insurance reimbursement, thereby causing improper and illegal reimbursements by federal and State governments. In so doing, all Defendants have violated the FCA, State FCAs, the District of Columbia FCA, Medicare and Medicaid rules, the Anti-Kickback Statute, the Federal Food, Drug, and Cosmetic Act, and other laws and regulations.

2.      This action has been brought against Defendants Novartis, AG; Novartis Corporation; its subsidiary Novartis Pharmaceuticals Corporation (the three of which are referred to collectively as "Novartis" because they are interrelated entities and worked in concert); Genentech, Inc.; the Roche Group (with which Genentech merged in 2009); and Roche Holdings, Inc. (Genentech, Inc. and The Roche Group's parent company) (the three of which are referred to collectively as "Genentech" because they are interrelated entities and worked in concert). Novartis and Genentech co-marketed Xolair from 2003 forward, and are jointly responsible for the illegal acts described herein. Thus, they are very frequently referred to herein collectively as "Defendants". In other words, "Defendants", when used herein, refers to all Defendants.

3.      The Food and Drug Administration ("FDA") approved Xolair in June 2003 for the treatment of only moderate to severe, persistent asthma in individuals aged 12 and older—if and only if certain criteria were met:  in short, that the patient have a positive skin test or in vitro reactivity to a perennial allergen, and whose symptoms are inadequately controlled with inhaled steroids. Defendants had hoped that the FDA would approve Xolair for much wider use, including the treatment of mild asthma. That potentially would have allowed for Xolair to become a

3

"blockbuster" drug, i.e., an extremely high-selling drug. But the FDA was very concerned about the lack of scientific evidence of Xolair's efficacy in the treatment of mild asthma. Moreover, the FDA was also concerned about Xolair's many potential, serious side effects, including the risk of anaphylactic shock. Hence, the FDA rejected the broad indication that Defendants sought.

4.      When the Xolair marketing launch began in mid-2003, which was prior to FDA approval, many sales representatives who had been hired or assigned to sell it had been told by managers that the Medicare and Medicaid approvals were in place. However, it was soon learned that these approvals had not been obtained and the lack thereof would adversely impact the companies' ability to meet revenue targets.

5.      Subsequently, in February 2007, the FDA required that Xolair's label carry a "black box" warning. A black box warning is required by the FDA for only a small percentage of drugs that have been FDA-approved, and is the most serious warning that the FDA may require when a drug is marketed. The black box warning was intended to place HCPs and patients on more conspicuous notice of the fact that Xolair carries a risk of serious injury or death, due to anaphylactic shock, and a marked increase in the risks of certain kinds of solid tumor cancers that can occur after only one year of use. More recently, in July 2009, the FDA announced that it is monitoring Xolair's safety data because of interim findings that Xolair increases the risk of various adverse cardiac events, including arrhythmia, ischemic heart disease, and cardiac arrest.

6.      Numerous HCPs have had their serious concerns about Xolair, too. They have been concerned with Xolair's potential dangerous effects; the limited usefulness of Xolair; and the time commitment, labor commitment, and high costs of administering Xolair—because it is injected subcutaneously—in contrast to competing, FDA-approved inhaled steroids, like Advair, as well as other drugs like Singulair (a pill), which cost a small fraction of what Xolair (an injected biologic) costs, and have been proven to be highly effective to

treat mild, moderate, and even severe asthma. With an annual cost per patient of approximately $10,000 to $24,000 per year, Xolair is extremely expensive. (Xolair costs about $548 per vial, and a recommended dosage of 1-3 vials every two weeks for a maximum of 6 vials, treatment can cost as much as about $3,000 per month per patient.)

7.      For the above reasons, many health insurance companies and managed care organizations ("MCOs") have been cautious about approving use of Xolair. Anticipation and appreciation of that fact has prompted Defendants to focus their sales forces and HCPs upon seeking reimbursement from Government-funded health programs, like Medicare and especially Medicaid.

8.      Some doctors also were reluctant to prescribe Xolair because they were concerned that it would harm their bottom line—i.e., by increasing office/administrative costs and interfering with doctors' "bread and butter"—for example, for allergists, immunotherapy and, more recently, rush immunotherapy. Sales representatives were instructed to counter this hesitancy with every marketing tool at their disposal.

9.      Faced with these major obstacles to high sales—all stemming from the high expense, questionable efficacy, and high-risk side effects of Xolair—Defendants responded not by accepting the limitations of the drug, but rather by disregarding patient safety, the wisdom of the FDA, and the concerns of numerous medical practitioners, by aggressively and illegally marketing Xolair to HCPs for use by patients with mild or "active" asthma, by patients with moderate to severe asthma who did not meet all FDA criteria, and by patients who merely suffer from seasonal allergies or the "allergic cascade" that could culminate with an asthma attack.

10.     "Active" asthma generally refers to patients who have been diagnosed with asthma, or experienced asthma symptoms to any extent, within the past year. The "allergic cascade" generally refers to the build-up allergy symptoms that may precede an asthma attack in

5

patients suffering from "allergic asthma". In addition, the "allergic cascade" can be involved in other allergic conditions that are not associated with asthma, like peanut allergy. Defendants instructed their Xolair sales managers and sales representatives to speak with HCPs about "active" asthma, allergies, and the "allergic cascade"—instead of the FDA criteria for diagnosis of moderate to severe, persistent asthma—to redirect HCPs' focus from the FDA's limited indication for Xolair, to a much larger patient population. This means of promotion necessarily (a) encompassed a far larger patient population pool than those with moderate to severe, persistent asthma; (b) meant that Xolair was being promoted to patients with mild asthma; (c) meant that Xolair was being promoted to patients with allergies, but not necessarily asthma; and (d) ran directly contrary to the limited indication approved by the FDA for Xolair. Allergies are, of course, distinct medical conditions from the disease of asthma. Moreover, Xolair has never been FDA-approved to preempt the specific allergic reactions that could contribute to asthma attacks. Defendants even marketed Xolair to HCPs for the treatment of asthmatics under the age of 12.

11.     Furthermore, in the course of promoting Xolair for uses that the FDA had never approved, Defendants' sales forces have failed to disclose, or have concealed and deemphasized, to HCPs the critical facts that: (a) the evidence from the very studies upon which Defendants had relied to obtain FDA approval of Xolair, failed to show *any* benefit for patients with mild asthma; (b) Xolair's safety and efficacy had not been established as to any other conditions besides that for which it had been expressly indicated; (c) the FDA had required that the previous two facts be included in Xolair's labeling; and (d) Defendants had never completed a study of Xolair's efficacy and safety for treating mild cases of asthma, despite the fact that the companies had committed to undertaking and completing such a study by November 30, 2005, as a condition for receiving FDA approval in June 2003.

12.     In short, Defendants determined that they would never succeed in transforming

6

Xolair into a blockbuster or near-blockbuster drug unless they broke the law. And that is exactly

what they knowingly did, by aggressively and illegally marketing Xolair, on a national basis, to

induce HCPs to prescribe Xolair—despite the drug's limited effectiveness and proven threats to

patient safety.

13.    Defendants' national campaign to aggressively off-label market, misbrand, and

boost Xolair sales was very successful. An FDA report concerning Xolair, dated July 9, 2009,

shows that FDA scientists analyzed data provided by Wolters Kluwer, a healthcare data collection

service. To quote the FDA report in most relevant part:

> According to Wolters Kluwer nation-wide estimate, 18,000 patients received a
> medical or prescription claim for [Xolair] in 2008, and approximately 89% of
> these patients were 18 years or older. The co-dispensing analysis revealed that
> during 2008 29% of patients did not receive another asthma medication and only 13% of
> asthmatics received a single class of medication along with their [Xolair] prescription.
> Based on this drug use data, about 1/3 of asthmatics are using [Xolair] as single treatment
> product, and in about 43% of asthmatics in the database, [Xolair] is possibly utilized by
> patients with mild asthma. This data raises two intriguing observations: 1) [Xolair] is
> being utilized outside its approved indication and outside the recommendations of national
> and international guidelines, and 2) the primary patient population that receives the drug
> (i.e., those with mild intermittent asthma) failed to show efficacy. This suggestion of mis-
> use or inappropriate use of [Xolair] is of concern.

14.    Thus, the case at bar is that extremely rare FCA lawsuit, in which FDA

scientists, through their own analysis, have observed that off-label use of a drug is widespread and

troubling. FDA researchers expressly found that about one-third of asthmatics receiving Xolair

were apparently using it as a single treatment product—a fact only consistent with use of the drug

for the mildest form of the condition: mild intermittent asthma. FDA researchers estimated that,

overall, 43% of Xolair prescriptions written during the 2008 sample year were for mild asthma

and were, thus, off-label.

15.    Because Defendants have routinely marketed and promoted Xolair through oral

and written off-label statements that mild asthma is one of the possible uses of Xolair, a use which

was not FDA-approved and as to which the drug's safety and efficacy has never been established,

the drug's labeling does not bear adequate directions for the "purposes for which it is intended". Defendants have therefore misbranded Xolair, making it ineligible for reimbursement under Government-funded health insurance plans like Medicare and Medicaid.

16.     Defendants have delivered misbranded drugs into interstate commerce and have engaged in off-label marketing, on a nationwide basis, posing a threat to patients' health, with the intention of increasing sales of Xolair, including sales paid for, in whole or in part, by Medicare, Medicaid, and other federally funded health programs.

17.     Defendants have illegally induced HCPs to prescribe Xolair by coaching them, through incorrect and misleading information—provided by Defendants themselves and through its retained independent contractor, the LASH Group—that they can submit claims for reimbursement for the administration of Xolair at improper rates: by advising HCPs to bill for patient levels 4-5 when only patient levels 1-2 were normally proper, and by advising HCPs to use improper Current Procedural Terminology ("CPT") and Diagnosis Codes ("ICD-9s"), to ensure coverage, and reimbursement at higher rates.

18.     Defendants have aggressively and illegally marketed Xolair by providing a panoply of valuable kickbacks to HCPs (doctors, nurses, and doctors' additional staff), to induce them to overlook its troubling profile. These kickbacks, which have targeted HCPs who prescribed Xolair or were in a position to prescribe Xolair, are clearly "over the top":

I.     Free Cash Equivalents and Expensive Gifts

> American Express traveler's checks (the equivalent of cash gifts);

> Expensive tickets to sports and entertainment events (e.g., tickets to New York Yankees and Boston Red Sox games);

> High–value celebrity and sports memorabilia (including celebrity autographs);

> Underwriting HCPs' "open houses" (payments for expensive parties when doctors have opened new offices and sought to advertise their

growth);

> Payments for advertising (print advertisements and flyers) for HCPs who prescribe Xolair;

> Opulent meals and expensive drinks for HCPs, nurses and other staff, with honoraria of $1,000.00 to $3,000.00 paid to speakers who frequently did not even speak about asthma, or made limited remarks, without following Pharma/industry guidelines;

> $500.00 payments to physicians for "preceptorships" (allowing sales representatives and/or managers to tag along for educational purposes, when asthma patients were being seen by the physicians);

> Other valuable items (if a HCP enjoyed a particular delicacy or hobby, sales representatives and/or managers could target that HCP with gifts of that delicacy or hobby (e.g., fine wines, cheeses, golf clothes or equipment));

> Unrestricted grants to HCPs to allow HCPs to pay for a broad array of valuable items, including some of the above-described items;

> Patient Experience Programs ("PEP") payments (Defendants relieved co-payment obligations of patients who reported or spoke favorably about asthma treatment by Xolair. This helped ensure that the patients would continue with Xolair treatment by the HCP, because the expensive co-payments constituted a reason that the patient might discontinue taking Xolair. However, it was frequently the sales representatives themselves who called in to Defendants or went online to register the "experience" with Defendants, in lieu of patients, creating false and unreliable data.);

> "Thought leaders" who prescribed Xolair and promoted the drug to other physicians, as well as one of the highest prescribers of Xolair in the country, were treated to the "President's Club" in the Bahamas (an opulent, all-expense paid trip to a Bahamas resort, which was normally only provided to the most successful sales representatives, sales managers, and select company executives);

> Gift certificates to opulent restaurants;

> Expensive pens, often engraved with HCPs' names;

> "Premium" gifts, including expensive medical books (e.g., sought-after anatomy books with color drawings);

> Speaker training events in which Defendants paid for the HCPs' travel expenses, hotel, meals, and drinks;

> Opulent "roundtable" meals and expensive alcoholic drinks;

> Speaker programs at country clubs and casinos, with lodging, meals and drinks paid for;

> Office parties for HCPs, their staffs, and guests (e.g., birthday parties, holiday parties, pi324a parties);

> "Happy hours" at bars and restaurants for HCPs, their staffs, and guests;

> Gourmet food and wine gift baskets;

> Expensive bottles of wine;

> Bogus/fake studies led by physician "thought leaders", with payments by Defendants to the "thought leaders" (e.g., the TENOR study); and

> Payments to "advisory ("ad") board" members—both physician ad boards and nurse ad boards—with the main purpose being payments to the physicians and nurses "serving on them", to ensure the prescribing of Xolair, as opposed to payments for advising Defendants about asthma and/or patients' experience with Xolair.

II.     <u>Free Medical & Office Equipment</u>:  Defendants have provided a variety of expensive equipment to HCPs to induce them to administer Xolair because storing and mixing/reconstituting Xolair, testing for asthma, and tracking asthma patients are all expensive, time-consuming propositions for the many HCPs, who, in contrast, do not incur these major expenses in prescribing FDA-approved competitor drugs like Advair and Singulair.

> Swirlers/spinners (for mixing Xolair);

> Pulmonary function machines (to test for asthma);

> Refrigerators (to store Xolair);

> IgE test kits (to test for asthma);

> Computers (to register and track asthma patients); and

> Wastage program (to ensure that HCPs would not be out of pocket for any vials of Xolair that were spilled, lost, or broken).

Many of the above-listed pieces of equipment—and the benefit of the wastage program—each cost hundreds of dollars.

III.    <u>Free Services</u>:  Defendants have provided a variety of free services to

HCPs, which are normally overhead/expenses to be borne by the HCP, because of Defendants' deep concern that prospective prescribers of Xolair would not prescribe the drug because of the administrative hassles and expenses of doing so.

> Sales representatives and managers singled out asthma patients by sorting through HCPs' patient charts and HCP computer records;

> Sales representatives and managers filled out Statements of Medical Necessity ("SMNs") for HCPs and their staffs, obtained physicians' signatures, and sent them off to specialty pharmacies, health insurers, managed care organizations ("MCOs"), and/or Government Health Programs, to ensure that HCPs actually followed through and prescribed Xolair (SMNs are, effectively, prescriptions.);

> Sales representatives and managers filled out appeals letters for HCPs when health insurers, MCOs, and/or Government Health Programs denied approval for administration of Xolair;

> Defendants provided for delivery of Xolair to patients in their homes, to reduce the costs to HCPs of administering Xolair, despite the fact that the FDA-approved indication for Xolair required administration of the drug in a medical office setting or hospital because of the serious risk of anaphylaxis and other serious side effects; and

> As noted above, Defendants provided coding and reimbursement assistance to HCPs—including the hiring of the LASH Group to provide such assistance (e.g., to advise HCPs to bill for patient levels 4-5 when patient levels 1-2 were proper, and to advise HCPs on CPT codes and ICD-9s to use, to ensure coverage and maximization of reimbursement.

19.     Many of these free services to HCPs involved violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936, insofar as patients did not give informed consent to allow Defendants to access their private health records for Defendants' purposes.

20.     Because Defendants' illegal schemes to boost sales of Xolair have been successful, the drug actually has achieved "blockbuster" or "near-blockbuster" status. The first year when Xolair was launched (in June 2003), the revenue for that year was only about $25 million. Since then, sales of Xolair have far exceeded goals, and have increased steadily and dramatically (e.g.,

$187 million in 2004, $320 million in 2005). The Defendants' goal for 2006 was initially $410 million, but at the 2006 "kickoff" meeting, sales representatives were asked by managers to bring in $500 million. This was referred to by company officials as the "half a billion dollar challenge".

21.     Overall, since 2003, billions of dollars of Xolair have been sold. From 2003 through 2008 alone, there were approximately $2 billion in Xolair sales in the United States. After 2008, Xolair sales increased greatly, despite the FDA's addition of a "black box" warning to Xolair's label in 2007, highlighting the serious potential side-effects of the drug. A large percentage of these billions of dollars in Xolair sales were financed through public funds— taxpayer money. Defendants have been fully aware, at all relevant times, of the huge contributions that Medicare, Medicaid, and other government programs have made towards the drug's sales and profitability. From 2004 through 2009 alone, HCPs submitted claims to Medicaid for reimbursement for Xolair for a total of approximately 293,465.29 units. Total Medicaid reimbursement for this time period equaled approximately $208,378,968.34.

22.     Pursuant to 31 U.S.C. § 3730(b)(2), and comparable provisions in the State FCAs and the FCA of the District of Columbia, this action has been brought *in camera* and filed under seal. Ms. Kelly previously initiated this lawsuit in 2006, but dismissed it without prejudice after the U.S.A. and various States declined to intervene in the action. Such declinations are not reflections of the merits of a case. (The U.S.A. and the States do not have endless resources to combat healthcare and other types of fraud and false claims). Ms. Kelly has re-filed the lawsuit because she has hired new counsel who are determined to pursue it even if the governments continue to elect not to intervene.

23.     Relator is a former employee of Novartis. Relator's allegations arise from her first-hand, inside knowledge of Defendants' practices, learned throughout the course of her full-time employment as a Xolair pharmaceutical sales representative for many years. Like so many other

employees of Defendants', Relator carried out very many of these practices, at the direction of Defendants—the architects of the fraud. Relator alleges no violations of the law on the part of Defendants' sales representatives and sales managers, who were acting under extremely high pressure by Defendants to meet sales objectives—at risk of losing their jobs. At the very least, the sales force was merely following "marching orders" from Defendants' mid- and high-level managers, and executives. Further, Defendants also frequently misled their sales forces about Defendants' activities, creating a false impression that they were legal, and hid from them a substantial amount of information about the drug's side effects.

24.     Similarly, Relator does not allege any legal violations by the overwhelming majority of HCPs that Defendants caused to submit false claims to Medicare, Medicaid, and other government programs, through the Center for Medicare and Medicaid Services ("CMS"). Had the Defendants not distributed a vast array of kickbacks, engaged in extensive off-label marketing, and misled HCPs into using improper billing codes, the United States Treasury and the treasuries of the 28 States and the District of Columbia would not have been overbilled.

25.     Through all of these actions, which are further detailed below, and memorialized in numerous attachments to this Complaint which are incorporated herein by reference, Defendants have caused the submission of false claims to government entities; have made, used, or caused to be made, false records or statements to get false or fraudulent claims to be paid by Medicare, Medicaid, and other government health programs; and have conspired to do so—all in violation of the FCA and other FCAs.

26.     As a result of Defendants' actions, they are jointly liable for treble damages, civil penalties of $5,500.00 to $11,000.00 per false claim, and all other damages in the premises, to the United States Treasury, as well as the treasuries of the 27 States and the District of Columbia, in an amount conservatively estimated to exceed $1.5 billion.

## THE MEDICARE AND MEDICAID PROGRAMS

27.    This is an action to recover treble damages, civil penalties of $5,500.00 to $11,000.00 per false claim, attorneys' fees, costs and expenses, on behalf of the United States of America, twenty-seven (27) individual States, and the District of Columbia, arising from Defendants' conduct in deliberately or recklessly causing the false claims to be presented under the Medicare, Medicaid, TRICARE and other federally-funded government health care programs (collectively "Government Health Care Programs").

28.    Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment, and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

29.    Medicare Part B generally covers drugs which are provided either: (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26) (e.g., certain oncology drugs); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit. 42 C.F.R. §§ 405.517, 414.701.

30.    Xolair is an injectable drug which was at all relevant times a Medicare Part B covered drug.

31.    During the relevant time period, CMS contracted with private insurance carriers ("Contractors") to administer and pay Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the Contractors act on behalf of CMS. 42 C.F.R. § 421.5(b).

32.     Contractors receive, process and pay claims under Medicare Part B for drugs from various Medicare providers and suppliers. Typically, once a contractor approves a claim, the contractor then submits a payment request to a Medicare bank account funded by federal funds.

33.     Coverage under Part B is limited to items and services which are "reasonable or necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § l395y(a)(1)(A).

34.     At all relevant times, the cost of providing Defendants' Xolair drug for on-label uses were covered by Medicare Part B. However, since Xolair was misbranded, no prescription for Xolair was properly reimbursable by Medicare Part B. Further, at all relevant times, the cost of providing Xolair for mild asthma was not properly covered by Medicare Part B because use of the drug to treat mild asthma was neither reasonable nor necessary. In addition, all Xolair prescriptions tainted in any way by a kickback were not properly reimbursable.

35.     On January 1, 2006, the Medicare Part D prescription drug benefit went into effect. Medicare Part D subsidizes the cost of prescription drugs for Medicare beneficiaries. *See* Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq.

36.     Part D covers the cost of FDA-approved prescription drugs used for "a medically accepted indication." *See* 42 U.S.C. §§ 1395w-102(e)(1), 1395w-151(a)(2). Just as in the Medicaid Program, for Medicare Part D reimbursement, a "medically accepted indication" means any use or indication which is approved by the FDA or which is supported by one or more citations in certain drug compendia. *See* 42 U.S.C. § 1396r-8(k)(6) and (g)(1)(B(i). The relevant drug compendia are the same as those for Medicaid: AHFS Drug Information and USP DI (or its successor publications). *See* 42 U.S.C. § 1396r-8(g)(1)(B)(i). In sum, Part D drug coverage excludes drugs not approved by the FDA, and those not for use for a medically accepted

indication. In addition, all Xolair prescriptions tainted in any way by a kickback were not properly reimbursable.

37.     The Medicare Part D prescription drug benefit is offered by private prescription drug plans and Medicare prescription drug plans. Medicare beneficiaries have a choice among many different plans in each State. Medicare reimburses the private plans for its coverage of Medicare beneficiaries.

38.     At all relevant times, Xolair for on-label uses was a covered drug under Medicare Part D. However, since Xolair was misbranded, no prescription for Xolair was properly reimbursable by Medicare Part D. Further, at all relevant times, the cost of providing Xolair for mild asthma was not properly covered by Medicare Part D because mild asthma was neither a medically accepted indication for which the drug was approved by the FDA nor one supported by any citations included in any of the specified drug compendia.

39.     Many low-income patients are "dual eligible"—those who qualify for both Medicare and Medicaid. In the case of dual eligibles, Medicare is the primary source of drug coverage.

40.     The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and State governments to help the States provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS. *See* 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. *See* 42 U.S.C. §§ 1396b(a)(l), 1903(a)(1). The federal government then pays each State a statutorily established share of "the total amount expended ... as medical assistance

16

under the State plan ..." *See* 42 U.S.C. § 1396b(a)(l).  This federal-to-State payment is known as federal financial participation ("FFP").

41.    Tricare, formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents. Tricare contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by Tricare beneficiaries or providers. The funds used to pay the Tricare claims are federal government funds. In addition to Medicare, Medicaid, and Tricare, the federal government also reimburses for the cost of prescription drugs under several other Government Health Care Programs, including the Railroad Retirement Medicare Program, the Federal Employee Health Benefit Plans, the Veterans Administration, the Indian Health Service and State Legal Immigrant Assistance Grants.

42.    Tricare categorically excludes coverage for "[u]nproven drugs". 32 C.F.R. § 199.4(g)(15). Tricare defines "unproven" as lacking necessary FDA approval. 32 C.F.R. § 199.4(g)(15)(i)(A)-(B). Thus, under Tricare, benefits may not be extended for drugs not approved by the FDA. At all relevant times herein, because Xolair was misbranded, no prescription for Xolair was properly reimbursable by Tricare. Further, at all relevant times herein, the cost of providing Xolair for mild asthma was not properly covered by Tricare because it was an "unproven" use of the drug in this regard.

43.    The Veteran Health Administration is the component of the U.S. Department of Veterans Affairs ("VA") that implements the medical assistance program of the VA through the administration and operation of numerous VA outpatient clinics, hospitals, medical centers, and long-term healthcare facilities. The VA provides numerous prescription drugs in connection with VA programs and obtains funds from the federal government.

44.    With respect to the VA, the federal reimbursement scheme provides that prescription drugs are only reimbursable if they are FDA-approved or otherwise medically accepted to treat the particular diagnosis for which the drug is prescribed. *See* 38 U.S.C. § 8126. A "medically accepted indication" means any use or indication which has been approved by the FDA or which is supported by one or more citations in certain drug compendia. *See* 42 U.S.C. §§ 1396r-8(k)(6), (g)(1)(B)(i). The relevant drug compendia are the same as those for Medicaid: AHFS Drug Information and USP DI (or its successor publications). *See* 42 U.S.C. § 1396r-8(g)(1)(B)(i). In sum, VA drug coverage excludes drugs not approved by the FDA, and those not used for a medically accepted indication.

45.    At all relevant times herein, Xolair for on-label uses was a covered drug under the VA. But because Xolair was misbranded, no prescription for Xolair was properly reimbursable by the VA. Further, at all relevant times herein, the cost of providing Xolair for mild asthma was not properly covered by the VA because mild asthma was neither a medically accepted indication for which the drug was approved by the VA nor one supported by any citations included in any of the specified drug compendia.

46.    Under all federal and State Government Health Programs, medical costs are not reimbursable when one or more kickbacks have been provided to the HCP.

## JURISDICTION AND VENUE

47.    These *qui tam* claims arise under the provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as well as 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 & 3730.

48.    Under the FCA, this Complaint has been filed *in camera* and under seal.

49.     Personal jurisdiction and venue for this action are predicated on 31 U.S.C.
§ 3732(a), which provides: "any action brought under § 3730 may be brought in any judicial
district in which the defendant, or in the case of multiple defendants any one defendant, can be
found, resides, transacts business or in which any act proscribed by § 3729 occurred." All
Defendants have transacted business in the District of Massachusetts.

50.     This Court also has supplemental jurisdiction over the claims brought pursuant to
the California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii,
Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada,
New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode
Island, Tennessee, Texas, Virginia, and Wisconsin *qui tam* statutes, pursuant to 28 U.S.C.
§ 1367, which provides that "in any civil action of which the district courts have original
jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are
so related to claims in the action within such original jurisdiction that they form part of the same
case or controversy under Article III of the United States Constitution."

51.     The above-listed States have enacted their own FCAs, which very closely track the
federal FCA, including: the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, the
Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*, the District of
Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-308.13 *et seq.*, the Florida
False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, the Hawaii False Claims Act, Haw. Rev. Stat. §§
661-21 *et seq.*, the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §
175/1 *et seq.*, the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, the
Louisiana Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. c. 3, § 437.1 *et seq.*, the
Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, §§ 5A *et seq.*, the Michigan Medicaid
False Claims Act, MI ST Ch. 400, the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et*

*seq.*, the New Hampshire False Claims Act, N.H. RSA §§ 167:61-b, *et seq.*, the New Mexico Medicaid False Claims Act, 2004 New Mexico Laws Ch. 49 (H.B. 468), the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*, the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§ 36.001 *et seq.*, and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01- 216.1 *et seq.* These State False Claims Acts, and the others asserted herein, apply, *inter alia*, to the state portion of Medicaid fraud losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program.

## PARTIES

*52.*     *Qui tam* Relator Allison Kelly ("Relator") is a person of the full age of majority and a resident of Scarsdale, New York. She is a former employee/pharmaceutical sales representative of Novartis. She first started working for Novartis on May 3, 1999 as a sales representative, selling Novartis products within the Ciba Sales Division (Cardio Vascular Sales: Diovan, Lotrel, Famvir, Lescol) in the Bronx/Westchester, New York area. She was then promoted to the Respiratory Dermatology Division (selling Elidel, Ritalin, Focalin, Lamisil). In June 2003, as Xolair was about to be launched, she was promoted again, this time to the Xolair Sales Force under the Respiratory Dermatology Division. In that role, she reported first to Frank Garay, then to William Stewart, and finally to acting manager, Daniel Giunta. She also reported to, and took directions from, Martin Clark. The Regional Director for the "Xolair franchise" is Elizabeth Johnson, who held that position since August 2005, taking over for her predecessor, Norbert Stone. Ms. Kelly was employed as a Xolair sales representative until late 2006.

53.     Ms. Kelly was assigned by Novartis to market Xolair to physicians in the Bronx/Westchester area of New York, under a co-marketing arrangement between Novartis and Genentech. Through this assignment, Ms. Kelly worked closely with Frank Garcia, a sales representative employed by Genentech to also market Xolair in that New York territory. They

20

frequently attended staff meetings and debriefings together, and often received instructions together as part of the joint Novartis-Genentech sales force for the co-marketing of Xolair. As part of their assignment to work together, they also had direct communications with physicians—including pulmonologists, allergists, internists, general practitioners, and family doctors—to whom Defendant's Xolair marketing was directed.

54.     Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

55.     Relator brings this action on behalf of herself and, *much more importantly*, on behalf of the United States of America, as well as twenty-seven (27) States and the District of Columbia.

56.     Relator brings this action based on her direct and independent knowledge, from first-hand experience, from examination of tens of thousands of pages of documents from the Defendants during her employment, and from examination of several thousand pages of those documents after her employment ended.

57.     None of the allegations set forth in this Complaint are based on a "public disclosure" as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding same, Relator is an "original source" of the facts alleged in this Complaint. As a former employee, she has direct and independent information of the allegations in this Complaint. As a pharmaceutical sales representative, she attended meetings and was privy to numerous internal communications and discussions regarding the marketing of the drug referenced herein.

58.     Relator has both personal and inside knowledge of Defendants' purposeful, corporate, nationwide schemes of (1) off-label marketing/misbranding of Xolair, (2) providing of kickbacks to HCPs to illegally promote both off-label and on-label sales of Xolair, (3) illegally inducing HCPs to bill for patient levels 4-5 when patient levels 1-2 were proper, and by advising HCPs to use improper CPT and ICD-9 codes, and (4) all other illegal conduct described herein.

59.     While employed by Novartis, Relator complained to superiors concerning many of the illegal activities described herein, which she and other members of Defendants' sales forces were compelled to undertake to satisfy executives' and managers' expectations, meet sales quotas, and to retain their jobs.

60.     Prior to filing this Complaint, Relator has provided to the Attorney General of the United States, the United States Attorney for the District of Massachusetts, and the State Attorneys General of the States identified in the Complaint, a confidential statement of material evidence and information related to this Complaint.

61.     Defendant Novartis Pharmaceuticals Corporation is a New Jersey-based pharmaceutical subsidiary of Novartis Corporation. It is headquartered at One Health Plaza, East Hanover, New Jersey, and is incorporated under the laws of the State of Delaware. Novartis Pharmaceuticals Corporation has locations in New York, New Jersey, and California. As the pharmaceuticals unit of Novartis Corporation and Novartis AG, Novartis Pharmaceuticals Corporation develops, manufactures, sells, and markets Novartis Corporation and Novartis AG's drugs in the United States.

62.     Defendant Novartis Corporation (traded on the NYSE as "NVS") is a New York corporation, formed in 1966, with locations in New York, New Jersey, and the District of Columbia. Its corporate headquarters is located at 608 5th Avenue, New York, New York 10020. Novartis Corporation is essentially the U.S. headquarters of Switzerland-based Novartis AG. Novartis Corporation handles the administration, sales, and marketing of a wide variety of prescription drugs, vaccines, consumer medicines, and veterinary products. It is the parent corporation of Novartis Pharmaceuticals Corporation—its and Novartis AG's pharmaceuticals unit.

63.     Defendant Novartis AG is a publicly traded, diversified pharmaceutical conglomerate with operations throughout much of the world, including the United States. It is headquartered in Basel, Switzerland, specifically at Lichtstrasse 35, Basel CH 4056, Switzerland. It is the parent company of U.S.-based and incorporated Novartis Corporation and Novartis Pharmaceutical Corporation.

64.     Defendants Novartis Pharmaceuticals Corporation, Novartis Corporation, **and Novartis AG are referred to herein collectively as "Novartis"** because they worked in concert and as a joint or common enterprise that marketed and sold Xolair and engaged collectively in the acts described in this Complaint.

65.     At all times relevant hereto, Novartis acted through its agents and employees, and the acts of its agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were established and/or ratified at the highest corporate levels of Novartis.

66.     Defendant Genentech, Inc. (traded on the NYSE as "DNA") is a United States pharmaceutical subsidiary, with its headquarters at One DNA Way, South San Francisco, California, and is incorporated under the laws of the State of Delaware.

67.     In March of 2009, Genentech, Inc. was acquired by, merged into, and became a member of Defendant, the Roche Group, through a merger agreement. With that merger, Roche and Genentech, Inc. combined their pharmaceutical operations in the United States. The Roche Group is responsible for the acts and liabilities of Genentech, Inc. after the merger in March 2009 and through the present. It is not presently known whether the Roche Group is a U.S. corporation, or is organized under the laws of a foreign nation. It is possibly merely a trade name of Roche Holdings, Inc., a U.S. corporation.

68.     Defendant Roche Holdings Inc. is a pharmaceutical corporation, headquartered at 340 Kingsland Street, Nutley, New Jersey 07110-1150, and is incorporated under the laws of Delaware.

69.     Defendants Genentech, Inc., the Roche Group, and Roche Holdings Inc. are **referred to herein collectively as "Genentech"** because they worked in concert and as a joint or common enterprise that marketed and sold Xolair and engaged collectively in the acts described in this Complaint.

70.     Genentech is a biotechnology company that discovers, develops, manufactures, markets, and sells pharmaceuticals/drugs.

71.     At all times relevant hereto, Genentech acted through its agents and employees, and the acts of its agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were established and/or ratified at the highest corporate levels of Genentech.

72.     Further, Novartis and Genentech worked in concert, jointly marketing and selling Xolair, and engaging collectively in, and conspiring in, the acts described in this Complaint.

73.     The United States of America is a plaintiff in this action. The United States brings this action on behalf of HHS, CMS, and the United States Treasury.

74.     The State of California is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients in California and was a covered Medicaid benefit under its Medi-Cal Program.

75.     The State of Colorado is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

24

76.     The State of Connecticut is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

77.     The State of Delaware is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

78.     The District of Columbia is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

79.     The State of Florida is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

80.     The State of Georgia is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

81.     The State of Hawaii is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

82.     The State of Illinois is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

83.     The State of Indiana is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

84. The State of Louisiana is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

85. The State of Maryland is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

86. The State of Massachusetts is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

87. The State of Michigan is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

88. The State of Minnesota is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

89. The State of Montana is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

90. The State of Nevada is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

91. The State of New Hampshire is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

92.     The State of New Jersey is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

93.     The State of New Mexico is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

94.     The State of New York is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

95.     The State of North Carolina is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

96.     The State of Oklahoma is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

97.     The State of Rhode Island is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

98.     The State of Tennessee is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

99.     The State of Texas is a Plaintiff in this action. At all relevant times herein, Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid benefit under its Medicaid Program.

100.    The State of Virginia is a Plaintiff in this action. At all relevant times herein,
Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid
benefit under its Medicaid Program.

101.    The State of Wisconsin is a Plaintiff in this action. At all relevant times herein,
Defendants' drug, Xolair, was provided to Medicaid recipients there and was a covered Medicaid
benefit under its Medicaid Program.

## THE ANTIKICKBACK STATUTE

102.    Congress enacted the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7(b)(2),
to prevent improper financial considerations from influencing the amount, type, cost, and/or
selection of health care services financed to any extent by the U.S. Treasury.

103.    It is remuneration, or merely the offering of it, to induce payments by Medicare or
Medicaid, that transforms an ordinary, lawful transaction into one that violates the AKS.

104.    Kickbacks can take a wide variety of forms, including cash, gifts, supplies, long-
term credit arrangements, equipment, and services.

105.    The AKS broadly defines a kickback or inducement to mean "any money, fee,
commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided,
directly or indirectly, to any prime contractor, prime contractor employee, subcontractor or
subcontractor employee, for the purpose of improperly obtaining or rewarding favorable
treatment in connection with a prime contract or in connection with a subcontract relating to a
prime contract." 41 U.S.C. §§ 52-53.

106.    The AKS provides both civil and criminal penalties for offering or paying any
remuneration to induce someone to refer patients to or for, or to purchase, lease, or order, any
item, service or facility for which payment may be made by a federally funded health care

28

program. 42 U.S.C. § 1320(a)-7(b). This prohibition applies whether the financial benefit is provided directly or indirectly, "in cash or in kind".

107.    Compliance with the AKS is a prerequisite for receiving payment from the Medicare, Medicaid and other federal health programs.

108.    In 2010, Congress amended the AKS when it enacted the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). The amendment makes clearer than ever that Medicare or Medicaid claims that are influenced in any way by kickbacks are, by definition, false claims under the FCA. PPACA, 124 Stat. 119, § 6402(g) (amending Section 1128B of Social Security Act, 42 U.S.C. § 1320a-7(b)(g)).

109.    Another PPACA amendment of the AKS clarified that specific intent to violate the AKS or actual knowledge of a kickback violation is not required under the FCA. PPACA, § 6402(f)(1).

110.    The PPACA provides in relevant part as follows:

Sec. 6402.    ENHANCED MEDICARE AND MEDICAID PROGRAM INTEGRITY PROVISIONS.

* * *

(f) HEALTH CARE FRAUD.—

(1) KICKBACKS.—Section 1128B of the Social Security Act (42 U.S.C. §1320a-7b) is amended by adding at the end the following new subsection:

"(g) In addition to the penalties provided for in this section or section 1128A, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code.".

(2) REVISING THE INTENT REQUIREMENT.—SECTION 1128B of the     Social Security Act (42 U.S.C. §1320a-7b), as amended by paragraph (1), is amended by adding at the end the following new subsection:

"(h) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.".

PPACA, Pub. L. No. 111-148, § 6402, 124 Stat. 119, 759 (2010) (AKS Amendments).

111.    When a pharmaceutical company pays a kickback to a HCP, the kickback taints the entire prescription and all related services, regardless of the medical propriety of its use. The kickback inherently interferes with the doctor-patient relationship, and creates a conflict of interest, potentially putting the patient's health at risk.[2]

112.    A kickback is material if it has a natural tendency to influence, or is capable of influencing, the decisionmaker to which it was addressed. All of Defendants' kickbacks, and offers thereof, were material.

113.    The Government is not required to pay for services tainted by kickbacks because, in such circumstances, the Government has no assurance that the medical services were provided in the best interests of the patient instead of the financial interests of the HCP or the party that induced the HCP.

114.    Kickback-tainted reimbursements are deemed to be false claims. All of Defendants' kickbacks "tainted".

115.    Alternatively, kickbacks render false the claims submissions of health care providers under either an express or an implied certification theory.

116.    Under the "implied certification" theory, "where the government pays funds to a party, and would not have paid those funds had it known a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent."

---

[2] Novartis itself has at least partially acknowledged that the presence of a kickback can taint a prescription and trigger FCA liability. To quote Novartis' own website (as of March 12, 2006): "[f]iling or facilitating the filing of 'false claims' against the Government is a violation of [the False Claims Act] and can lead to huge fines and penalties. Claims submitted for reimbursement from Federal health care programs tainted by any number of problems, including prescriptions written where a kickback has been found to be present, are alleged by the Government to be 'false claims.'" This description of FCA liability for kickbacks is partially accurate.

117.   Under the "express certification" theory, claims submissions are false where the providers at issue expressly certified that they would comply with all relevant laws, or a specific law like the AKS.

118.   As set forth herein, Defendants engaged in a nationwide system of kickbacks to promote and sell Xolair.

119.   Defendants' wide array of kickbacks was designed to alter physicians' objectivity in deciding on therapies for the treatment of asthma and allergies. Specifically, they were designed to cause physicians to be less concerned about the dangerous side effects and expenses associated with the administration of Xolair, as compared to the FDA-approved uses of competitor drugs, like inhaled corticosteroids.

120.   It is important to note that Relator has not alleged that the myriad HCPs that Defendants caused to submit false claims, are liable in the case at bar. Rather, liability is only sought to be imposed against Defendants—the *architects*, or cause, of the false claims submissions.

121.   Notably, Defendants engaged in many aggressive marketing activities that were *not* AKS violations—like providing lucrative commissions to their marketing forces. Those rich incentives were sufficient to effectively market Xolair without running afoul of the AKS. But that was not enough for the Defendants, which knowingly and intentionally went into prohibited AKS territory to ensure that key decision-makers—the HCPs who could purchase Xolair and seek reimbursement from federal and State programs—would be induced to buy Xolair (instead of competitors' FDA-approved drugs, which were the logical and comparatively safe alternative).

122.   Defendants were at all relevant times herein not only aware that they were violating—or at serious risk of violating—the AKS, FDA off-label marketing laws, and the other

31

laws set forth herein, but were also aware that AKS-based FCA cases have formed the basis of some of the largest FCA lawsuits brought by relators and the Government. Despite the known risks—both to patient safety and of legal liability—Defendants have doled out kickbacks to boost Xolair sales for nearly a decade, to date.

### THE STRICT REQUIREMENT OF FDA APPROVAL OF PRESCRIPTION DRUGS

123.    The FDA regulates human use of pharmaceutical drugs and biologics like Xolair. Companies seeking to introduce new drugs for human use into interstate commerce must comply with FDA statutes and regulations, such as the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq.

124.    Notably, the FDCA prohibits companies from distributing in interstate commerce any drugs that the FDA has not approved as safe and effective. 21 U.S.C. § 355(a), (b).

125.    In order for a company to gain FDA approval of a drug, the company must first submit and receive approval of a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355. The company is required to include in the NDA all intended uses proposed for a new drug's labeling and to prove that the new drug is safe and effective for those uses. 21 U.S.C. § 355(b).

126.    With respect to biologics like Xolair, the process is substantially the same or very similar.

127.    To prove that the drug is safe and effective, the company must provide the FDA with data from scientifically sound clinical trials. The FDA will refuse approval of a new drug unless, on the basis of all information reviewed, it is demonstrated that a drug can safely accomplish its purported effect under the conditions proposed, and that the method of manufacture and distribution will properly preserve the drug for this purpose. 21 U.S.C. § 355(d).

128.     Any use for a drug that was not proposed in the BLA and approved for the label by the FDA is "unapproved" or "off-label." 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000).

129.     Although physicians may traditionally prescribe a drug for an off-label use so long as the drug has been FDA-approved for some use, pharmaceutical companies are strictly prohibited from marketing a drug for an off-label use.

130.     Furthermore, a drug's "labeling"—and materials or oral statements are considered part of a drug's labeling if they are distributed by the manufacturer or stated by a sponsor's representative for the purpose of explaining the uses of the drug, even if they are not packaged with the drug—must be consistent with its FDA indications. 21 U.S.C. §§ 321(m) and (n), 331.

131.     The FDCA prohibits the distribution in interstate commerce of any drug that is misbranded. 21 U.S.C. §§ 331(a), 331(k), & 333(a). Specifically, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any...drug...that is... misbranded." 21 U.S.C. § 331(k) prohibits the "alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

132.     A drug is misbranded if the labeling does not contain adequate directions for use and adequate warnings against its use where such use can be dangerous to the user's health. 21 U.S.C. § 352. "Adequate directions for use" are directions "under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5.

133.     A drug's "intended use" is determined by considering the "objective intent of the persons legally responsible for the labeling of the drugs[,]" as evidenced by the "labeling claims,

33

advertising matter, *or oral or written statements by such persons or their representatives*." 21 C.F.R. § 201.128 (emphasis added).

134.    A drug's labeling must not be in any way inaccurate or otherwise misleading. 21 C.F.R. § 201.56(a)(2); *see also* 21 U.S.C. § 321(m), (n). Furthermore, if a manufacturer or its representatives makes oral/written statements regarding medical indications or uses for which the drug has not been approved by the FDA, then the drug's labeling will not bear adequate directions, and the drug will be considered misbranded.

135.    Misbranded drugs are not approved by the FDA and therefore are ineligible for reimbursement under public health plans.

136.    Use of an approved drug for any purpose other than those indications specifically approved by the FDA is referred to as an "off-label" use. Off-label uses include treating a condition not indicated on the label, treating the indicated condition at a different dosage or dosage frequency, or treating a different patient population than those approved by the FDA.

137.    Once a drug is approved as safe and effective for one indication, the FDA does not prohibit doctors from prescribing the drug for off-label uses. This is consistent with the FDA's mission to regulate drugs without interfering with the practice of medicine and doctors' discretion in treating their patients.

138.    Although physicians may prescribe drugs for non-FDA-approved uses, the law prohibits drug manufacturers from marketing or promoting a drug for uses that the FDA has not approved. 21 U.S.C. § 331. This includes marketing or promoting a different dosage or dosing frequency or treating a different patient population than that for which the FDA approved the drug.

139.    Under public health plans like Medicare Part D, Medicaid, and the Veteran's Health Administration, reimbursement is available only for covered outpatient drugs, which

34

pursuant to 42 U.S.C. § 1396r-8(k)(3), only includes drugs that are used for "a medically accepted indication," defined in 42 U.S.C. § 1396r-8(k)(6) to be a use "which is approved under" the FDCA or included in certain drug compendia identified in 42 U.S.C. § 1396r-8(g)(1)(B)(i). Similarly, under Medicare Part B only drugs which are reasonable or necessary can be reimbursed. 42 U.S.C. § 1395y(a)(i)(A).

140.     In sum, at all relevant times, the regulatory scheme set up by Congress has aimed to protect patients and consumers by ensuring that drug companies do not try to promote drugs for uses other than those found to be safe and effective by the FDA, and do not make materially misleading statements, while allowing doctors the freedom to treat patients as they see fit.

### THE SUBJECT DRUG: XOLAIR

141.     As set forth above, the drug at issue is Omalizumab, which Defendants jointly marketed as "Xolair."

142     The National Drug Code ("NDC") number for Xolair is 50242-0040-62. Previously, the 10-digit version was 50242-040-62.

143.     Xolair is a sterile, white, preservative-free, lyophilized powder contained in a single-use vial that is reconstituted with sterile water for injection ("SWFI") USP, and administered as a subcutaneous ("SC") injection.

144.     A Xolair vial contains 202.5 milligrams (mg) of Omalizumab, 145.5 mg of sucrose, 2.8 mg of L-histidine hydrochloride monohydrate, 1.8 mg of L-histidine, and 0.5 mg of polysorbate 20, and is designed to deliver 150 mg of Omalizumab in 1.2 milliliters (mL) after reconstitution with 1.4 mL SWFI, USP.

145.     In 2005, Defendants distributed a CD-ROM to HCPs entitled "Prescribing Xolair: The how-to guide for healthcare providers."

146.    According to the guide, in June 2003, the FDA approved Xolair, which is "indicated for adults and adolescents (12 years of age and above) with moderate to severe persistent asthma who have a positive skin test or in vitro reactivity to a perennial aeroallergen and whose symptoms are inadequately controlled with inhaled corticosteroids." The Guide elaborated that Xolair "is a prescription medicine for people who:

> • Are 12 years of age and above
>
> • Have moderate to severe persistent asthma. This means they have 1 or more of the following:
>
>> - Asthma symptoms every day
>>
>> - Daily need for a rescue inhaler
>>
>> - 2 or more asthma attacks a week
>>
>> - 1 or more nights a week waking up with asthma symptoms
>>
>> - A below-normal reading (less than 80%) from a toll called a peak flow meter, which measures how well the lungs work.
>
> • Have asthma that is triggered by year-round allergens in the air, which is confirmed by a doctor using a simple skin or blood test. This is known as allergic asthma.
>
> • Continue to have asthma symptoms even though they are taking inhaled steroids. Adding Xolair injections to treatment with inhaled steroids has been clinically proven to help reduce the number of asthma attacks. Xolair has not been proven to work in other allergic conditions."

147.    The guide specified the "specialty pharmacies" from whom HCPs should purchase the drug. HCPs were also directed to fax them the Patient Authorization and Notice of Release ("PAN") and Statement-of-Medical-Necessity ("SMN") forms:

• Priority Healthcare Corporation, Ph: 866-757-3929, fax: 866: 269-3113,

www.priorityheathcare.com.

• Option Care, Inc., Ph: 888-282-5166, fax: 888-570-4700, www.optioncare.com

• Nova Factor, Inc., Ph: 866-839-2162, fax: 866-531-1025, www.accredohealth.net/nova

• CuraScript Pharmacy, Inc., Ph: 888-281-5464, fax: 888-773-7386, www.curascript.com

•Caremark Rx, Inc., Ph: 800-237-2767, fax: 800-323-2445, www.caremark.com

148.     Specialty pharmacies—like the five approved to handle shipment of Xolair to

patients or their physicians—provide special handling and packaging of medicines, as well as

support services for determining whether the patient's health insurance covers a drug. The treating

physician or patient normally chooses the specialty pharmacy. The choice may be affected by the

patient's health plan and/or which specialty pharmacy already has a working relationship with the

treating physician.

149.     The guide also instructed HCPs to "contact [Defendants'] Single Point of Contact

(SPOC) at 800-704-6610 for assistance with authorization for patients outside the Specialty

Pharmacy Network or for appeal, buy-and-bill support, alternative coverage assistance, and co-

pay resource referral". SPOC's website is at www.spoconline.com.

150.     The guide also instructed office-based, non-institutional HCPs and suppliers on

filling out CMS-1500 forms for Xolair reimbursement and services.

151.     The guide also instructed institutional HCPs on filling out CMS-1450 (UB-92)

forms for Xolair reimbursement and services.

152.     The guide also instructed HCPs that the following ICD-9 diagnosis codes were

proper: 493 for "asthma", and 493.0__* for "extrinsic asthma".

153. The guide also instructed HCPs that the following Current Procedural Terminology ("CPT") codes were proper for billing of professional services by physicians: 86003, 82785, 95004, 95024, 95027, 95028, 90782, G 0351, 95115, 95117, and 95199.

154. The guide also instructed HCPs that the following Evaluation and Management ("E/M") codes were proper for level-of-service billing of professional services by physicians: 99201, 99202, 99203, 99204, 99205, 99211, 99212, 99213, 99214, and 99215.

155. The guide also instructed HCPs that the following CPT modifiers were proper for use by physicians: -25 and -76.

156. The guide also instructed HCPs that the following additional reference codes were proper for use by physicians: S 0107 for "omalizumab, injection, 25 mg"; J 2357 for "omalizumab, injection, 5 mg"; and NDC 50242-00460-62 for the "Xolair national drug code".

## THE EXTENT OF THE FRAUD

157. Defendants' off-label marketing of Xolair, furnishing of illegal kickbacks relating to its purchase and use, and other illegal acts, render false and invalidate the claims that have been submitted by HCPs to Government health programs, concerning the administration of Xolair, and the hospital, outpatient, physician, and other related services rendered along with the administration of Xolair, for which Defendants are liable under the FCA and the State FCAs described herein.

158. Through her position as a pharmaceutical sales representative for Novartis for approximately eight (8) years, including approximately five (5) of which were spent promoting and selling Xolair, Relator attained and possesses extensive, intricate personal and inside knowledge of the unlawful acts that are detailed herein, including, but not limited to, the identities of many client HCPs that billed Medicare and/or Medicaid.

159.    Notwithstanding this fact, Defendants closely guarded information concerning clients' billing of drug therapies and related services, in order to conceal the fraudulent nature of Defendants' activities. Numerous details concerning the fraud are within the exclusive, collective knowledge of Defendants, and may only be utilized in this litigation through the taking of discovery.

160.    Defendants' fraudulent acts were committed on a nationwide basis. Many of the written and oral communications from Defendants that are featured herein highlight the fact that Defendants' off-label marketing and kickback schemes were both national and endorsed by Defendants' executives, senior-level managers, and mid-level managers.

161.    Relator also knows that the fraudulent acts detailed herein caused HCPs who were customers of Defendants to submit false claims, because the off-label marketing, kickback, and other illegal acts set forth herein were conducted nationally and systematically—as confirmed by Relator throughout the course of her employment—having been learned from local, regional, and national training, sales, and strategy meetings and sessions, as well as various phone calls with sales managers, and with other sales representatives, who repeatedly acknowledged the off-label marketing and kickbacks, and other fraudulent acts detailed herein.

162.    All known facts point to the endemic nature of these violations by Defendants. Relator knows that all policies and procedures concerning Xolair emanated from or were approved by Defendants' respective corporate headquarters.

163.    It is impossible to state, at this stage of the proceedings, the exact number of HCPs affected by Defendants' actions because—as set forth above—Defendants closely guarded information concerning HCPs' billing of drug therapies and related services, in order to conceal the fraudulent nature of Defendants' activities, and because of the extremely widespread nature of the fraud. Precious few individuals who have worked for Defendants would ever be in a

position to specifically identify, at the pleadings stage of a lawsuit, every single HCP that Defendants caused to submit false claims. Moreover, those individuals normally would be very high-ranking officers within the company.

164.    Relator learned from multiple managers, sales representatives, and/or analysts who worked for Defendants—that HCPs routinely "billed" (i.e., submitted requests for reimbursement from) Medicare and/or Medicaid for the purchase and administration of Xolair. Hence, there can be no question that false claims were submitted to the Medicare, Medicaid, and other Government programs as a result of Defendants' actions.

## BACKGROUND ON ASTHMA AND THE REGULATORY HISTORY OF XOLAIR

165.    As explained by the National Institutes of Health ("NIH"), asthma is a common yet complex chronic disorder of the airways that is characterized by variable and recurring symptoms including airflow obstruction, bronchial hyper responsiveness, and an underlying inflammation. The interaction of these features of asthma determines the clinical manifestations and severity of asthma and the response to treatment.

166.    In the United States, asthma affects more than 22 million persons. It is one of the most common chronic diseases of childhood, affecting more than 6 million children (current asthma prevalence, National Health Interview Survey ("NHIS"), National Center for Health Statistics, Centers for Disease Control and Prevention, 2005) (NHIS 2005).

167.    The subjective measures used to grade asthma generally include ability to sleep through the night, ability to participate in daily activities without breathlessness, the occurrence of acute worsenings called exacerbations, and exercise tolerance. Peak expiratory flow rate ("PEFR") may be used for home monitoring of obstruction of breathing. In the clinic, expiratory volume in the first second of a forced expiration ("FEVI) is determined to assess severity. The FEVI is measured using equipment found in a clinic or hospital that can be calibrated so that

individuals may be compared rigorously to reference populations. Decrements in either measure signify a worsening in the ability to exhale rapidly and completely, due in asthma to reversible obstruction of the airways.

168. The NIH guidelines categorize asthma as mild intermittent, mild persistent, moderate persistent, and severe persistent, based upon pretreatment symptoms and measurements, as follows:

> • A patient is diagnosed with "mild intermittent asthma" if: the patient experiences symptoms less than once a week; the patient experiences brief exacerbations; the frequency of nighttime awakenings with asthma symptoms is less than or equal to twice/month; and the patient's FEVI or PEF readings are greater than or equal to 80% with variability less than 20%.

> • A patient is diagnosed with "mild persistent asthma" if: the patient experiences symptoms over once a week but less than once a day; the patient's exacerbations possibly affect the patient's activity and sleep; the frequency of nighttime awakenings with asthma symptoms is more than twice/month; and the patient's FEVI or PEF readings are greater than or equal to 80% with variability between 20%- 30%.

> • A patient is diagnosed with "moderate persistent asthma" if: the patient's asthma interferes with daily activities; the patient's exacerbations possibly affect the patient's activity and sleep; the frequency of nighttime awakenings with asthma symptoms is more than once/week, but not nightly; the patient uses a quick-relief inhaler daily; and the patient's FEVI or PEF readings are 60 to 80% with variability less than 30%.

> • A patient is diagnosed with "severe persistent asthma" if: the patient's asthma interferes with daily activities; the patient experiences frequent exacerbations; the patient experiences frequent nighttime awakenings with asthma symptoms; the patient's daily activities are limited; and the patient's FEVI or PEF readings are less than 60% with variability greater than 30%.

169. The FDA has approved many drugs for treating asthma, depending on which severity category applies to the specific asthma and whether long-term relief or short-term relief is needed. The NIH states that there are two basic kinds of medication for treating asthma: long-term control medications used to achieve and maintain control of persistent asthma and quick-relief medications used to treat acute symptoms and exacerbations.

170.    Xolair, which was produced by Genentech and marketed by Genentech and Novartis, is a recombinant Chinese Hamster Ovary cell-derived humanized IgE lk monoclonal antibody. Because it derives from living matter, it is considered a biologic drug. Xolair acts to capture IgE (the molecule in the human body that can play a major role in asthma) to help stop asthma attacks and symptoms before they start. The human body produces IgE in response to certain allergens. For 6 in 10 people with asthma, IgE triggers the release of chemicals, which may lead to an attack. Xolair captures most of the IgE related to asthma.

171.    Xolair is administered subcutaneously every 4 weeks at 150 mg or 300 mg per dose, or every 2 weeks at 225 mg, 300 mg, or 375 mg per dose. Because the solution is slightly viscous, the injection may take 5 to 10 seconds to administer.

172.    According to the Xolair label/product insert, Xolair's safety and efficacy were evaluated in three randomized , double-blind, placebo-controlled, multi-centered trials. The trials enrolled patients aged 12 to 76 years old, with moderate to severe persistent asthma (according to criteria of the National Heart Lung and Blood Institute ("NHLBI") for at least one year, and a positive skin test reaction to a perennial aeroallergen. All patients were already being treated with inhaled corticosteroids ("ICS") and short-acting beta-antagonists. Xolair dosing was based on body weight and baseline serum total IgE concentration.

173.    Biological products are approved for marketing under the provisions of the Public Health Service Act ("PHSA"). The PHSA requires a firm who manufactures a biologic for sale in interstate commerce to hold a license for the product. A biologics license application ("BLA") is a submission that contains specific information on the manufacturing processes, chemistry, pharmacology, clinical pharmacology and the medical effects of the biological product. If the information provided meets FDA requirements, the application is approved and a license is issued allowing the firm to market the product.

174.    Genentech and Novartis jointly submitted a BLA on June 2, 2000 (received by the FDA on June 5, 2000) to license and sell Xolair.

175.    Defendants' management placed a great deal of importance on Xolair, and were optimistic that it would prove to be a breakthrough, blockbuster drug.

176.    In Defendants' original BLA submission on June 2, 2000, the companies sought licensure for the broad use of Xolair in the prophylaxis and treatment of: 1) adult/adolescent allergic asthma (including mild asthma); 2) pediatric allergic asthma (including mild asthma); 3) adult/adolescent seasonal allergic rhinitis (SAR) and 4) pediatric seasonal allergic rhinitis.

177.    In response to their June 2000 BLA submission, the FDA sent Defendants its Complete Review Letter on July 5, 2001, in which the FDA wholly rejected the drug for approval. The July 5, 2001 Complete Review Letter from the FDA highlighted a number of limitations within the original submission, including the limited size of the clinical safety database and the inability to meaningfully assess certain safety signals. The letter noted that substantially greater safety information was necessary in order to assess the risks and benefits related to the proposed asthma indication, and even greater amounts of clinical safety information were necessary for the proposed SAR indication.

178.    In response to the FDA's Complete Review Letter dated July 5, 2001, Genentech filed a December 18, 2002 BLA amendment (Complete Response to Complete Review Letter) that significantly narrowed the proposed indications for Xolair:  it excluded both adult and pediatric seasonal allergic rhinitis, as well as pediatric allergic asthma.

179.    The December 18, 2002 Complete Response also included clinical data from approximately three times more subjects exposed to Xolair than were originally submitted in June 2000.

43

180.    The FDA approved Xolair on June 20, 2003 for a far smaller patient pool than Defendants had originally anticipated approval. Specifically, as the FDA-approved labeling states, it approved the drug: "for adults and adolescents (12 years of age and above) with moderate to severe persistent asthma who have a positive skin test or in vitro reactivity to a perennial aeroallergen and whose symptoms are inadequately controlled with inhaled corticosteroids. Xolair has been shown to decrease the incidence of asthma exacerbations in these patients. Safety and efficacy have not been established in other allergic conditions."

181.    As stated in the original BLA submission, the safety and efficacy of Xolair were evaluated in three clinical studies. As the labeling observes, the studies showed that there is an increased rate of various kinds of cancer among Xolair users that surfaced after only a year of use of the drug, and there is also an increased risk of anaphylaxis.

182.    Anaphylaxis is a severe, whole-body allergic reaction to a chemical that has become an allergen. It is a life-threatening condition and requires immediate, professional medical attention. In all three studies, Xolair did not relieve asthmatic incidents in the case of mild asthma, a fact which was required to be included in the FDA-approved labeling.

183.    As a condition for the June 20, 2003 approval of Xolair, Defendants agreed to conduct a post-marketing study specifically designed to evaluate the efficacy of Xolair in patients with mild asthma (the "EXACT" study). The study was due for submission to the FDA on November 30, 2005. Sometime in 2009, five years after the study was due to the FDA, Defendants began to conduct the post-marketing EXACT study it had agreed to conduct when Xolair was approved in June 2003. According to the FDA, as of October 21, 2009, only 77 of the 300 planned patients were enrolled, and just 54 had completed the study. To date, more than six years after the study was due for submission to the FDA, the study is still not complete.

44

184.    On July 2, 2007, the FDA issued a "black box" warning regarding Xolair due to anaphylaxis risk, which was double what it appeared to be when the drug was originally approved, stating:

> Anaphylaxis, presenting as bronchospasm, hypotension, syncope, urticaria, and/or angioedema of the throat or tongue, has been reported to occur after administration of Xolair. Anaphylaxis has occurred as early as after the first dose of Xolair, but also has occurred beyond 1 year after beginning regularly administered treatment. Because of the risk of anaphylaxis, patients should be closely observed for an appropriate period of time after Xolair administration, and health care providers administering Xolair should be prepared to manage anaphylaxis that can be life-threatening. Patients should also be informed of the signs and symptoms of anaphylaxis and instructed to seek immediate medical care should symptoms occur (see WARNINGS, and PRECAUTIONS, Information for Patients).

185.    According to the FDA, black box warnings on a drug's labeling are added when a drug has "special problems, particularly ones that may lead to death or serious injury."

186.    On December 5, 2008, Defendants jointly submitted a supplement to their BLA seeking to expand the asthma indication for Xolair to children 6 to 11 years of age. They submitted this supplement despite the fact that they had yet to conduct the clinical study on the efficacy of Xolair in mild cases of asthma, which they had committed to conducting and completing as a condition of approval back in June 2003. This supplement to the BLA triggered a closer examination of Xolair by the FDA.

187.    In a Notice of Violation letter from the FDA to Genentech dated March 26, 2009, the FDA stated that Defendant's sponsored link regarding Xolair was misleading because it made representations and/or suggestions about the efficacy of Xolair, but failed to communicate any risk information associated with the drug; it inadequately communicated the drugs' indications; and it failed to use the required established name. Thus, the FDA concluded, the sponsored links misbranded the drugs in violation of the FDCA and FDA implementing regulations. *See* 21 U.S.C. §§ 352(a) & (n), 321(n); 21 C.F.R. 201.10(g)(1), 202.l(b)(1), (e)(3)(i), (ii) & (e)(6)(i). Specifically, the Notice of Violation letter states:

45

The sponsored link for Xolair misleadingly broadens the indication for Xolair by implying that all patients with allergic asthma are candidates for Xolair therapy ("Are you suffering from allergic asthma? The cause might be IgE"; presented along with the name of the drug), when this is not the case. Rather, as stated in its PI, Xolair is only indicated for patients 12 years and older with moderate to severe persistent asthma "who have a positive skin test or in vitro reactivity to a perennial aero allergen and whose symptoms are inadequately controlled with inhaled corticosteroids." Additionally, the sponsored link fails to convey that the safety and efficacy of Xolair has not been established in other allergic conditions.

188.    The FDA's Division of Pulmonary and Allergy Products completed an analysis

dated July 9, 2009, which concluded that in roughly 43% of cases Xolair may well have been

prescribed off-label for mild cases of asthma. The Division concluded this was cause for concern

not only because Xolair was being used off-label to such a large extent, but also because studies

showed that Xolair was of no use to mild asthmatics. In particular, Xolair was the sole asthma

drug the patient was using in one-third of the cases overall—a fact which is only consistent with

Xolair prescriptions being written for the mildest form of asthma:  mild intermittent asthma. This

fact was also of concern because Xolair was FDA-approved as an add-on drug, not as a drug to be

used alone. The analysis specifically states:

> According to Wolters Kluwer nation-wide estimate, 18,000 patients received a
> medical or prescription claim for omalizumab in 2008, and approximately 89% of
> these patients were 18 years or older. The co-dispensing analysis revealed that
> during 2008 29% of patients did not receive another asthma medication and only 13% of
> asthmatics received a single class of medication along with their omalizumab prescription.
> Based on this drug use data, about 1/3 of asthmatics are using omalizumab as single
> treatment product, and in about 43% of asthmatics in the database, omalizumab is possibly
> utilized by patients with mild asthma. This data raises two intriguing observations: 1)
> omalizumab is being utilized outside its approved indication and outside the
> recommendations of national and international guidelines, and 2) the primary patient
> population that receives the drug (i.e., those with mild intermittent asthma) failed to show
> efficacy. This suggestion of mis-use or inappropriate use of omalizumab is of concern.

189.    On July 16, 2009, the FDA publicly announced that it was evaluating interim

safety findings from yet another study of Xolair which Defendants had agreed to conduct as a

condition to the June 2003 approval. According to the FDA, these interim findings suggested a

disproportionate increase in ischemic heart disease, arrhythmias, cardiac failure and other cardiac events among patients taking Xolair.

190.    On November 18, 2009, the FDA advisory panel voted 10-4 against approval of Xolair for use in children aged 6-11.

### OFF-LABEL MARKETING AND MISBRANDING OF XOLAIR

191.    At the time Xolair entered the market in June 2003, at least two different asthma drugs were already on the market which were FDA-approved for the long-term treatment of mild asthma, Advair and Singulair. Singulair is an asthma medication taken once daily in a pill form which was FDA-approved in 1998 for allergic asthma (mild, moderate, and severe), and also for seasonal allergic rhinitis ("SAR").

192.    At all relevant times, Defendants' sales representatives and sales managers marketed Xolair pursuant to a co-marketing agreement. (Xolair is listed as a Novartis drug on the Novartis website, and as a Genentech drug on Genentech's website, or as drugs from both companies.) Indeed, representatives of both companies attended many of the same sales calls made on physicians.

193.    Defendants' Xolair sales forces were at a major disadvantage. Xolair was an extremely expensive medication. With an annual cost per patient of approximately $10,000 to $24,000 per year, its price was substantially more than that of the drugs that Defendants' sales representatives and managers were directed to compete against. The drug's indications were very limited: (1) It could only be used for patients aged 12 and over, with moderate to severe persistent asthma—not mild asthma and not SAR; (2) a detailed SMN had to be completed and signed by the treating physician, providing justification for the use of the drug before insurers, including government programs, would reimburse for it; (3) the patient's pre-treatment serum IgE level had to be tested; and (4) the drug was required to be administered by needle in the doctor's office, and

47

the patient was required to remain in the office for at least two hours to be monitored for the risk of an anaphylactic response.

194.    Initially, Defendants' sales representatives were positioned to promote Xolair in a manner consistent with its label. But even as early as at the launch of the drug in 2003, sales managers instructed sales representatives to downplay anaphylaxis and malignancy data and to provide off-label information (e.g., on pediatric use, rush immunotherapy, and SAR). Further, Defendants very quickly recognized that sales were not on pace to approach the companies' optimistic sales forecasts, so management began to implement and approve of new, more aggressive promotional methods.

195.    Defendants' management began to view Advair and Singulair as being directly in competition with Xolair. However, Advair and Singulair were FDA indicated for a significantly larger pool of patients—those with mild to severe asthma—while Xolair was only indicated for patients with moderate to severe persistent asthma.

196.    Sales representatives complained to management and objected to management's marketing position that Advair and Singulair were direct competitors to Xolair, stating that Advair and Singulair were approved for a wider patient population than Xolair. But Defendants' sales managers, including John Mastrianni, Jim Sullivan, Leslie Flynn, Kelly Wilson, Rob Rindini, and others, rejected the sales representatives' objections, and encouraged sales representatives to engage in aggressive "best practices" and "pull through" methods to maximize sales. Defendants' use of the terms "pull through" and "best practices" were often "code", or euphemisms, for implementation of many of the aggressive, illegal activities highlighted by this lawsuit.

197.    Defendants instructed their sales representatives to promote illegal uses of Xolair to their prescribing physician customers by marketing Xolair for treatment of all types of asthma, not just moderate to severe asthma, as the approved indication stated.

198.    More specifically, Defendants instructed the sales representatives, when speaking to physicians, to use the term "active asthma" in place of "moderate to severe persistent asthma." The term "active asthma" generally means asthma that has been diagnosed by a physician, or asthma in which symptoms have been experienced within the last year. Thus, most any patient that sees a doctor for asthma will have "active asthma."

199.    Defendants' practice of using the term "active asthma" began in the Northeast in early 2004. Because its use was met with success, spurring more sales, it was formally embraced and adopted nationwide no later than November 2004. Specifically, instructions are contained in the minutes to a November 5, 2004 National Xolair Sales Representative Panel Meeting, attended by certain Xolair sales personnel from across the United States to reflect the opinions of the wider Xolair sales force, This documents reflects many of Defendants' illegal marketing tactics. These minutes were distributed to all of Genentech's Xolair sales representatives and treated as sales directives from management by the sales force nationwide. Marketing by using the term "active asthma", in place of moderate to severe persistent asthma, greatly expanded Xolair sales representatives' patient pool.

200.    These minutes, which show both the Genentech and Novartis names/logos at the top of the first page, were created by Genentech Sales Manager Leslie Flynn, and are dated November 5, 2004. The minutes' "Subject" is "Recap of the National Rep Panel meeting". Attendees of that meeting are listed as Ms. Flynn, Dwayne Blackwell, Steve Fauci, Barb Dreiling, Stacey Stames, Lora Eberhardt, Greg Tutko, Dave Tyson and Thomas Woods—all Genentech or Novartis sales managers and representatives. It states that the "Meeting Objectives" were to "[s]olicit feedback on High Impact ideas to grow SMNs and other topics of interest to the [sales] field". Among the "High Impact Ideas" listed and memorialized by Ms. Flynn were to "[u]se term 'Active Asthma' vs mod / severe"; "[u]se TENOR data – filed of PELS" (TENOR was a bogus,

off-label study, financed by Defendants, in which physicians were paid to provide patient quality-of-life data to Defendants); "[m]easure impact of LASH programs on B&B [buy and bill] for Medicare with 'other Report'"; "Offices used [off-label] Juniper [study] for QOL [quality of life] follow up, can we put link on Xolair.com to juniper site?" (reference to utilizing this off-label study of the quality of life of Xolair users), and "[c]apitalize on RN [registered nurse], NP [nurse practitioner] and Resp[iratory] Therapist in pt [patient] identification". These reflect decisions, and directives, to off-label market to HCPs by encouraging them to prescribe Xolair to any patient experiencing asthma symptoms, with a focus on using physicians' nurses and respiratory therapists to influence doctors, and even bypass doctors to achieve Xolair sales. In other words, physicians' assistants could be targeted for identifying new Xolair patients. Id. at 1.

201.    These minutes also reflect some of the barriers that the Xolair sales force frequently encountered, and ways to try to surmount them. To get "PUDs" (pulmonologists) and other physicians to prescribe Xolair, despite their long-term concerns with Xolair's efficacy and safety, and preference for safer, more effective inhaled corticosteroids for the treatment of asthma it was written: "Access to PUDs-Work with hosp[ital.] case managers to recommend Xolair to MDs that are no see, every territory has no see PUDs and MDs that will never write on their [sales representatives'] target list." Similarly, Ms. Flynn wrote that "20% of target list will never write [a Xolair prescription] – sleep PUDs or Intensivists". Id. That reflects the fact that the Xolair sales force encountered strong resistance from about 20% of physicians on sales representatives' target lists because of the drug's safety and efficacy issues. To the question, "What steps should we take in 2005 to be sure that our customers see us as highly valued?", one of the answers written by Ms. Flynn was "preceptorships for all [sales] reps". "Preceptorships", as noted above and described further below, are payments from Defendants to physicians for allowing sales representatives into their offices, to witness physician interactions with asthma patients. Training initiatives in 2005

for other types of kickbacks and off-label marketing were listed, as well, including: training for "pulm[onary] function tests" (which were distributed to HCPs as a kickback), "spin selling" (which referred to selling Xolair by putting a spin on the appropriate use of the drug), and ""[d]ivisional journal clubs", which were sales force sub-groups for exchanging off-label promotional literature for more effective off-label marketing. Defendants' push to get the Xolair sales force to "pull through" in getting SMNs was reflected by the notation that some sales representatives expressed that they "[d]on't need constant mentioning of SMNs, but need strategies, pilots and how to's, like more divisional contests" to obtain SMNs. The minutes also reflect the Defendants' goal in 2004 to "grow [Xolair] from $1-3 billion". Id. at 3. "Clinicals" (clinical studies) are also, by their very nature, off-label studies.

202.    Although Xolair's FDA-approval required administration of the drug in doctor's offices, because of the risk of anaphylactic shock and other side effects, these November 5, 2004 minutes clearly reflect that Defendants blissfully ignored that safety requirement. In answer to the questions, "Do you have any MDs implementing home infusion [at-home administration of the drug]? How is it working?", Ms. Flynn wrote: "Yes, it is being done and is spreading[.] One office does the first 4 injections then moves to the home[.] Sporadic, relatives who are medical personnel request it[.] Sent home with epi pens, Done selectively based upon geography or insurance requirements[.] ALs don't want this[.] Uli- new SMN includes box for home administration, this will cause a lot of issues with Allergists, remove and leave office and other boxes only". "Epi pens" are epinephrine "pen" devices that allergy patients theoretically may use to inject themselves in case of an emergency—like an anaphylactic reaction.

203.    The concluding notation in the minutes reflect the fact that physicians continued to have concerns about safety and efficacy: "One year safety data, safety concerns still exist, laggards want more date [data]".

51

204.    While employed by Novartis, Relator attended national, regional and/or breakout sales meetings during which attendees were shown PowerPoint slides directing sales representatives to employ the phrase "active asthma" rather than "moderate to severe persistent asthma" when discussing Xolair's potential uses with physicians. That phrase was also contained in flip-charts as a directive to the sales force. These flip charts were used at national, regional and/or breakout sales meetings.

205.    Defendants never directed the Xolair sales force to draw any distinction between "mild" or "active" asthma and "moderate to severe asthma". To the contrary, as of late 2004, the sales forces were being directed nationwide to avoid the term "moderate to severe" and "moderate to severe, persistent", and instead to employ and market the terms "active asthma", "allergic asthma", and "allergic cascade" so that the drug would not be pigeon-holed to its FDA label/approved indication, which would limit sales by reminding HCPs of its limited indication because of safety and efficacy issues.

206.    Furthermore, in the course of promoting Xolair for a use the FDA had never approved, Defendants' sales forces failed to disclose to HCPs the critical facts that: (a) the evidence from the very studies upon which Genentech and Novartis had relied to obtain FDA approval of the drug to treat a subset of patients with moderate to severe asthma, failed to show any benefit to patients with mild asthma; (b) Xolair's safety and efficacy had not been established as to any other allergic conditions besides that for which it was expressly indicated; (c) the FDA had required that the previous two facts be included in Xolair's labeling; and (d) starting December 1, 2005, Defendants had never completed a study of Xolair's efficacy and safety for treating mild cases of asthma, despite the fact the companies had committed to undertaking and completing such a study by November 30, 2005, as a condition to receiving FDA approval in June 2003.

207.    Defendants' Xolair sales forces—including over 20 Regional and Divisional Sales Managers as well as sales representatives from Genentech alone—promoted Xolair for "active asthma". These include the head of sales for the Northeastern United States (Kelli Wilson), the head of sales for New England (John Mastrianni), the head of sales for New York State (Jerry Kelly), and the head of sales for Washington D.C., Pennsylvania, and Maryland (Ryan Diez).

208.    The marketing of Xolair for mild asthma, contrary to the indication and use approved by the FDA, constituted misbranding of the drug.

209.    Relator and the rest of the Xolair sales force knew that the drug was not efficacious for mild asthma. Pre-launch Xolair materials made clear the drug has no benefit for mild cases of asthma.

210.    Defendants also instructed its sales representatives to misrepresent and thereby downplay to pulmonologists and other physicians the significance and relevance of the IgE test to the prescription of Xolair. Rather than reveal to such physicians that a high level of IgE is required in order for a patient to qualify for treatment with Xolair, absent clinical impressions of severe asthma, Defendants' management repeatedly and quite forcefully instructed sales representatives to falsely advise physicians that IgE levels are only relevant to a determination of the dosage of Xolair to be administered, and that physicians should therefore focus on making extremely strong clinical impressions of symptomatic "active asthma" regardless of the IgE level in prescribing Xolair. In this manner, as well as the other methods discussed herein, Defendants promoted Xolair for the treatment of asthmatic conditions other than moderate to severe, persistent allergic asthma. The manner of improperly increasing Xolair sales was expressed in the minutes of the same November 2004 National Xolair Sales Representatives Panel Meeting during which the "active asthma" phraseology was used, as well.

211.     Defendants also encouraging doctors to use Xolair in Rush Immunotherapy, to gain more patient "successes" and boost sales.

212.     Rush immunotherapy, unlike traditional long term immunotherapy which can last several years, involves giving a patient a larger dose of antigen in one injection, but it comes with a higher risk of anaphylactic shock; Xolair was promoted to be given in conjunction with the rush immunotherapy because it supposedly would reduce the risk of anaphylactic shock.

213.     Genentech and Novartis created a document entitled "Statement of Medical Necessity for Xolair (Omalizumab) For Subcutaneous Use" ("SMN") to satisfy the requirement that a physician-administered drug must be reasonable and "medically necessary" for the treatment of an indicated condition in order to qualify for reimbursement under Medicare Part B. This SMN included specially demarcated boxes in which to insert the pretreatment IgE level of the patient, concomitant therapies, the patient's weight and the physician's clinical impressions, among other information, thus creating documentation that the patient met the criteria for administration of Xolair. The completed SMN, signed by the prescribing physician, constituted the formal prescription for Xolair.

214.     Xolair gets approved by the patient's health insurance when the treating physician sends 2 forms to the chosen specialty pharmacy: the SMN and the PAN. The SMN is the Xolair prescription that the physician fills out. The PAN, which is signed by the patient, authorizes the physician and the specialty pharmacy to exchange information about the patient's case. The specialty pharmacy then determines whether the patient's health plan covers Xolair, and the patient's co-payment/out-of-pocket costs.

215.     Defendants further instructed their sales representatives, when necessary to achieve "pull through" (consummation of the sale or prescription), to fill out the SMNs for physicians and, when so doing, to place false information therein, such as increased body weight

54

to increase the dosage, and thereby increase the sales, of Xolair, and/or to exaggerate the clinical impressions of a patient's asthmatic symptoms in order to make his asthma appear moderate to severe so that the administration of Xolair would qualify as "medically necessary" and thus reimbursable under Medicare Part B.

216.    These sales practices and, in particular, the "active asthma" promotion triggered an increase in the number of SMN forms and greatly increased sales of Xolair.

217.    Increased sales of Xolair led to increased profits for Defendants and, under Defendants' compensation structures, led to increased commission payments for their sales representatives and sales managers.

218.    The sales practices that Defendants' management directed sales representatives to utilize, which were utilized by sales representatives, illegally promoted the "off-label" use of Xolair.

219.    As of Relator's last date of employment, there were no signs whatsoever that Defendants intended to comply with the Medicare, Medicaid, FDA and other requirements discussed.

220.    Indeed, through her investigation, Relator has learned that the vast majority of the illegal sales practices employed by Defendants to sell Xolair, described herein, have continued past the end of her employment, and into the present, as sales people have continued to feel pressure from management to meet their sales goals. (One scheme that Relator believes that Novartis discontinued in 2006 or 2007 was the kickback scheme of preceptorships.) However, Genentech continued with them.

221.    Indeed, additional evidence of Defendants' off-label marketing of Xolair is evident from after her employment. Among other things, off-label marketing statements have appeared in both Defendants' websites during 2012.

55

222.    Xolair's FDA-approved label states:

Xolair is indicated for adults and adolescents (12 years of age and above) with *moderate to severe persistent asthma* who have a positive skin test or in vitro reactivity to a perennial aero allergen and whose symptoms are inadequately controlled with inhaled corticosteroids. Xolair has been shown to decrease the incidence of asthma exacerbations in these patients. *Safety and efficacy have not been established in other allergic conditions.*

(emphases added).

223.    As explained above, Tricare does not extend benefits for drugs not approved by

the FDA, and Medicaid, Medicare Part D and the Veteran's Health Administration will only

reimburse for a drug used for a "medically accepted indication", which means an FDA-approved

indication or one which is supported by one or more citations in certain drug compendia,

including USP DI and AHFS Drug Information. Mild asthma is not supported by any citations in

the relevant drug compendia:

> • USP DI 2007 (last available edition): Xolair "is indicated for adults and adolescents (12 years of age and above) with moderate to severe persistent asthma who have a positive skim test or in vitro reactivity to a perennial aeroallergen and whose symptoms are inadequately controlled with inhaled corticosteroids."
>
> Xolair "is not indicated to treat acute asthma exacerbations and should not be used for treatment of acute bronchospasm of status asthmatics."
>
> • AHFS Drug Information 2009: "[Xolair] is indicated for adults and adolescents (12 years of age and above) with moderate to severe persistent asthma who have a positive skim test or in vitro reactivity to a perennial aeroallergen and whose symptoms are inadequately controlled with inhaled corticosteroids."
>
> "Safety and efficacy of [Xolair] in the management of other allergic conditions have not been established."

224.    Faced with competition, and a limited moderate to severe asthma FDA indication,

Defendants marketed and distributed misbranded Xolair in interstate commerce, and promoted

Xolair for mild asthma, an off-label indication, in order to increase sales, revenues and market

share.

225.    Xolair sales representatives made oral statements regarding the drug being

indicated for use in patients with mild asthma, an indication for which the drug was not approved by the FDA; thus, the drug did not bear adequate directions for use and under the FDCA the drug was misbranded. Misbranded drugs are not approved by the FDA.

226.    Defendants promoted and sold misbranded Xolair to prescribing physicians. When such prescribing physicians sought reimbursements from the government for non-FDA approved misbranded Xolair, Defendants caused false claims to be submitted to the government.

227.    In addition to the instances listed elsewhere herein, Defendants illegally promoted and marketed Xolair off-label to prescribing physicians by promoting Xolair to patients experiencing mild asthma, contrary to its indications and labeling; by failing to mention to prescribing physicians that the evidence does not support Xolair's efficacy for mild asthma and that the FDA has specifically concluded that Xolair is not effective for mild asthma; and by either filling out SMN forms, or instructing physicians to fill out SMN forms, to reflect the patient had "moderate to severe" asthma thereby supporting the prescribing of Xolair. Defendants also made material affirmative misstatements and omitted material facts in the course of engaging in this off-label promotion.

228.    Defendants regularly instructed their Xolair forces to market the off-label uses of Xolair, and to disseminate medical literature which, in part or in full, described the usefulness or potential usefulness in treating asthma patients who were outside of the FDA-approved indication.

229.    Defendants' sales representatives followed a national sales policy and procedure to promote Xolair off-label by providing non-approved clinical studies and "homemade" marketing materials not approved by the FDA which were designed to show the supposed but unproven efficacy of Xolair for off-label conditions. Defendants' sales forces utilized these unreliable and unapproved clinical studies to promote off-label use of Xolair.  Defendants directed their sales forces to intentionally misstate or overstate the findings of these unreliable studies to support

specific claims of Xolair's off-label efficacy. Defendants intended that these unapproved clinical studies and marketing materials would cause Accounts to prescribe Xolair for off-label use and would result in Accounts presenting false and fraudulent claims to Government Health Programs.

230. Defendants deliberately detailed physicians on "off-label" uses of Xolair, often orally and sometimes in the form of unpublished abstracts (often financed by the companies themselves), and encouraged their sales forces to get this information before doctors, in order to increase sales. (While physicians are allowed to prescribe medications "off label," it is a violation of the FDCA for drug companies to market their products "off label," except in narrowly prescribed categories not present here.)

231. On a routine basis throughout the course of their employment, Defendants' sales representatives, including Ms. Kelly and Mr. Garcia, received promotional literature on, and were informed about, Xolair's unapproved uses, and were encouraged to get this information before physicians. The literature and discussions dealt with such potential, but unapproved, uses of Xolair as: sinusitis, rhinitis, peanut allergy, use in conjunction with rush immunotherapy, and pediatric applications.

232. Xolair is *not* approved for and/or lacks sufficient efficacy data for: steroid reduction; atopic dermatitis; other IgE mediated diseases i.e. cerebral palsy, multiple sclerosis, lupus; sinusitis; rhinitis; food allergies; latex allergies; peanut allergies; mild asthma; pediatric patients; patients with IgE levels below 30 or above 700; patients who weigh more than 150 kilograms ("KG") or less than 30 KG; patients who do not test positive to a perennial allergy; patients who are currently controlled on inhaled corticosteroids; improving quality of life; and reducing emergency room visits.

233. Although the FDA did not approve Xolair for use by children under the age of 12, Defendants aggressively marketed the drug to pediatricians, who cared for patients who were

58

predominantly under that age. While it is true that pediatricians also care for youths who are age

12 or over, Defendants' intent was to capture as much of the pediatric market as possible,

regardless of age.

234.     The off-label studies were not peer-reviewed, often were scientifically

questionable due to the small sample size of patients, and failed to meet the criteria of the FFDCA

for dissemination of "off-label" data to physicians. For example, Mr. Garcia's manager stressed

the importance of noting to allergists the "rush immunotherapy" educational literature since they

would be most hesitant to write Xolair if traditional allergy shots (immunotherapy) or rush

immunotherapy was eliminated or reduced. He also stressed the importance of the steroid

reduction studies to pulmonologists, allergists, pediatric pulmonologists, pediatric allergists, and

pediatricians.

235.     Relators and other sales representatives were given "target lists" of

hospitals, other medical facilities, physicians, and other HCPs to contact in their territories, and

instructed to sell Xolair prescriptions to them. For example, Novartis gave Ms. Kelly a target

list of doctors that included pediatricians, internists, family practice doctors, pediatric

pulmonologists, and pediatric allergists. When Xolair was launched, the Defendants openly

discussed pediatric studies and that there had been children as young as six in the studies.

These practices were company-wide, and nationwide, in scope. Relators attended sales

meetings on a regional and national basis in which these practices were openly discussed

between managers and sales representatives from all parts of the country, and encouraged.

Examples include the Xolair Launch meeting in Orlando, July 2003, the Las Vegas Xolair

meeting in September 2003, the San Diego Xolair "T1" (Trimester 1 covering January-April of

the year) meeting in January 2004, the Dallas T1 meeting in February 2004, and the Xolair

Teleconference Nationwide in February 2005.

236.    At these and other meetings, sales representatives, including Ms. Kelly and Mr. Garcia, were told to absorb this data on unapproved uses fully, in order to detail physicians with the information and show the "success" Xolair was having in these unapproved uses. At several points, there were open discussions about the fact that the majority of patients on Xolair did not meet the approved indications and eligibility criteria.

237.    E-mails clearly show that Xolair sales managers distributed off-label studies to sales representatives. For example, on September 20, 2006, Marty Clark, Novartis' Xolair New York Area Sales Manager, e-mailed "3" off-label "reprints to Xolair sales representatives, specifically off-label reprints from Mary K. Miller and the TENOR Study Group, Dr. De Marco, and Dr. Stuart W. Stoloff. Novartis and Genentech intended and instructed their sales managers and representatives to utilize such off-label studies to "change the conversation" from the FDA's approved indication for Xolair, to alternative off-label approaches for determining which patients are candidates for receiving the drug.  For example, while the FDA indication required that specific criteria be met for prescribing Xolair, including "severity" (moderate to severe persistent asthma), the Stoloff study also discussed "control".  The Miller/TENOR concluded in part, in the opening synopsis of the study, that "[c]lassification of asthma severity on the basis of current asthma symptoms and lung function may be useful but not completely reflective of a patient's true asthma condition." This study was used by the sales force to convey a clear message to HCPs that the FCA indication was an incomplete way of targeting the appropriate Xolair patient population.

238.    Defendants' sales force was specifically instructed by superiors to fight the FDA label with the off-label studies that Defendants provided to them.  It was another one of Defendants' "best practices" to achieve "pull through".

239.    Defendants not only instructed their sales managers and representatives to off-label market, provide kickbacks, and engage in other unlawful actions to boost sales,

Defendants regularly reminded them of the importance of doing so, and even made the sales managers and representatives write out plans for aggressively achieving sales objectives. This was done on a nationwide basis by Defendants, during national, regional and local sales meetings/conferences, in e-mails, in conference calls, and in sales manager "ride-alongs" with sales representatives during their visits to HCPs. For example, in planning for most Xolair National Sales Meetings, sales representatives were asked to complete "Account Planning Workshop Pre-Work" papers. In these papers, sales representatives were to identify their physicians into three categories: high-prescribing physicians, low-prescribing physicians, and non-prescribing physicians. They were then required to "[l]ist the barriers you think are preventing your low- and non-prescribing physicians from prescribing Xolair for more patients" and "[l]ist the strategies and tactics you plan to use to advance high-prescribing physicians along the sales continuum and increase the prescribing habits of low-and non-prescribing physicians."

240. The following publications are included among the off-label studies that Defendants' sales representatives have been instructed and encouraged to share with and/or disseminate to HCPs:

> Donald Y.M. Leung, M.D., Ph.D., Hugh A. Sampson, M.D., John W. Yunginger, M.D., A. Wesley Burks, Jr., M.D., Lynda C. Schneider, M.D., Cornelis H. Wortel, M.D., Ph.D., Frances M. Davis, Ph.D., John D. Hyun, B.S., & William R. Shanahan, Jr., M.D., for the TNX-901 Peanut Allergy Study Group, "Original Article": *Effect of Anti-IgE Therapy in Patients with Peanut Allergy*, The New England Journal of Medicine (Vol. 348, No. 11; Mar. 13, 2003, at 986-993). This study, which involved 84 participants who were administered either TNX-901 [omalizumab] or a placebo, notes at the outset that "peanut allergy is characterized by symptoms and signs after ingestion that may include nausea, vomiting, diarrhea, abdominal pain, urticarial, angioedema, bronchospasm, hypotension, loss of consciousness, and death." The article concludes: "A 450-mg

dose of TNX-901 [omalizumab] significantly and substantially increased the threshold of sensitivity to peanut on oral food challenge from a level equal to approximately half a peanut (178 mg) to one equal to almost nine peanuts (2805 mg), an effect that should translate into protection against most unintended ingestions of peanuts." Thus, this article touts the possible efficacy of omalizumab for treatment of peanut allergies. The FDA did not approve Xolair (omalizumab) for treatment of peanut allergies, or any allergies. Hence, Defendants were prohibited from off-label marketing through the use of this article.

> Henry Metzger, M.D., "Editorial": *Two Approaches to Peanut Allergy*, The New England Journal of Medicine (Vol. 348, No. 11; Mar. 13, 2003, at 1046-1048). This editorial summarizes the study conducted by Donald Leung, M.D., Ph.D., et al, *Effect of Anti-IgE Therapy in Patients with Peanut Allergy*, The New England Journal of Medicine (Vol. 348, No. 11; Mar. 13, 2003, at 986-993). Dr. Metzger notes the "efficacy of the treatment" that was provided with TNX-901 [omalizumab], and that "this approach has been under investigation for about 15 years and has been used in clinical trials to treat allergic rhinitis and allergic asthma." (Allergic rhinitis is a collection of symptoms, mostly in the nose and eyes, which occur when one breathes in something to which he is allergic, such as dust, dander, insect venom, or pollen.) Xolair [omalizumab] was not FDA-approved for treatment of allergic rhinitis, peanut allergies, or other allergies. Hence, Defendants were prohibited from off-label marketing through the use of this editorial.

> Beverly Merz, "Behind the Research": *Studying Peanut Anaphylaxis*, The New England Journal of Medicine (Vol. 348, No. 11; Mar. 13, 2003, at 975-976). This commentary also summarizes the study conducted by Donald Leung, M.D., Ph.D., et al, *Effect of Anti-IgE Therapy in Patients with Peanut Allergy*, The New England Journal of Medicine (Vol. 348, No. 11; Mar. 13, 2003, at 986-993). Ms. Merz states that "In this issue of the *Journal*, Leung et al (pages 986-

993), report results with a new drug [TNX-901/omalizumab] to reduce the risk of anaphylactic reactions to food. In a multi-center, phase 2 study, TNX-901, a monoclonal antibody to IgE, increased the threshold of sensitivity to peanut antigen to a level that should afford protection from unintended ingestions....The study brings new information at a time when the prevalence of food allergy is rising....For children and adults with peanut allergy, hyper-vigilance has become a way of life: food-label scrutiny is second nature, and sampling dishes of unknown provenance is verboten." This commentator also quotes one of the study's authors as saying that some of the study's participants even reported to have seemingly developed a greater tolerance to foods other than peanuts. Ms. Merz subsequently noted: "In September 2002, the [FDA] granted TNX-901 fast-track status, a designation designed to expedite review for approval. Even so, further investigation has come to a halt. Phase 3 studies, which would establish dosage and indications, are on hold pending the resolution of litigation among Tanox, Genetech, and Novartis—the companies that were partners in developing the drug." Xolair [omalizumab] was not FDA-approved for treatment of peanut allergies or any other allergies. Hence, Defendants were prohibited from off-label marketing through the use of this commentary.

> Thomas B. Casale, M.D., William W. Busse, M.D., Joel N. Kline, M.D., Zuhair K. Ballas, M.D., Mark H. Moss, M.D., Robert G. Townley, M.D., Masoud Mokhtarani, M.D., Vicki Seyfert-Margolis, Ph.D., Adam Asare, Ph.D., Kirk Bateman, M.S., Yamo Deniz, M.D., and the Immune Tolerance Network Group, *Omalizumab pretreatment decreases acute reactions after rush immunotherapy for ragweed-induced seasonal allergic rhinitis*, Journal of Allergy & Clinical Immunology 2006 (Vol. 117, at 134-140): The authors of this study wrote that rush immunotherapy (RIT) "presents an attractive alternative to standard immunotherapy. However, RIT carries a much greater risk of acute allergic reactions, including anaphylaxis." The authors "hypothesized that omalizumab [Xolair], a humanized monoclonal antiIgE antibody, would be

effective in enhancing both safety and efficacy of RIT." A 123-patient study was conducted. The authors reported: "Patients receiving omalizumab plus immunotherapy had fewer adverse events than those receiving immunotherapy alone. Post hoc analysis of groups receiving immunotherapy demonstrated that addition of omalizumab resulted in a 5-fold decrease in risk of anaphylaxis caused by RIT…." The authors concluded: "Omalizumab pretreatment enhances the safety of RIT for ragweed allergic rhinitis. Furthermore, combined therapy with omalizumab and allergen immunotherapy may be an effective strategy to permit more rapid and higher doses of allergen immunotherapy to be given more safely and with greater efficacy to patients with allergic diseases." Other notable statements included: (1) "Omalizumab (Xolair…) is a humanized monoclonal anti-IgE antibody with established efficacy for moderate-to-severe allergic asthma and intermittent (seasonal) and persistent (perennial) allergic rhinitis"; (2) "This study has demonstrated the potential utility of omalizumab pretreatment in allergen-specific immunotherapy of ragweed-induced allergy rhinitis. It is unique in showing that omalizumab pretreatment can provide substantial protection against acute allergic reactions, including anaphylaxis, during a RIT protocol. Pretreatment of patients with omalizumab for 9 weeks reduced the rate of anaphylactic events during RIT by almost 80%."; (3) "A previous study in children showed that concomitant treatment with omalizumab and allergen-specific (tree or grass) immunotherapy was more effective than immunotherapy alone"; (4) "In summary, omalizumab pretreatment appears to offer substantial protection from serious allergic reactions after RIT. With further investigation, omalizumab pretreatment appropriately dosed and timed could ultimately lead to the safer and more effective use of allergen-specific immunotherapy for a variety of patients and disorders." Several of the study's authors disclosed significant conflicts of interest: including six authors who disclosed that they have either worked at, owned stock in, served a consultant with, served on the speakers bureau of, or have received grants from, the Defendants or a parent company thereof.

The FDA did not approve Xolair (omalizumab) for treatment of ragweed-induced seasonal allergic rhinitis, or any allergies. Hence, Defendants were prohibited from off-label marketing through the use of this article.

> Thomas B. Casale, M.D., *Omalizumab and Immunotherapy* (undated, at 83-87): In this paper/presentation, Dr. Casale made numerous off-label statements that are pertinent because Defendants' sales representatives were directed to distribute it to HCPs. These statements included the following: "Allergic rhinitis effects 20 to 40 million Americans annually, including 10 to 30% of adults and up to 40% of children. Symptoms can range from mild to seriously debilitating and can affect quality of life resulting in loss of work and school days. Effective management of seasonal allergic rhinitis may be an important component of the treatment of co-existing or complicating respiratory conditions such as asthma, sinusitis and otitis media....Omalizumab...has been approved for the treatment of moderate to severe persistent allergic asthma in the United States. Omalizumab has been shown to be safe and effective for the treatment of children and adults with seasonal and perennial allergic rhinitis as well as allergic asthma....there is a need for safer and more effective therapies capable of inducing an immune tolerant state. The combination of anti-IgE and allergen immunotherapy holds promise for such therapy....The rationale for combining omalizumab plus allergen immunotherapy includes the prospects of improved clinical benefits and immunotolerogenic effects. Furthermore, by decreasing serum IgE levels and FceR1 expression, omalizumab should make immunotherapy safer. In a study conducted by the Omalizumab Rhinitis Study Group, the effects of adding omalizumab to immunotherapy were examined in children....The combination of immunotherapy plus omalizumab was more effective than either therapy alone or placebo....In this presentation, I will also review the results of a NIH/Immune Tolerance Network sponsored study examining the effects of pre-treatment of ragweed allergic rhinitis patients with omalizumab prior to

immunotherapy. Our hypothesis was that pre-treatment of ragweed allergic patients with omalizumab will condition the recipient so that subsequent administration of ragweed allergen immunotherapy is safer, clinically more effective and immunologically more efficient at inducing a long-lasting immune tolerance to ragweed….159 total subjects were randomized. At the time of preparation of this handout, we are still analyzing the data for statistical differences between the 4 treatment groups. However, preliminary analyses indicate that the average daily allergy severity scores were significantly better in the omalizumab plus immunotherapy group versus the immunotherapy alone group. Furthermore, in protocol correct patients, the combination of omalizumab plus immunotherapy was better than omalizumab alone, immunotherapy alone or placebo alone. Omalizumab had a protective effect on allergic-type reactions to both rush immunotherapy and maintenance immunotherapy. This effect was manifested by a reduction in serious adverse events, anaphylactic reactions, and the use of epinephrine and prednisone to treat reactions. The data suggest that omalizumab pre-treatment may be an effective strategy to permit more rapid and high doses of allergen immunotherapy to be used. However, the exact dosing and timing warrants further study. The mechanisms involved in improved efficacy and safety of omalizumab and immunotherapy are still under investigation. Further analyses of these data will likely provide important information on how best to use these therapies in combination. It is anticipated at the time of this meeting the final results from the primary efficacy and safety trial will be available." The FDA did not approve Xolair (omalizumab) for treatment of allergic rhinitis, or any allergies. The FDA also did not approve Xolair for use with children. Hence, Defendants were prohibited from off-label marketing through the use of this article.

> "Abstract": *The Epidemiology and Natural History of Asthma: Outcomes and Treatment* Regimens (TENOR) Study (American College of Allergy, Asthma and Immunology (ACAA) Meeting, Nov. 12, 2003), concerning "the natural history, including medication use, of patients

with severe or difficult-to-treat asthma". This analysis described the outcomes of TENOR patients who reported single-unit combination asthma therapy use (fluticasone propionate and almeterol xinafoate) at baseline and Month 12 visits compared to patients who reported never using combination asthma therapy." The analysis concluded that "patients taking single-unit combination asthma therapy do not appear to differ from patients taking multiple asthma medications in terms of asthma-related healthcare utilization in this population of patients with severe or difficult-to-treat asthma." The distribution of this study by Defendants' sales force was unlawful because the spectrum of patients with "difficult-to-treat asthma" is much broader than the approved indication of Xolair. Further, the study focused on patients that were 13 years or older, which includes children who were not within Xolair's indicated age restriction.

> "Abstract": *Latex Allergy and Omalizumab* (undated). This study concerned latex allergy, which is "common among healthcare workers (prevalence estimated at 3-21%), who are regularly exposed to latex gloves or other latex-containing medical supplies. Symptoms can be local and/or systemic and include conjunctivitis, rhinitis, urticaria, bronchospasm and anaphylaxis." The study noted that "omalizumab…stops the allergic cascade by binding to free IgE…[and] is effective in the treatment of patients with allergic asthma and rhinitis." The study's purpose was "to evaluate the efficacy of omalizumab in healthcare workers with occupational latex allergy." The study concluded that "omalizumab had statistically and clinically relevant ocular anti-allergic activity (assessed by the conjunctival challenge test); had skin anti-allergic activity (assessed by the latex glove challenge test and the quantitative skin prick test); [and] was well tolerated." The promotion by Defendants of this abstract—and study—was off-label because Xolair was not FDA-approved for occupational latex allergy, or any other allergies.

> S.T. Holgate, et al, on behalf of the Omalizumab 011 International Study *Group, Efficacy and safety of a recombinant anti-immunoglobulin E antibody (omalizumab) in severe*

*allergic asthma*, Clinical & Experimental Allergy 2004; Vol. 34, at 632-638: This study "was supported by a grant from Novartis Pharma AG, Basel, Switzerland and Genentech, South San Francisco, California, USA." The study was conducted because "patients with severe asthma are often inadequately controlled on existing anti-asthma therapy, constituting an unmet clinical need," and concluded that "[o]malizumab treatment improves asthma control in severely allergic asthmatics, reducing inhaled corticosteroid requirements without worsening of symptoms control or increase in rescue medication use." The more detailed conclusion of the study was: "In conclusion, the present study in patients with severe allergic asthma shows that omalizumab is not only well tolerated when added to optimized therapy with inhaled corticosteroids but also enables the underlying disease to be controlled (and in most cases improved) with a significantly lower dose of such therapy. These findings build upon earlier studies showing that omalizumab represents a novel therapeutic approach for allergic asthma over a range of severities in adults and children." The promotion by Defendants of this study was off-label because Xolair was not FDA-approved for treatment of any allergies, or for use with children. Hence, Defendants were prohibited from off-label marketing through the use of this article.

> *Can Guideline-defined Asthma Control Be Achieved? The Gaining Optimal Asthma Control Study*, American Journal of Respiratory Critical Care Medicine, Vol. 170, No. 8, Oct. 2004, at 836-844: This study involved a patient population of 3,421 people between the ages of 12 and 80 with at least a 6-month history of asthma. The promotion by Defendants of this study was off-label because, among other things, Xolair was not FDA-approved for use in children, and only for moderate and severe cases of asthma, and only then after preconditions were satisfied. This study included mild cases and children, and the promotion of this study was intended to highlight Xolair's efficacy in such off-label cases. The study concluded: "In summary, this study has shown that guideline-defined control of asthma can be achieved in the majority of patients with

uncontrolled asthma with combination salmeterol/fluticasone treatment. This approach should be the preferred treatment selection for patients whose asthma is uncontrolled, regardless of their previous inhaled corticosteroid regimen. salmeterol/fluticasone achieves sustained control of asthma as defined by a composite of relevant clinical goals of treatment in more patients, more rapidly and at a lower dose of inhaled corticosteroids than fluticasone alone. In addition, the approach of aiming for total control and maintaining treatment resulted in the virtual elimination of exacerbations and near-normal quality of life in the majority of patients and brought substantial benefit even to those who failed to achieve this high level of control." The study disclosed that one of the authors, William W. Busse, received consultancy fees from "Genentech/Novartis ($100,000 for 2002 and 2003)" and other companies.

> Stanley J. Szefler, M.D., et al, for the Asthma Clinical Research Network of the National Heart, Lung, and Blood Institute, *Significant Variability in Response to Inhaled Corticosteroids for Persistent Asthma*, Journal of Allergy & Clinical Immunology (Vol. 109, No. 3, Mar. 2002): The promotion by Defendants of this study was off-label because, among other things, Xolair was only FDA-approved for moderate and severe cases of asthma, and only then after preconditions were satisfied—not for broader "persistent" asthma. Indeed, the conclusion of the study stated in part: "In summary, our findings show that in this study population of individuals with *mild to moderate* persistent asthma, low-to-medium-dose FP-MDI and BDP-MDI was sufficient to attain a maximal increase in…" label (emphasis added), which underscores that the study was off-label.

> *J.K. Peat*, et al, *Serum IgE levels, atopy, and asthma in young adults: results from a longitudinal cohort study*, Allergy, Vol. 51 (1996), at 804-810: The promotion by Defendants of this study was off-label because, among other things, Xolair was not FDA-approved for use in children, and only for moderate and severe cases of asthma, and only then after preconditions were satisfied. This study included mild cases and children, and the promotion of this study was

intended to highlight Xolair's efficacy in such off-label cases. To quote the study in part: "In this paper, we examine the relation between sensitization to common allergens, respiratory symptoms, and AHR in childhood and levels of total serum IgE in a cohort of young adults aged 18-19 years who had been studied up to five times at 2-year intervals during their childhood….718 children were studied. Each second year thereafter until 1992, every effort was made to contact and study each subject….A total of 407 of 718 subjects who attended the initial study in 1982 were also subjects at the final study in 1992…" At the end of the study, the authors stated: "Because allergic history influences the presence of symptoms and AHR which continue into adulthood, further research is needed to determine the mechanisms which protect some sensitized children from developing sensitization and high serum IgE levels in response to the inhalation of common allergens."

> Larry Borish, M.D., et al, for the TENOR Study Group, *Total serum IgE levels in a large cohort of patients with severe or difficult-to-treat asthma,* Annals of Allergy, Asthma & Immunology (Vol. 95, No. 3, Sept. 2005), at 247-253: This study was performed, in part, due to the existence of "limited data being available on levels of IgE in large cohorts of patients with severe or difficult-to–treat asthma." The study's objective was "[to] examine IgE levels and disease in patients from The Epidemiology and Natural History of Asthma: Outcomes ad Treatment Regimens (TENOR) study. The study found, among other things that "[c]hildren (6-12 years old) and adolescents (13-17 years old) have higher mean IgE levels than adults.…Among children, patients with severe asthma have a higher mean IgE level…than patients with moderate…or mild…asthma.…" The study concluded that "[i]n patients with severe or difficult-to-treat asthma from the TENOR study, higher total IgE levels were observed in males, children, smokers, nonwhite/racial ethnic groups, and adults with childhood-onset disease. In addition, IgE levels are associated with asthma severity among younger patients." 10.4% of the study group

was adolescent, and 16.2% was pediatric. The authors noted that "[o]verall, TENOR's pediatric patients with severe asthma have higher IgE levels compared with children with moderate or mild asthma." The study touted "TENOR [as] the largest observational study conducted of patients with severe or difficult to treat asthma with measured IgE levels. Although TENOR is not a population-based study, the cohort represents children, adolescents, and adults of diverse racial and ethnic backgrounds from widely distributed areas across the United States. With more than 4,500 participants with a measured IgE level at baseline, TENOR provides the largest database available to examine the relationships between demographic and clinical characteristics and IgE patients with severe or difficult-to-treat asthma." One of the authors of this study, Chantal Dolan, Ph.D., was specifically identified as working on behalf of Genentech. Further, it was specified that "[t]he TENOR Study is funded by Genentech Inc and Novartis Pharmaceuticals Corp." The promotion by Defendants of this study was off-label because Xolair was not FDA-approved for treatment of "difficult-to-treat asthma", mild asthma, or asthma in children or adolescents. Hence, Defendants were prohibited from off-label marketing through the use of this study.

> Chantal M. Dolan, Ph.D., et al, for the TENOR Study Group, *Design & baseline characteristics of The Epidemiology and Natural History of Asthma: Outcomes & Treatment Regimens (TENOR) study: a large cohort of patients with severe or difficult-to-treat asthma,* Annals of Allergy, Asthma & Immunology (Vol. 92, Jan. 2004), at 32-39: This study began by stating that "[p]atients with severe and difficult-to-treat asthma represent a small percentage of asthma patients, yet they account for much of the morbidity, mortality, and cost of disease. The goal of The Epidemiology and Natural History of Asthma: Outcomes ad Treatment Regimens (TENOR) study is to better understand the natural history of asthma in these patients." The study's objective was described as being "[t]o describe the methods and baseline characteristics of the TENOR study cohort." To this end, "[f]rom January through October 2001, more than 400

U.S. pulmonologists and allergists enrolled patients", including "patients 6 years or older who were considered to have severe or difficult-to-treat asthma by their physicians were eligible." 10% of the study participants were adolescents (13-17 years), and 16% were children (6-12 years). The authors observed that "[a]n economic analysis of asthma costs in 1992 reported that the largest single contributor to the indirect costs of asthma was days of school missed, with more than 10 million days of school missed each year." The study's conclusions were: "The TENOR study is the largest cohort of patients with severe or difficult-to-treat asthma. Although patients are equally divided into moderate or severe asthma categories, most are considered difficult-to-treat. The TENOR study highlights the lack of control in moderate-to-severe asthma and provides a unique opportunity to examine factors related to health outcomes in this understudied population." The authors also concluded: "Despite more mild disease, both children and adolescents reported high levels of health care utilization. In particular, unscheduled office visits and the use of steroid bursts in the previous 3 months were equally high among adults, adolescents, and children. A greater proportion of children and adolescents had a history of intubation compared with adults. These data suggest that even patients considered to have mild or moderate asthma have symptom control problems." The first-listed author of this study, Chantal Dolan, Ph.D., was specifically identified as working for Genentech in South San Francisco. Further, it was specified that "[t]he TENOR Study is sponsored by Genentech Inc and Novartis Pharmaceuticals Corp." The promotion by Defendants of this study was off-label because Xolair was not FDA-approved for treatment of "difficult-to-treat asthma", mild asthma, or asthma in children or adolescents. Hence, Defendants were prohibited from off-label marketing through the use of this study.

241.    Defendants not only distributed such off-label studies to their sales forces to be used in off-label marketing, they also frequently provided sales managers and sales representatives with concise written summaries of the off-label studies which highlighted major

off-label points and conclusions of the studies. For example (and there were many), Defendants provided them a summary of one Dr. Borish's study, "The Role of IgE in Ashtma".

242.  Defendants frequently reminded their sales forces to minimize a "paper trial" that would show the off-label marketing: by abstaining from direct references in e-mails; by showing off-label studies to HCPs and their staffs, but trying to limit leaving the studies with them; and by using code phrases or euphemisms like "pull through" and "best practices" to conceal the details of the off-label marketing push.

243.  Defendants monitored off-label use, and targeted physicians for off-label use of Xolair, by utilizing written and oral feedback from sales representatives and sales managers, SMNs, PANs, Xolair Patient Progress Reports, Xolair Patient Injection Reports, Xolair Patient Injection Records, Patient SMN Approval Tracking Forms, Appeal Letters to CMS and private payors, Xpansion enrollment cards (in which patients describe their Xolair use as "severe persistent", "moderate persistent" or "other", and send the cards to Genentech/Novartis), the Xpansion/Xolair "patient education and support" program, and other documents.

244.  As part of the Xpansion program, Defendants send patients a "Daily Tracker" with an "Asthma Action Plan to help [patients] monitor and manage [their] allergic asthma"; an "Office Visit Planner to promote good communication with [the patient's] doctor or healthcare professional"; answers to frequently asked questions, and other information.

245.  In sum, such prescribing physicians sought reimbursement from the United States government for such "off-label" prescriptions and based on Xolair sales representatives' half-truths, causing the submission of false claims for reimbursement to the government.

246.  Defendants' off-label marketing not only has violated federal prohibitions against the practice, and the FCA in general, but also have violated Defendants' own standards. For example, Novartis's own website (as of March 12, 2006), stated that Novartis' "Use of

73

**Unapproved Promotional Materials ("Homemade bread")** is unlawful. To further quote the website: "Promotion includes any material provided to potential users or decision-makers regarding our products that makes a claim about a Novartis product. It also includes verbal statements made by representatives of our company. The use of any material or claims not approved by the Novartis Promotional Review Process in the promotion of our products is strictly prohibited."

247. From 2003 forward, Defendants routinely made grant funds and other resources available to key teaching hospital administrators and national physician "thought leaders" in order to gain access for Defendants off-label doctor promoters to make presentations pushing the off-label use of Xolair.

248. Smaller-scale grants were also provided to local physicians and organizations in each sales territory to create local "thought leaders", to convert them into Xolair prescribers. For example, grants of $1,000.00 to $1,500.00 were made in Ms. Kelly's territory to the Dominican Medical Society and the Bronx Medical Society, as well as individual doctors like Dr. James Pollowitz, who also was paid a wide array of kickbacks (honoraria, meals, etc.).

249. At this point, the line between off-label marketing and kickbacks becomes fu324y, because local "thought leaders" were very frequently paid a lot of money to purportedly promote scientific/medical ideas about off-label uses of Xolair, but so little actual work was done by so many local "thought leaders" that the payments are really nothing more than kickbacks—especially when the local "thought leader" is being paid $1,000.00 or $1,500.00 to chat about Xolair for a few minutes at a fancy dinner and very few or no doctor invitees/friends are able to show up—making it nothing more than a lucrative payment to dine with a few doctor friends, the sales representative, and/or the "thought leader's" spouse.

250.    From 2003 forward, Defendants conducted Advisory ("Ad") Board meetings across the United States where doctors were hired by Defendants to speak on various off-label uses for Xolair at weekend "conferences" at high-end resorts to which other health care professionals, particularly potential prescribers of the drugs, were invited. At the very least, hundreds of doctors attended these nationwide.

251.    Some of the speaker programs were advertised as being focused on Xolair's narrow indication. But the actual presentations were substantially off-label. Others were given titles that suggested the off-label focus of the presentations.

252.    Xolair's top prescribers were often the most frequent speakers retained by Defendants. Their payments provided to these physicians were all lucrative—far from minimal. Attendees were frequently also paid thousands of dollars for their attendance at the resorts where the presentations occurred.

253.    Xolair prescribers, and potential Xolair prescribers, *routinely* were provided all-expenses-paid, free trips to conferences at high-end hotels in which Defendants sponsored off-label speaking programs. These "programs" were really brief presentations, compared to the long days at the resorts. Large stipends were routinely doled out for attendees. This was Defendants' pattern and practice.

254.    The "crossing the line" into AKS territory here is clear: Defendants could have promoted the off-label uses of Xolair by simply mailing, e-mailing, or otherwise providing the information to doctors. Instead, Defendants opened up their coffers to induce.

255.    However, it has been the *speakers* at the programs who have been provided the most lucrative inducements in exchange for their off-label uses and promotions of Xolair. They were frequently paid tens of thousands of dollars per year, plus other covered expenses, in speaking/consulting fees. This, too, was Defendants' pattern and practice.

## KICKBACKS TO HCPs

256.    Defendants have aggressively and illegally marketed Xolair by providing a

very wide array of valuable kickbacks to HCPs (doctors, nurses, and doctors' additional staff), to

induce them to overlook its troubling profile. These kickbacks—all of which were carried out

nationally from 2003 forward (unless otherwise specifically indicated)—have targeted HCPs who

have prescribed Xolair or were in a position to prescribe Xolair. Further, all of these types of

kickbacks were frequently discussed by Defendants' sales managers and sales representatives,

which confirms their existence beyond the specific ones (many of them) that Relator distributed.

Also, these kickbacks normally had to be approved by management as sales and marketing

expenses, which further shows managerial knowledge of them.

257.    The myriad kickbacks that are provided by Defendants to boost Xolair sales are

clearly "over the top":

> I.      Free Cash Equivalents and Expensive Gifts
>
> > American Express traveler's checks (the equivalent of cash gifts):
>
> This has been perhaps the single-most egregious kickback provided by
> Defendants. There was no conceivable legitimate purpose for distributing
> American Express traveler's checks to HCPs, their nurses, and other staff.
> These are like cash, because they can be redeemed for cash or used to
> purchase items at virtually any retail store, restaurant, or other
> establishment that accepts them. They were distributed in amounts typically
> ranging from $50.00 to $500.00. These were used to ingratiate HCPs to the
> Xolair sales force and achieve access to doctors' offices. For example, if a
> pulmonologist office employee exhibited some openness to the idea of
> reaching out to his/her pulmonologist employer about allowing the sales
> representative to have access to patient files to identify patient candidates
> for Xolair, the sales representative might give that pulmonologist office
> employee and/or pulmonologist an American Express traveler's check as a
> "thank you." In short, they were used to "grease the wheels" and "open the
> door" to Xolair sales. Allison Kelly and Stephen Fauci (a Boston sales
> representative for Genentech) collectively distributed thousands of dollars
> of American Express traveler's checks—among the many others who did
> so across the United States.

> Expensive tickets to sports and entertainment events (e.g., tickets to New York Yankees and Boston Red Sox games):

What better way to boost sales of Xolair for an off-label use than by giving away expensive sports and entertainment tickets? New York Yankees, Boston Red Sox, other baseball, basketball, football, other sports and entertainment tickets are highly coveted—especially when they are high-quality seats worth several hundreds of dollars apiece, or more in some cases.

> High–value celebrity and sports memorabilia (including celebrity autographs):

These were also worth at least hundreds of dollars per item. Upon information and belief, football legend Joe Montana signed sports memorabilia that were distributed to some HCPs. Although Genentech announced in late 2006 that this type of gift would be restricted in the future, due to "compliance" concerns, Defendants frequently sent out memoranda indicating that their ethics and compliance departments cautioned against a sales practice, but the practices continued, with approval from upper management.

> Underwriting HCPs' "open houses" (payments for parties when doctors have opened new offices and sought to advertise their growth):

When a HCP opened a new office (e.g., a satellite office or a relocation), sales managers and sales representatives were encouraged to attempt to gain favor with that HCP—especially a HCP that was being for increased Xolair sales—by offering to pay for, and actually paying for, a party to celebrate the opening of the new office. The tab for food, drinks and decorations normally was in the range of $1,000.00 to $3,000.00.

> Payments for advertising (print advertisements and flyers) for HCPs who prescribe Xolair:

HCPs need to promote their practices, with all of the competition that exists in medicine in this country. To assist HCPs with this, Defendants frequently offered to pay for print advertisements and flyers that stated the physician's name, his address and other contact information, and the fact that he or she treated asthma or allergy patients and prescribed Xolair. This free advertising saved HCPs hundreds or thousands of dollars, and helped generate revenues for their practices. It also was a kickback that was well-designed to make HCPs feel obligated to prescribe Xolair: after all, the advertisements themselves mentioned Xolair. This kickback saved HCPs hundreds or thousands of dollars that normally would be part of overhead for HCP advertising.

> Opulent meals and expensive drinks for HCPs, nurses and other staff, with honoraria of $1,000.00 to $1,500.00 paid to speakers who frequently did not even speak about asthma, or made limited remarks:

This was one of the most common kickbacks distributed by Ms. Kelly. She would ask a HCP to speak about Xolair to fellow doctors at a fancy restaurant. The speaker would receive a check in the amount of $1,000.00 to $1,500.00 for making a small sales pitch for Xolair, plus a fancy meal and drinks. The speaker and/or Xolair salesperson would invite other physicians to attend and partake in the lavish meal. Sometimes Xolair never even was discussed by the speaker. Nonetheless, the speaker would receive excellent compensation and a delightful meal, with other attendees also getting a fine dining experience. Defendants overwhelmingly treated HCPs to meals and drinks at very fine, very expensive restaurants—to better ensure attendance.

> $500.00 to $1,000.00 payments to physicians for "preceptorships" (allowing sales representatives and/or managers to tag along for educational purposes, when asthma patients were being seen by the physicians):

Ms. Kelly believes that Novartis (but not Genentech) may have discontinued this kickback in 2006 or 2007. Defendants would ask HCPs to provide "clinical" preceptorships to Defendants' sales representatives, in which a sales representative, in theory, would spend a day with the HCP as an "educational experience", to learn more about the HCP's practice and perhaps asthma and/or allergy treatment, by viewing the HCP's interactions with actual patients. The HCP would receive an "honorarium"—normally $500.00 from Novartis and/or $1,000.00 from Genentech—from one of the Defendants. In actual practice, sales representative very rarely spent more than a couple of hours with the HCP for that $500.00, and patients were rarely advised that the visitor was a pharmaceutical sales representative. Many of these preceptorships amounted to payments to HCPs for a little bit of their time to hear the sales representative speak about Xolair. Not a bad deal for letting a sales representative sit in your office for half an hour to an hour.

> Other valuable items (if a HCP enjoyed a particular delicacy or hobby, sales representatives and/or managers could target that HCP with gifts of that delicacy or hobby (e.g., fine wines, cheeses, golf clothes or equipment)):

Defendants encouraged the Xolair sales force to "get on the good side" of HCPs to consummate Xolair sales. Sales representatives were routinely approved reimbursement for specific gifts to HCPs to accomplish this. Hence, "fine wines, cheeses, golf clothes or equipment" is hardly an exclusive list of the types of valuable items gifted to HCPs who could prescribe Xolair.

> Unrestricted grants to HCPs to allow HCPs to pay for a broad array of valuable items, including some of the above-described items:

Similar to the above, Defendants allowed for "unrestricted grants" to HCPs for a wide array of valuable items. The designation of the item as an "unrestricted grant" also served to conceal the nature of the kickback. For example, approval of and/or accounting for the gift as an "unrestricted grant" could make the gift appear as a payment for asthma consulting services.

> Patient Experience Program ("PEP") payments and co-payment waivers:

Under one of Defendants' PEP programs, Defendants would forgive the co-payments of patients who agreed to speak favorably about asthma treatment by Xolair. This helped ensure that the patients would continue with treatment by the HCP, because the expensive co-payments constituted a reason that the patient might discontinue taking Xolair. Under the other, related PEP program, patients were paid cash to speak favorably about Xolair. Many patient speakers were flown to Arizona, with all expenses paid, for Defendants to debrief these patients and study how to maximize their experiences for marketing purposes. However, it was frequently the sales representatives themselves who called in to Defendants or went online to register the "experience" with Defendants, in lieu of patients, creating false and unreliable data that was fed into the TENOR study.

Another purpose of the PEP was to stock the TENOR Study—a Novartis-Genentech sponsored "scientific study" on the quality-of-life scores of patients taking Xolair—with patients taking Xolair who, it was *already* determined, would state that they had had a positive experience with the drug. This removed the random, scientific nature that is expected of such a study. Xolair sales representatives received compensation, directly (e.g., a bonus), or indirectly (e.g., by a commendation by e-mail, praise in an annual review, certificate of recognition, etc., all of which may affect salary), for succeeding at convincing physicians to persuade Xolair patients to participate.

The existence and purpose of the PEP is reflected in part by an e-mail dated October 6, 2006 from Peter Streit, Product Manager, Xolair Brand Team, to the Xolair Sales Team, about "Weekly Pep Report – October 5th". The e-mail set forth: "Attached is this week's PEP Report. Remember the overall objective of the Patient Experience Program is: to change behavior of prescribers to allow a positive experience with Xolair!!!" (emphases in original) The behavior would be changed in two ways: First, by compelling physicians to locate patients with a positive experience with Xolair, the physicians would be reminded of the drug's positive effects on patient quality of life, and make the physicians more likely to prescribe more Xolair. Second, the patients' positive experiences would be "fed into" the TENOR Study, which would artificially raise the study's results

concerning the extent of patient satisfaction with Xolair. With publication of the TENOR Study's "results", the behavior of prescriber and non-prescribers would be influenced, because they would learn of positive patient experiences, as promoted by the "study". Mr. Streit continued by stating "HCP with one or more patients enrolled:  The goal for each territory should be 100%. This would mean that every enrolled physician in a territory has at least 1 patient enrolled!!."  In other words, the goal was, for each sales territory throughout the country, that each "enrolled physician", i.e., each Xolair-prescribing physician in each such territory that is participating in the program, should have at least one patient in the PEP.  In this way, at least one patient for each enrolled physician was expected to "go to bat" for Xolair. Mr. Streit's e-mail went on to recognize the top 5 performing territories in the last week (Omaha, Houston East, Austin, Las Vegas, and Denver South), to list "Key Metrics Achieved" (including a total of 806 patients enrolled nationwide in PEP), to note that "there were 10 additional physicians who enrolled patients since last week, bringing the total to 383 physicians with 1 patient enrolled", "106 physicians with 2 patients enrolled (+7 since last week's report!)", "29 physicians with 3 patients enrolled"; and "4 physicians with 5 patients enrolled (this is a key metric to allow for physicians to experience a "Wow" patient)". (emphases in original) Finally, Mr. Streit congratulated the "North Stars/Minneapolis" territory "who led the Nation for the 2nd week in a row, and commended other sales territories for enrollments, including Chesapeake/Baltimore, Metropolis/New York, Little Rock, Lubbock, West Palm Beach, and San Antonio. A two-page attachment to the e-mail showed the "40+ Club" and the "Double Digit Club".

> "Thought leaders" who prescribed Xolair and promoted the drug to other physicians, as well as one of the highest prescribers of Xolair in the country, were treated to the "President's Club" in the Bahamas (a reward of an opulent, all-expense paid trip to a Bahamas resort, which was normally only provided to the most successful sales representatives, sales managers, and select company executives):

This was an extremely lavish gift for Xolair's preeminent "thought leaders": Doctors who were already compensated handsomely for speaking, researching, and/or writing extensively about uses of Xolair, were treated to this Caribbean paradise because they had proven to be effective at influencing other HCPs to prescribe Xolair. That is why they were considered national-level thought leaders. A local-level "thought leader" could also be treated to the "President's Club" in the Bahamas, or treated to another lavish trip, if Defendants determined that he or she also was effective at influencing other HCPs to prescribe Xolair, on a local or regional level (e.g., in the Northeast). One HCP, Dr. Nori, attended the President's Club in the Bahamas, on behalf of sales representative Frances Estramera, to reward her for being a leading (or the leading) prescriber of Xolair nationally or in the Northeast.

> Gift certificates to opulent restaurants:

They were distributed in amounts normally ranging from $100.00 to $1,000.00, to ingratiate Defendants to HCPs and their staffs.

> Expensive pens, often engraved with HCPs' names:

At several national conferences concerning asthma, allergies, and/or Pulmonology, Defendants provided expensive pens to HCPs. An engraver was present to inscribe the doctor's name. These has a value of approximately $200.00 to $400.00.

> "Premium" gifts, including expensive medical books (e.g., sought-after anatomy books with color drawings):

This was yet another type of gift that Defendants gave to potential prescribers of Xolair. The anatomy books had a value of between $200.00 and $500.00.

> Speaker training events in which Defendants paid for the HCPs' travel expenses, hotel, meals, and drinks:

This is distinct from other travel junkets provided by Defendants. While Defendants would frequently pay for speakers and attendees to attend and hear presentations about Xolair and asthma treatment, at some of America's premier resorts and hotels, *this* was payment for the *speakers* at those events to be trained at resorts and hotels in preparation for those events. These speaker training events often had a value of $1,500.00 to $4,000.00.

> Opulent "roundtable" meals and expensive alcoholic drinks:

These were more informal get-togethers for HCPs, without any planned program about asthma, Xolair or reimbursement optimization. In short, they were meals and drinks paid for by Defendants, normally with one or two sales representatives in attendance to pay the tab.

> Speaker programs at resorts, country clubs and casinos, with lodging, meals and drinks paid for:

These events often had a value of $1,500.00 to $4,000.00. Although Defendants' compliance office announced in 200__ that speaker programs at country clubs and casinos were disfavored, they continued after 200_ to take place at resorts and hotels with golf and tennis facilities that Defendants paid for.

> Office parties for HCPs, their staffs, and guests (e.g., birthday parties, holiday parties, pi324a parties):

81

These events often had a value of $75.00 to $3,000.00, with the lower end being for pi324a parties in HCPs' offices and the higher end being for lavish holiday parties in restaurants.

> "Happy hours" at bars and restaurants for HCPs, their staffs, and guests:

These events often had a value of $100.00 to $1,000.00.

> Gourmet food and wine gift baskets:

These often had a value of $100.00 to $1,000.00, and like all the other kickbacks, were used to target Xolair prescribers and potential Xolair prescribers. Ms. Kelly distributed approximately 30 such gift baskets.

> Expensive bottles of wine:

These often had a value of $100.00 to $1,000.00. Ms. Kelly distributed approximately 10 of these.

> Bogus/fake studies led by physician "thought leaders", with payments by Defendants to the "thought leaders":

The TENOR study was Defendants' preeminent bogus study, on the quality of life of patients taking Xolair—with patients taking Xolair who, it was *already* determined, would state that they had had a positive experience with the drug. This removed the random, scientific nature that is expected of such a study. A purpose of the PEP was to stock the TENOR Study.

> Payments to "advisory ("ad") board" members—both physician ad boards and nurse ad boards—with the main purpose being payments to the physicians and nurses "serving on them", to ensure the prescribing of Xolair, as opposed to payments for advising Defendants about asthma and/or patients' experience with Xolair:

Physicians and nurses who were best situated to serve as "thought leaders" and high prescribers of Xolair were recruited to serve on these ad boards. Ad board members were paid consulting fees, as well as hotel, food and travel expenses.

II.    Free Medical & Office Equipment:  Defendants have provided a variety of expensive equipment to HCPs to induce them to administer Xolair because storing and mixing/reconstituting Xolair, testing for asthma, and tracking asthma patients are all expensive, time-consuming propositions for the many HCPs, who, in contrast, do not incur these major expenses in prescribing FDA-approved competitor drugs like Advair and Singulair.

> Swirlers/spinners (for mixing Xolair):

It was time-consuming for HCPs to mix Xolair before administering the drug. To save them time, Defendants provided them with free swirlers/spinners. Coupons for them were given to the HCPs, who could then go online, enter the promotional code, and other information, and the free swirler/spinner arrived within days—paid for by Defendants. These had a market value of approximately $460.00 in recent years. The specific type of swirler that HCPs can and do get, courtesy of Defendants, is the IKA (manufacturer's name) MS 450 Swirler. The coupons that were distributed to HCPs contained both Genentech and Novartis' name on them. They were redeemable at www.IKAusa.com.

> Pulmonary function machines (to test for asthma):

These were provided, free of charge, to HCPs, to save them money and make it easier for them to test pulmonary function values in deciding whether or not to prescribe Xolair.

> Refrigerators (to store Xolair):

Xolair had to be stored in a refrigerator in order to be kept cool. Competitors' asthma drugs did not require such expense/storage. So Defendants provided free mini-refrigerators to many HCPs to induce them to administer Xolair.

> IgE test kits (to test for asthma):

These were provided, free of charge, to HCPs, to save them money and make it easier for them to test for asthma.  These had a market value of approximately $140.00.

> Computers (to register and track asthma patients):

In the Midwest, including Chicago, and in some other sales territories, sales managers approved sales representatives' provision of free computers to HCPs, to register and track asthma patients. These had a market value of approximately $500.00 to $1,300.00.

> Wastage program (to ensure that HCPs would not be out of pocket for any vials of Xolair that were spilled, lost, or broken):

Defendants' Wastage Program, described above, is a prohibited kickback that was designed to induce physicians to order Xolair. Normally, when a HCP spills, loses, or breaks a vial of medicine, it must bear the expense of the mishap. The Wastage Program removed that risk, as an inducement. Such a financial guarantee is clearly a prohibited inducement.

Under the Wastage Program, the HCP could seek reimbursement from Genentech. Genentech distributed to HCPs a form called a "Xolair Wastage Replacement Request Form." To submit the request, the HCP or sales representative would fax the form to Genentech Customer Service at 650-225-8517. In the form, the HCP or sale representative was asked to fill out fields that included: (1) the sales representative's name; (2) phone number; (3) e-mail address; (4) fax number; (5) customer (HCP) name; (6) sales territory number; (7) customer (HCP) address; (8) customer (HCP) city and state; (9) customer (HCP) zip code; and (10) the reason for the wastage replacement request, including the quantity of Xolair that was wasted and whether the reason was that the Xolair was destroyed (dropped), that the Xolair was reconstituted but that the patient missed the appointment; that blood had been pulled pack into the syringe; that that the Xolair could not be administered to the patient due to exacerbation; or that an admixture error had occurred which made the solution unsuitable for use. The form also had a line for someone to sign and date indicated that the product being replaced had not been billed to a patient or a private or Government payer.

This program constituted an illegal kickback because it was an inducement for HCPs to buy Xolair, in violation of the AKS. Normally, if these types of errors occur, it is the HCP's financial loss, because Medicare, Medicaid, or private insurance would never reimburse the HCP under these circumstances. Here, however, Genentech put itself in the place of Government programs and ensured no out-of-pocket loss for the purchase price of the drug, which is a prohibited kickback.

III.     Free Services:  Defendants have provided a variety of free services to HCPs, which are normally overhead/expenses to be borne by the HCP, because of Defendants' deep concern that prospective prescribers of Xolair would not prescribe the drug because of the administrative hassles and expenses of doing so.

> Sales representatives and managers singled out asthma patients by sorting through HCPs' patient charts and HCP computer records:

> Sales representatives and managers filled out Statements of Medical Necessity ("SMNs") for HCPs and their staffs, obtained physicians' signatures, and sent them off to specialty pharmacies, health insurers, managed care organizations ("MCOs"), and/or Government Health Programs, to ensure that HCPs actually followed through and prescribed Xolair (SMNs are, effectively, prescriptions.):

> Sales representatives and managers filled out appeals letters for HCPs when health insurers, MCOs, and/or Government Health Programs denied approval for administration of Xolair:

> Defendants provided for delivery of Xolair to patients in their

homes, to reduce the costs to HCPs of administering Xolair, despite the fact that the FDA-approved indication for Xolair required administration of the drug in a medical office setting or hospital because of the serious risk of anaphylaxis and other serious side effects:

> Defendants provided coding and reimbursement assistance to HCPs— including the hiring of the LASH Group to provide such assistance (e.g., to advise HCPs to bill for patient levels 4-5 when patient levels 1-2 were proper, and to advise HCPs on CPT codes and ICD-9s to use, to ensure coverage and maximization of reimbursement:

This directive to HCPs is described below under its own subject heading.

258.    Defendants frequently hosted fancy dinners to instruct HCPs on how to maximize opportunities to profit from Government health programs.

259.    For example, on July 1, 2006 the Competitive Acquisition Program (CAP) for Medicare part B drugs and biologics commenced, some three years after it was established by the 2003 Medicare Modernization Act ("MMA").  To encourage physicians to participate, CMS identified a list of approximately 180 drugs that are available to participating physicians. Physicians were given two opportunities to enroll, May 8-June 2, 2006 and June 3-30, 2006. Under the CAP, participating doctors would no longer purchase particular Medicare Part B drugs under the "buy and bill" process.  Rather, they would order the drugs for their patients from BioScrip, the only CAP vendor until 2008.  Physician's offices would bill CMS for the administration of the drug. Thereafter, BioScrip, as the CAP vendor, would be responsible for shipping CAP drugs, billing CMS for the drug, and collecting the patient drug co-payment after administration.

260.    Novartis and Genentech created and carried out their own promotion of CAP, to boost sales of Xolair. Defendants targeted pulmonologists, allergists, internists, and general practitioners who were high prescribers of Xolair, or potentially high prescribers of Xolair.

261.    Defendants did not wait for HCPs to inquire about the CAP.  Defendants initiated the dialogue, to promote sales of Xolair. Promotional efforts included company-sponsored dinners across the country, and other marketing outreaches.

262.    For example, on October 24, 2006, beginning at 7:30 p.m., Novartis treated HCPs to a fancy meal and drinks at Bambara restaurant at 202 South Main Street, in Salt Lake City, Utah 84101.  The invitation, which was printed by Novartis, stated "Please join your fellow colleagues at CHEST for dinner.  Nick Opalich, Managing Partner, Strategica Health Partners, LLC on behalf of Bioscrip will be presenting on: CAP-Competitive Acquisition Program for Medicare". Prospective attendees were asked to RSVP to Jerry Covell with Novartis.  The purpose of this meal was to ingratiate HCPs while educating them on how to maximize billing Medicare.

263.    Similarly, on November 14, 2006, beginning at 7:30 p.m., Novartis treated physicians to a fancy meal and drinks at Brasserie Perrier at 1619 Walnut Street, Philadelphia, PA.  The invitation, which was printed by Novartis, stated that "BIOSCRIP (CAP vendor, VP of Operations, Russ Corvese will be presenting on: CAP-Competitive Acquisition Program for Medicare", and specified that the restaurant was a "First rate American Brasserie—modern French cuisine with Italian and Asian influence".  Prospective attendees were asked to RSVP to Lynn Tommelleo or Jerry Covell with Novartis. The purpose of this meal was to ingratiate HCPs while educating them on how to maximize billing Medicare.

264.    Besides the nationwide dinner presentations, Defendants' sales push for Xolair under its own CAP is illustrated by the October 2, 2006 e-mail from Peter Streit, Xolair Brand Team Product Manager, to the Xolair sales force about "SPOC and Medicare CAP".  It states: "Xolair Sales Team, Please see attached JPRT- approved PDF regarding Medicare CAP and SPOC.  Contact your BRM or Area Sales Manager if you have questions."  The attached

memorandum dated August 2006 and attached "FAQs and Key Messages on CAP" (messages for the sales force to publicize to HCPS), stated, in part, that "[t]his information is for your background use only and should not be proactively discussed with customers. If asked an unsolicited question concerning CAP, you may inform the customer of the general status of the program and refer them to BioScrip or CMS resources."

265. However, Defendants' dinner invitations and other acts of outreach to HCPs about CAP show that Defendants were actually soliciting HCPs' participation in CAP to boost Xolair sales. Defendants created venues for presentations about CAP and invited physicians to attend, but feigned a lack of solicitation, in writing, by coyly stating in the memorandum that sales representatives may merely respond to independent inquiries by HCPs. The memorandum and FAQs instructed the Xolair sales force to promote the fact that: "The CAP primarily affects physicians. CAP physicians no longer obtain CAP drugs via the buy-and-bill process; instead they will order these drugs through the CAP vendor. As such, CAP physicians will not be liable for any un-reimbursed drug costs or uncollected coinsurance." "FAQs and Key Messages on CAP", at 2. This message was created to assist the Xolair sales force in overcoming a frequent obstacle to Xolair sales: that physicians were wary of off-label prescribing Xolair because of low profit margins, un-reimbursed drug costs, and uncollected coinsurance. The "FAQs and Key Messages on CAP" also stated that "[b]ased upon the strict conflict of interest provisions, SPOC will not offer services to the CAP vendor but in some instances SPOC may offer assistance to the CAP participating physician and/or their patients." Id. at 3.

266. In September 2006, Gerald Covelle, a Novartis Business Accounts Manager, authored an e-mail and New York City Update slide presentation which, in part, reflects the objectives of the program. It shows that, in that sales territory, three specific doctors were targeted

in 2006 for CAP, and four doctors in 2007. It stated that re-enrollment of current enrolled practices was also an objective.

267.   Further, the slide presentation also reflects the companies' efforts to maximize billing of Medicaid patients. It states that, in New York, it is a "situation" that "[p]hysicians are required to buy and bill for Fee for Service Medicaid", "HOPDs only get reimbursed" the low amount of "$67.50", and "[m]anaged Medicaid Plans (most) follow Fee for Service Medicaid and require physicians to buy and bill." See page 6. Mr. Covell emphasized the "New York Medicaid Opportunity" for sales by stating that "73% of NY Medicaid are enrolled in a Managed Medicaid plan". See page 7. The slide presentation also listed sixteen (16) "Major Managed/Medicare/Medicaid Care Payors", which shows many of the largest purchasers of Xolair, i.e., that were reimbursed by Medicare and/or Medicaid, including Medicare and/or Medicaid themselves, many managed care organizations ("MCOs"), other private health insurers, and some supplemental health insurers. See page 8. New York Medicaid purchasers were highlighted on page 9. The slide presentation also reflects Defendant's marketing push to "Get Managed Medicaid Plans to allow a SP [specialty pharmacy] to supply Xolair and bill instead of the physicians having to buy and bill", to achieve "Pull Through", and to target 340B hospitals. See page 10. Finally, this slide presentation also reflects the fact that physician roundtables were a focal point for boosting sales, and that there were to be "Office Managers Night Out (Best Practice Discussions)". See page 13. This slide presentation exemplifies Defendants' use of the terms "pull through" and "best practices", which were "code", or euphemisms, for implementation of many of the aggressive, illegal activities highlighted by this lawsuit. In the context of this slide presentation, for example, the "pull through" refers to the implementation by the Xolair sales force of aggressive practices to maximize the actualization of Xolair purchases by nudging HCPs to utilize specialty pharmacies. The "best practice" of "Office Managers Night

Out" refers to the fact that Defendants paid for HCPs' office manager dinners and happy hours to attempt to nudge them to prescribe Xolair off label and in general, maximize reimbursement from Medicare and Medicaid, etc. At such events, there was often little talk of business. Later, however, after treating office managers to such events, medical offices would be more open to Defendants' Xolair sales push. A second attached slide presentation, dated October 19, 2006, addressed maximization of billing the new Medicare Part D Program which started on January 1, 2006.

268. Defendants' kickbacks have been flagrant violations of the AKS. These inducements are exactly what the AKS was designed to prevent.

269. Many of Defendants' free services to HCPs involved violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936, insofar as the HCPs' patients did not give informed consent to allow Defendants to access their private health records for Defendants' purposes.

## STATEMENTS OF MEDICAL NECESSITY ("SMNs")

270. Defendants engaged in a national campaign of encouraging, aiding, abetting, and causing HCPs and others to falsely represent facts on SMNs for Xolair.

271. Much of this information is already set forth above.

272. In order to receive reimbursement from a Government Healthcare Program for a prescription of Xolair, a physician must complete a Statement of Medical Necessity ("SMN"), indicating, *inter alia*, the patient's condition, that the condition falls within the approved use of the drug, the dosage prescribed, etc., and submit a claim form such as a CMS Form 1450 or 1500 in which the doctor, *inter alia*, certifies that the treatment is medically indicated and covered.

273.    Many Novartis and Genentech representatives throughout the country fill out the SMNs themselves, using patient information obtained improperly including from patient medical records (in violation of the Health Insurance Portability and Accountability Act of 1996), in order to facilitate the transaction for the physicians and increase sales.

274.    In the process, information is often manipulated on the SMN forms. For example, many representatives check off maximum dosing to ensure more vials are used to establish greater sales, many check off that the patient has a perennial allergy when he or she does not, and many state that the patient has had one of the requisite tests (e.g., rast or skin) and qualify, when they have and do not.

275.    The majority of patients taking Xolair do not in fact fall within the 30-700 IgE level (as required by the approved label); however, this critical fact is *routinely* omitted or misrepresented on the SMN forms filled out by the company sales representatives. Having the sales representatives fill out the SMN forms, often with inaccurate and misleading information, substantially distorts the reimbursement process–by making it appear that the prescription falls within the bounds of the approved and covered/eligible use, when it does not.

276.    In addition, sales representatives often encourage physicians that if the patient falls off or outside the dosing chart because they are above the 700 IgE level, the doctor should just prescribe the maximum dosage. This has the effect of boosting sales, but also compromises patient safety. Relators estimate that 75%-95% of all patients on Xolair in fact fall outside the

approved 700 IgE range. Relator also has specific knowledge of improper targeting of pediatric clinics to promote use of Xolair by pediatric allergists. (Pediatric use—i.e., under 12 years of age—of Xolair is unapproved.) Sales representatives would then inaccurately fill out the SMN form to disguise the fact that the patient was under the age (12) of approved use of the drug. Sales representatives routinely also discuss billing and coding and disseminate information on the same, all in an effort to ensure that the patient claim will be reimbursed regardless of whether the patient is eligible or the drug is covered for that patient.

277.    Xolair sales representatives' highly intimate involvement in patient health records and troubleshooting of HCPs' Medicare, Medicaid, and other insurers' payment/reimbursement issues is reflected not only by SMNs, but also by a form that Defendants, as a matter of routine policy and procedure, distributes to the Xolair sales force for their use. This form is called the "Xolair Issues Resolution Form".

278.    The "Xolair Issues Resolution Form" had fields that Xolair sales personnel and others completed, identifying the applicable Xolair sales representative, sales manager, physician, physician contact information, the applicable specialty pharmacy ("SP"), the payer (e.g., Medicare, Medicaid, MCO, etc.) and its contact information, patient initials and patient's employer, details concerning the SMN, a brief description of the issue, and a brief description of the steps needed to resolve the issue.  It is important to recognize that the issue was normally a Xolair payment or reimbursement issue.

279.    The completed forms are to be e-mailed to Defendants' local account managers who are "point people" with the SPs.  A box in the form is to be checked to answer, "Is this a national issue that should immediately be communicated to the Hot Spots Team?" That helped Defendant track barriers to their off-label sales objectives and kickback schemes.

## UPCODING FOR ADMINISTRATION OF XOLAIR

280.    Defendants have engaged in a national campaign to illegally and misleadingly instructing HCPs to upcode for the administration of Xolair.

281.    Defendants instructed and nudged them, through incorrect and misleading information—provided by Defendants themselves and through independent contractor the LASH Group—to submit claims for reimbursement for the administration of Xolair at improper rates: by advising HCPs to bill for patient levels 4-5 when patient levels 1-2 were proper, and by advising HCPs to use improper Current Procedural Terminology ("CPT") and Diagnosis Codes ("ICD-9s"), to ensure coverage, and reimbursement at higher rates.

282.    For example, the 2005 Medicare reimbursement codes and rates for Evaluation and Management ("E & M"/office visits) were:

Level 1 (99211)    $21.60

Level 2 (99212)    $38.66

Level 3 (99213)    $52.68

Level 4 (99214)    $82.62

Level 5 (99215)    $120.14

283.    Hence, the overbilling that Defendants promoted and caused, was very significant.

284.    Defendants also utilized the LASH Group to promote this overbilling.

285.    Since Xolair was launched in 2003, until *at least* July 10, 2006, Defendants assiduously and specifically instructed HCPs throughout the country, orally and in writing, to use improper CPT codes, especially CPT code 96401, to seek Government Healthcare Program reimbursement for the administration of Xolair.

286.     CPT code 96401 is for infusion therapy, and is used by oncologists to bill for the administration of cancer drugs. It is not to be used for reimbursement of administration of a subcutaneous injection of an asthma medication.

287.     CPT code 96401 is to be used for "chemotherapy administration; subcutaneous or intramuscular nonhormonal antineoplastic [formerly code G-0355]".

288.     Even after the American Medical Association and JCAHO specifically stated that CPT code 96401 was improper, Defendants continued to market to Xolair purchasers and prospective purchasers, to use CPT code 96401 (which triggered reimbursement for between $40.00 and $60.00) instead of CPT code 90772, which was proper and allowed for much lower reimbursement (only about $12.00).

289.     Defendants also improperly instructed HCPs to use other CPT codes for Xolair administration, including 95115, 95117, and 95199, which were for inapplicable allergen immunotherapy.

290.     As noted above, in September 2006, Gerald Covelle, a Novartis Business Accounts Manager, authored an e-mail and New York City Update slide presentation. These items also reflect Defendants' marketing to physicians of use of specific CPT codes for administration of Xolair. It states: "96401 UPDATE  Followed up with targeted accounts to address concerns regarding the 96401 change. Many practices are now utilizing 90772. Others will utilize 96401 until CPT 2007 is published." See page 5. This e-mail appears to reflect a change in course by Defendants, away from telling HCPs to use CPT code 96401.

291.     Defendants, independently and through the LASH Group, also specifically instructed and nudged HCPs to bill for patient billing levels 4-5 when patient levels 1-2 were proper for the administration of Xolair.

292.    Level 4 or 5 is used for a "complex" administration of a drug or other medical service. It may be appropriate when an asthma patient is first seen by a physician, evaluated for asthma, and administered Xolair. However, in subsequent office visits for Xolair administration, frequently overseen by a nurse, without evaluation of asthma history and other factors, levels 4 and 5 are not proper. However, recognizing the challenge that Defendants faced in selling Xolair, Defendants engaged in a direct campaign to advise and convince HCPs that it was okay to bill for such a high-level visit, at a higher reimbursement rate.

### DEFENDANTS DIRECT THEIR SALES FORCES TO COMPENSATE FOR XOLAIR'S MEDICAL RISKS AND LIMITED INDICATION IN THEIR SALES PRESENTATIONS BY OFFERING SIGNIFICANT DISCOUNTS TO HOSPITALS QUALIFYING FOR DISPROPORTIONATE SHARE HOSPITAL ("DSH") BENEFITS, AND BY "MARKETING THE SPREAD" IN GENERAL.

293.    Section 602 of the Veterans' Health Care Act of 1992, 42 U.S.C., § 340B(a)(4) ("§ 340B") requires drug manufacturers to provide outpatient drugs to covered entities including Disproportionate Share Hospitals ("DSH") at a reduced price.

294.    Defendants' sales representatives were directed by Defendants' management to "market the spread" between standard pricing and the discounts that they are permitted to offer to DSH hospitals pursuant to § 340B.

295.    In February 2004, shortly after the end of the 2003 year, Defendants encouraged their sales representatives in the New York area, including Relator, to target doctors at 340B clinics and DSH and VA hospitals to encourage them to utilize their federal funding for Xolair (see paragraph 11 above). Relator attended at meetings and privy to other discussions where managers instructed and encouraged this targeting, while at the same time stating that the practice was "illegal". This business strategy then spread across other regions of the companies.

296.     Relator and Mr. Garcia attended a meeting in New York City in early March 2004, attended by the sales representatives for Xolair from the entire Northeast region, and Norbert Stone, a Novartis Regional Director, Bill Stewart, Novartis' Manager of the New York Division of Xolair, Jerry Kelly of Genentech (Relator Garcia's immediate boss), and Pilar Carbone, a Novartis hospital sales representative. They and other sales representatives were briefed on the targeted hospitals and told that the plan was an opportunity for the region to "get up there with the rest of the country" on Xolair sales because these hospitals treat a lot of asthmatics. However, Jerry Kelly and Bill Stewart both also told the attendees that what was being proposed was "illegal" and that they should not discuss it.

297.     Defendants' sales representatives were also directed by Defendants' management to "market the spread" in general to HCPs (not just to DSHs)—the difference between the acquisition price of Xolair and the reimbursement rates provided by Medicare, Medicaid, and other government health programs. Following Defendants' instructions, the Xolair sales force routinely advised HCPs of the profits they could achieve by "buying and billing" Xolair, as opposed to allowing patients to purchase the drugs directly from pharmacies.

## DEFENDANTS HAVE CAUSED THE MASS SUBMISSION OF FALSE CLAIMS AND RECORDS

298.     Defendants have embarked upon this course of unlawful conduct knowing it would lead directly to the submission of myriad false claims for Xolair, and related physician services, by government health program-participating HCPs, when by law these claims were not reimbursable and would not have been reimbursed by Government Health Care Programs had the truth about Defendants' illegal marketing practices been known.

299.    Hence, the participation of doctors, hospitals, and pharmacists in the submission of the false claims was not only foreseeable; it was an intended consequence of Defendants' schemes.

300.    When pharmaceutical companies misbrand drugs, encourage off-label uses for their drugs, and provide kickbacks for purchasing their drugs, the number of prescriptions rises, thereby causing Government Health Care Programs to pay out more for prescriptions that are not eligible for payment. Defendants intended for their schemes to improperly increase the submissions of Xolair prescriptions, including such prescriptions reimbursed by the Government Health Care Programs.

### STAUTORY SCHEMES, PROVIDER AGREEMENTS, AND HOSPITAL COST REPORTS

301.    Defendants' off-label marketing practices, kickbacks, and other wrongful conduct knowingly caused doctors, hospitals and pharmacists to file false reimbursement requests and cost reports with Government health programs, in violation of statutory schemes, provider agreements, and hospital cost reports.

302.    CMS issues standardized, form provider agreements and hospital cost reports that health care providers are required to utilize. All of the providers that Defendants marketed to, and provided kickbacks to, utilized these standardized, form provider agreements and hospital cost reports. All of the providers specifically named in this Complaint utilized them.

303.    In order to be eligible for Medicare reimbursement, both hospitals and doctors are required to sign a Provider Agreement which states: "I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]....I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the AKS and Stark

law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

304.    Hospitals, but not physicians, are also required to submit a Hospital Cost Report with their submissions of requests for claims reimbursement. It states: "Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report [were] provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

305.    The person signing the Hospital Cost Report must certify: "To the best of my knowledge and belief, [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

306.    These statutory schemes, provider agreements, and hospital cost reports make clear that AKS compliance, and compliance with other federal health care laws, are a precondition of Medicare and Medicaid payment. They make no exceptions for violations caused by third parties like Defendants.

307.    Further, it is established law that a non-submitting entity may be liable under the FCA for knowingly causing a submitting entity to submit a false or fraudulent claim, and such liability is not conditioned on whether the submitting entity knew or should have known about a non-submitting entity's unlawful conduct. See, e.g., U.S. ex rel. Marcus v. Hess, 317 U.S. 537,

544-45, 63 S.Ct. 379, 87 L.Ed. 443 (1943); U.S.v. Bornstein, 423 U.S. 303, 309-13, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

308.    Defendants' kickbacks, misbranding, and off-label marketing also caused HCPs' non-compliance with applicable state health care statutes.

309.    For example, claims for Medicaid payment in Illinois "may be withheld...upon receipt by the Department [of Healthcare and Family Services] of evidence" of "fraud or willful misrepresentation under the Illinois Medical Assistance Program." Ill. Admin. Code tit. 89, § 140.44(a). Under Ill. Admin. Code tit. 89, § 140.35, titled "False Reporting and Other Fraudulent Activities," medical providers are subject to the requirements of both the federal AKS, which "prohibits kickbacks, false reporting and other fraudulent activities," id., § 140.35(b) (emphasis added), and the Illinois AKS, "pertaining to penalties for vendor fraud and kickbacks," id., § 140.35(a) (emphasis added). The Illinois AKS also extends liability to any entity that "willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme or device...obtains or attempts to obtain benefits or payments under this Code to which [it] is not entitled, or in a greater amount than that to which [it] is entitled." 305 Ill. Comp. Stat. 5/8A-3(a) (emphasis added).

310.    Similarly, under a portion of the Indiana Medicaid statute, Indiana Code §§ 12-15-1 to 12-15-44, if the state's Medicaid office "determines that a provider has violated a Medicaid statute or rule adopted under a Medicaid statute, the office may" deny "payment to the provider for Medicaid services provided during a specified time," id. § 12-15-24-1. Another portion of the statute provides that a person who "furnishes items or services to an individual for which payment is or may be made under this chapter and who solicits, offers, or receives a kickback in connection with the furnishing of the items or services or the making or receipt of

the payment" commits a misdemeanor. Id., § 12-15-22-2. The state's regulations also make clear

that the state's Medicaid office "may deny payment" of claims "arising out of...acts or practices"

including (1) "Engaging in a course or conduct or performing an act deemed by the office to be

improper or abusive of the Medicaid program," 405 Ind. Admin. Code § 1-1-4(a)(6)(E), and (2)

"Violating any provisions of state or federal Medicaid law or any rule or regulation promulgated

pursuant thereto," id., § 1-1-4(a)(6)(H).

311. Similarly, the Massachusetts Medicaid program "may withhold payments to a

provider...if [it] believes that the provider has received any overpayments or committed any

violations." 130 Mass. Code Regs. 450.249(B). Massachusetts law governing "Medical

Assistance" provides:

> Whoever solicits or receives any remuneration, including any bribe or rebate,
> directly or indirectly, overtly or covertly, in cash or in kind in return for
> purchasing, leasing, ordering or arranging for or recommending purchasing,
> leasing, or ordering any good, facility, service, or item for which payment may be
> made in whole or in part under this chapter, or whoever offers or pays any
> remuneration, including any bribe or rebate, directly or indirectly, overtly or
> covertly, in cash or in kind to induce such person to purchase, lease, order, or
> arrange for or recommend purchasing, leasing, or ordering any good, facility,
> service, or item for which payment may be made in whole or in part under this
> chapter shall be punished....

Mass. Gen. Laws, ch. 118E, § 41.

312. Violations are punishable by "a fine of not more than ten thousand dollars,"

and/or "imprisonment in the state prison for not more than five years or in a jail or house of

correction for not more than two and one-half years."

313. Similarly, the New York Medicaid program provides that an "overpayment

includes any amount not authorized to be paid under the medical assistance program, whether

paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable

practices, fraud, abuse or mistake." N.Y. Comp. Codes R. & Regs. tit. 18, § 518.1(c). The

regime defines "unacceptable practice", to include "[b]ribes and kickbacks", id., § 515.2(b)(5),

and lists within this category both "soliciting or receiving", id., § 515.2(b)(5)(ii), and "offering

or paying", id., § 515.2(b)(5)(iv), "either directly or indirectly any payment (including any

kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for

purchasing, leasing, ordering or recommending any medical care, services or supplies for which

payment is claimed under the program", id., §§ 515.2(b)(5)(ii), (iv). New York's anti-kickback

statute forbids kickbacks in similar terms. *See* N.Y. Soc. Serv. Law §§ 366-d, -f.

     314.    Similarly, the California Medicaid program may withhold payment when it

receives evidence "of fraud or willful misrepresentation by a provider as defined in Section

14043.1." Cal. Welf. & Inst. Code § 14107(a)(2). Section 14043.1 defines "fraud" as

"intentional deception or misrepresentation made by a person with the knowledge that the

deception could result in some unauthorized benefit to herself or herself or some other person. It

includes any act that constitutes fraud under applicable federal or state law." Id., § 14043.1(I).

California also has a regulation that lists fraud as grounds for suspension from California's

Medicaid program. See id., § 14123.  Under California's provider agreement, which providers

must sign to participate in the state's Medicaid program, the first page requires that providers

agree "to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and

Institutions Code." Chapter 7 of the code includes California's AKS, which applies to:

> Any person who solicits or receives any remuneration, including, but not
> restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or
> covertly, in cash or in valuable consideration of any kind . . . in return for the
> purchasing, leasing, ordering, or arranging for or recommending the purchasing,
> leasing, or ordering of any goods, facility, service or merchandise for which
> payment may be made, in whole or in part, under this chapter or Chapter 8.

> Cal. Welf. & Inst. Code § 14,107.2(a).

315.    Similarly, under New Mexico's provider agreement, which providers must sign in order to participate in that state's Medicaid program, Article VIII, entitled "Imposition of Sanctions for Fraud or Misconduct", states:

> If the provider obtains an excess payment or benefit willfully, by means of false statement, representation, concealment of any material fact, or other fraudulent scheme or devise with intent to defraud, criminal sentences and fines and/or civil monetary penalties shall be imposed pursuant to, but not limited to, the Medicaid Fraud Act, NMSA 1978, §§ 30-44-1 et seq., 42 U.S.C. § 1320a- 7b, and 42 C.F.R. § 455.23.

316.    The misrepresentations in the provider agreements and hospital cost reports, and the noncompliance with federal and state health care laws,  are material because they had a natural tendency to influence, or were capable of influencing, the decisions of the decisionmaking bodies to which they were addressed (CMS). Indeed, the express contractual language is dispositive of materiality.

### ADDITIONAL DETAILS ABOUT XOLAIR FALSE CLAIMS

317.    At all relevant times herein, reimbursement specialists employed by Defendants, the Lash Group, a consulting group hired by Defendants, coached and provided comprehensive instructions to HCPs, at Defendants' direction, on how to maximize reimbursement from Medicare and Medicaid for administration of Xolair.

318.    Defendants' reimbursement specialists, and those employed by LASH group, provided telephone support to Defendants' Xolair buyers to facilitate the presentment of false claims to Medicare and Medicaid by Defendants' accounts.

319.    Defendants intended that, as a direct result of the instruction and support on off-label billing provided by their reimbursement specialists to Accounts, that these Accounts would make false or fraudulent claims to Medicare and Medicaid for off-label use of Xolair.

320.    As a direct result of the work by Defendants' and Lash Group's reimbursement specialists, HCPs presented false or fraudulent claims for Government Health Program Medicaid reimbursement of off-label claims for Xolair.

321.    At all relevant times herein, from 2003 forward, there have been open discussions at meetings of sales representatives and management about the fact that the vast majority of patients on Xolair do not, in fact, meet the approved indications and eligibility criteria.

322.    Novartis and Genentech hired and paid a large sales force to drive sales of Xolair. On August 25, 2006, Mr. Clark sent an e-mail to the Xolair sales force which forwarded a roster of a total of approximately 140 Xolair sales personnel from both companies [attached hereto and incorporated herein by reference as **Exhibit "A"**].

323.    However, the total sales force was larger than that. Another sales force roster shows almost 200 sales managers and representatives companies [attached hereto and incorporated herein by reference as **Exhibit "B"**].

324.    Relator possesses a list of HCPs that purchased Xolair for the week ending July 7, 2006. It also shows year-to-date and rolling 12-month totals [attached hereto and incorporated herein by reference as **Exhibit "C"**]. This reflects a fraction of the total number of Xolair buyers and purchasers from 2003 to the present.

## COUNTS

*For all Counts appearing below, **"Defendants"** means *all* Defendants.

## COUNT ONE:

## VIOLATIONS OF THE FEDERAL FCA: 31 U.S.C. § 3729(a)(1) and (2)

325.     Relator restates and realleges  the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

326.     Defendants knowingly presented or caused to be presented false or fraudulent claims to Federal Health Care Programs and knowingly made, used or caused to be made or used, false records or statements to get said claims paid by Federal Health Care Programs. Xolair prescriptions for off-label purposes and for ineligible patients would not have been presented but for the unlawful promotional activities made by Defendants, the improper manipulation of SMNs, and the kickback activity. As a result of this illegal activity, these claims were improper in whole pursuant to 31 U.S.C. § 3729(a)(1)-(2).

327.     These claims were also false or fraudulent and the statements and records were false because they were monetarily excessive, in violation of 31 U.S.C. § 3729(a)(1)-(2).

328.     It is illegal to pass the costs of unlawful promotional activities back to any Federal Health Care Program and it is also illegal to falsely report the true cost of a drug. In addition to violating 31 U.S.C. § 3729(a)(1)-(2), Defendants' conduct violated 31 U.S.C. § 3729(a)(7) as alleged below.

329.     Federal Health Care Programs have been damaged and suffered losses because of the illegal actions by Defendants.

## COUNT TWO:

### CONSPIRACY TO DEFRAUD: FEDERAL FCA, 31 U.S.C. § 3729(a)(3)

330.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

331.     Defendants knowingly conspired to defraud the United States causing increased sales of Xolair through unlawful promotion and other unlawful activities in violation of law. Said actions constitute violations of 31 U.S.C. § 3729(a)(3).

332.     Defendants knowingly conspired to violate the FCA by causing false or fraudulent claims to be presented and to make or use false records or statements to get such claims reimbursed, all of which damaged the Federal Health Care Programs. Said claims were improper and would not have been made but for the unlawful promotional activities, which caused the prescriptions of Xolair to be made. Said claims were also monetarily excessive in cost due to the unlawful promotional activities of the Defendants. Said actions constitute violations of 31 U.S.C. § 3729(a)(3).

333.     The Defendants knowingly conspired to conceal their actions and they failed to alert the state or federal governments of their unlawful promotion of Xolair. It is illegal to pass the costs incurred in unlawful promotional activities back to any Federal Health Care Program and it is also illegal to falsely report the true cost of a drug. Said actions constitute violations of 31 U.S.C. § 3729(a)(3). Federal Health Care Programs have been damaged and suffered losses because of the illegal actions by Defendants.

## COUNT THREE:

### VIOLATIONS OF THE FEDERAL FCA: 31 U.S.C. § 3729(a)(7)

334.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

335.     The Federal FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid

or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law. Claims to Government Health Care Programs as described above were false or fraudulent and the statements and records were false because they were monetarily excessive.

336.    Defendants' conduct violated 31 U.S.C. § 3729(a)(7), and caused harm and damage to Government Health Care Programs.

## COUNT FOUR:

## VIOLATIONS OF THE CALIFORNIA FCA

### Cal. Gov't Code § 12651(a)(1)

337.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

338.    The California False Claims Act, Cal. Gov't Code § 12651(a)(1), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the state .   . . for three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state .
. . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(1) Knowingly presents or causes to be presented to an officer or employee of the state . . . a false claim for payment or approval.

339.    Defendants knowingly presented or caused to be presented to the California Medicaid program false and fraudulent claims for payment and approval, claims which failed to

disclose the material violations of the AKA and other laws, in violation of Cal. Gov't Code §
12651(a)(1).

340.    The State of California paid said claims and has sustained damages because of
these acts by the Defendants.

## COUNT FIVE:

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(2)

341.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above
as if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

342.    The California False Claims Act, Cal. Gov't Code § 12651(a)(2), specifically
provides:

(a) Any person who commits any of the following acts shall be liable to the state . . . for

three times the amount of damages which the state . . . sustains because of the act of that

person. A person who commits any of the following acts shall also be liable to the

state… for the costs of a civil action brought to recover any of those penalties or

damages, and may be liable to the state . . . for a civil penalty of up to ten thousand

($10,000) for each false claim:

 (2) Knowingly makes, uses, or causes to be made or used a false record or statement to

get a false claim paid or approved by the state . . . .

343.    Defendants knowingly made, used and/or caused to be made or used false records
and statements to get false and fraudulent claims paid and approved by the California Medicaid
program, in violation of Cal. Gov't Code § 12651(a)(2).

344.    The State of California paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT SIX:

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(3)

345.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

346.    The California False Claims Act, Cal. Gov't Code § 12651(a)(3), specifically provides:

"Any person who commits any of the following acts shall be liable to the state . . . for three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

...Conspires to defraud the state . . . by getting a false claim allowed or paid by the state . . ."

347.    Defendants conspired to defraud the State of California by getting false and fraudulent claims allowed and paid, in violation of Cal. Gov't Code § 12651(a)(3).

348.    The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVEN:

### VIOLATIONS OF THE CALIFORNIA FCA
### Cal. Gov't Code § 12651(a)(7)

349.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

350.    The California False Claims Act, Cal. Gov't Code § 12651(a)(7), specifically provides:

(a) Any person who commits any of the following acts shall be liable to the state . . . for three times the amount of damages which the state . . . sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state . . . for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state . . . for a civil penalty of up to ten thousand ($10,000) for each false claim:

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state . . . .

351.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Cal. Gov't Code § 12651(a)(7).

352.    The State of California paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHT:

### VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
### C.R.S. §25.5-4-305(1)(a)

353.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

354. The Colorado Medicaid False Claims Act, C.R.S. §25.5-4-303.5 *et seq.*

specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval ."

355. Defendants knowingly presented or caused to be presented to the Colorado Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of C.R.S. §25.5-4-305(1)(a).

356. The State of Colorado paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINE:

## VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
## C.R.S. §25.5-4-305(1)(b)

357. Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

358. The Colorado Medicaid False Claims Act, C.R.S. §25.5-4-303.5 *et seq.*

specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

359. Defendants knowingly made, used and caused to be made and used, false records

109

and statements to get false and fraudulent claims paid and approved by an agency of the State of Colorado, in violation of C.R.S. §25.5-4-305(1)(b).

360.    The State of Colorado paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TEN:

## VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
## C.R.S. §25.5-4-305(1)(g)

361.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

362.    The Colorado Medicaid False Claims Act, C.R.S. §25.5-4-303.5 *et seq.* specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Conspires to commit a violation of [the Colorado Medicaid False Claims Act]."

363.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of C.R.S. §25.5-4-305(1)(g).

364.    The State of Colorado paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ELEVEN:

## VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
## C.R.S. §25.5-4-305(1)(f)

365.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

366. The Colorado Medicaid False Claims Act, C.R.S. §25.5-4-303.5 *et seq.* specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act.""

367. Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of C.R.S. §25.5-4-305(1)(f).

368. The State of Colorado paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWELVE:

### VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT
### Conn. Sec. 17b-301b(a)(1)

369. Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

370. The Connecticut False Claims Act, Conn. Sec. 17b-301a *et seq.*, specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five

thousand dollars and not more than ten thousand dollars. plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Knowingly present[s], or cause[s] to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services."

371.    Defendants knowingly presented or caused to be presented to the Connecticut Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Conn. Sec. 17b-301b(a)(1).

372.    The State of Connecticut paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTEEN:

### VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT
Conn. Sec. 17b-301b(a)(2)

373.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

374.    The Connecticut False Claims Act, Conn. Sec. 17b-301a *et seq.*, specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars. plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Knowingly make[s], use[s] or cause[s] to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services."

375.     Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Connecticut, in violation of Conn. Sec. 17b-301b(a)(2).

376.     The State of Connecticut paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FOURTEEN:

## VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT
Conn. Sec. 17b-301b(a)(3)

377.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

378.     The Connecticut False Claims Act, Conn. Sec. 17b-301a *et seq.*, specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Conspire[s] to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services."

379.     Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Conn. Sec. 17b-301b(a)(3).

380.     The State of Connecticut paid said claims and has sustained damages because of these acts by the Defendants.

113

## COUNT FIFTEEN:

### VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT
### Conn. Sec. 17b-301b(a)(7)

381.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

382.    The Connecticut False Claims Act, Conn. Sec. 17b-301a *et seq.*, specifically provides, in part, that any person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages that the state sustains because of the act of that person if the person:

"Knowingly make[s], use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services."

383.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Conn. Sec. 17b-301b(a)(7).

384.    The State of Connecticut paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIXTEEN:

### VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(1)

385.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

114

386. The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §

1201(a)(1), specifically provides, in part, that any person who:

(a)(1) Knowingly presents, or causes to be presented, directly or indirectly, to an officer

or employee of the Government a false or fraudulent claim for payment or approval;

shall be liable to the Government for a civil penalty of not less than $5,500 and not more

than $11,000 for each act constituting a violation of this section, plus 3 times the amount

of actual damages which the Government sustains because of the act of that person.

387. Defendants knowingly presented or caused to be presented, directly and

indirectly, to the Delaware Medicaid program false and fraudulent claims for payment and

approval, claims which failed to disclose the material violations of the AKA and other laws, in

violation of Del. Code Ann. tit. 6, § 1201(a)(1).

388. The State of Delaware paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT SEVENTEEN:

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
## Del. Code Ann. tit. 6, § 1201(a)(2)

389. Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

390. The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §

1201(a)(2), specifically provides, in part, that any person who:

(a)(2) Knowingly makes, uses or causes to be made or used, directly or indirectly, a false

record or statement to get a false or fraudulent claim paid or approved;

shall be liable to the Government for a civil penalty of not less than $5,500 and not more

115

than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

391.    Defendants knowingly made, used and caused to be made and used, directly and indirectly, false records and statements to get false and fraudulent claims paid and approved by the State of Delaware, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

392.    The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTEEN:

## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### Del. Code Ann. tit. 6, § 1201(a)(3)

393.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

394.    The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(3), specifically provides, in part, that any person who:

(a)(3) Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

395.    Defendants conspired to defraud the State of Delaware by getting false and fraudulent claims allowed and paid, in violation of Del. Code Ann. tit. 6, § 1201(a)(3).

396.    The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

<u>COUNT NINETEEN:</u>

## <u>VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT</u>
### <u>Del. Code Ann. tit. 6, § 1201(a)(7)</u>

397.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

398.    The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201(a)(7), specifically provides, in part, that any person who:

(a)(7) Knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, increase, or decrease an obligation to pay or transmit money to or from the government; shall be liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of actual damages which the Government sustains because of the act of that person.

399.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Del. Code Ann. tit. 6, § 1201(a)(7).

400.    The State of Delaware paid said claims and has sustained damages because of these acts by the Defendants.

## <u>COUNT TWENTY:</u>

### <u>VIOLATIONS OF THE DISTRICT OF COLUMBIA</u>
### <u>PROCUREMENT REFORM AMENDMENT ACT</u>
### <u>D.C. Code § 2-308.14(a)(1)</u>

401.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

402.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.14(a)(1), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and may be liable to the District for a civil penalty of not less than $5,000, and not more than $10,000, for each false claim for which the person:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval.

403.    Defendants knowingly caused to be presented to the District of Columbia Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of D.C. Code § 2-308.14(a)(1).

404.    The District of Columbia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-ONE:

### VIOLATIONS OF THE DISTRICT OF THE COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(2)

405.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

406.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.14(a)(2), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and may be liable to the District for a civil penalty of not less than $5,000, and not more than $10,000, for each false claim for which the person:

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

407.    Defendants knowingly made, used and caused to be made and used, directly and indirectly, false records and statements to get false and fraudulent claims paid and approved by the District of Columbia, in violation of D.C. Code § 2-308.14(a)(2).

408.    The District of Columbia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-TWO:

### VIOLATIONS OF THE DISTRICT OF THE COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
#### D.C. Code § 2-308.14(a)(3)

409.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

410.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.14(a)(3), specifically provides:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for the costs of a civil action brought to recover penalties or damages, and may be liable to the District for a civil penalty of not less than $5,000, and not more than $10,000, for each false claim for which the person:

(3) Conspires to defraud the District by getting a false claim allowed or paid by the District;

411.    Defendants conspired to defraud the District of Columbia by getting false and fraudulent claims allowed and paid, in violation of D.C. Code § 2-308.14(a)(3).

412.    The District of Columbia paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT TWENTY-THREE:

### VIOLATIONS OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT D.C. Code § 2-308.14(a)(7)

413.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

414.    The District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.14(a)(7), specifically provides, in part:

(a) Any person who commits any of the following acts shall be liable to the District for 3 times the amount of damages which the District sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the District for

the costs of a civil action brought to recover penalties or damages, and may be liable to

the District for a civil penalty of not less than $5,000, and not more than $10,000, for

each false claim for which the person:

(7) Knowingly makes, uses or causes to be made or used a false record or statement to

conceal, avoid, increase, or decrease an obligation to pay or transmit money to or from

the government;

415.    Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit

money to the state, in violation of D.C. Code § 2-308.14(a)(7).

416.    The District of Columbia paid said claims and has sustained damages because of

these acts by the Defendants.

### COUNT TWENTY-FOUR:

### VIOLATIONS OF THE FLORIDA FCA
#### Fla. Stat. § 68.082(2)(a)

417.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated by reference.

418.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(a), specifically provides, in

part, that any person who:

(a) Knowingly presents or causes to be presented to an officer or employee of an agency

a false claim for payment or approval; …is liable to the state for a civil penalty of not less

than $5,000 and not more than $10,000 and for treble the amount of damages the agency

sustains because of the act or omission of that person.

419.    Defendants knowingly presented or caused to be presented to the Florida

Medicaid program false claims for payment and approval, claims which failed to disclose the

material violations of the AKA and other laws, in violation of Fla. Stat. § 68.082(2)(a).

420.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT TWENTY-FIVE:

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(b)

421.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

422.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(b), specifically provides, in part, that any person who:

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; …

is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

423.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Florida, in violation of Fla. Stat. § 68.082(2)(b).

424.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT TWENTY-SIX:

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(c)

425.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

426.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(c), specifically provides, in part, that any person who:

(c) Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid;. . .is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

427.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Fla. Stat. § 680.82(2)(c).

428.    The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT TWENTY-SEVEN:

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(g)

429.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

430.    The Florida False Claims Act, Fla. Stat. § 68.082(2)(g), specifically provides, in part, that any person who:

(g) Knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an

agency. . .is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

431.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Fla. Stat. § 680.82(2)(g).

432.     The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT TWENTY-EIGHT:

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT
### O.C.G.A. § 49-1-168.1(a)(1)

433.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

434.     The Georgia False Medicaid Claims Act, O.C.G.A. § 49-1-168 *et seq.*, specifically provides, in part, that any person who:

"Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."

435.     Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of O.C.G.A. § 49-1-168.1(a)(1).

436.     The State of Georgia paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT TWENTY-NINE:

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT

## O.C.G.A. § 49-1-168.1(a)(2)

437.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

438.    The Georgia False Medicaid Claims Act, O.C.G.A. § 49-1-168 *et seq.*, specifically provides, in part, that any person who:

> "Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program."

439.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Georgia, in violation of O.C.G.A. § 49-1-168.1(a)(2).

440.    The State of Georgia paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT THIRTY:

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT O.C.G.A. § 49-1-168.1(a)(3)

441.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

442.    The Georgia False Medicaid Claims Act, O.C.G.A. § 49-1-168 *et seq.*, specifically provides, in part, that any person who:

> "Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid."

443.    Defendants conspired to submit a false claim to Government Health Care

Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of O.C.G.A. § 49-1-168.1(a)(3).

444. The State of Georgia paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT THIRTY-ONE:

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT
### O.C.G.A. § 49-1-168.1(a)(7)

445. Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

446. The Georgia False Medicaid Claims Act, O.C.G.A. § 49-1-168 *et seq.*, specifically provides, in part, that any person who:

> "Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia."

447. Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of O.C.G.A. § 49-1-168.1(a)(7).

448. The State of Georgia paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT THIRTY-TWO:

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(1)

449. Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

450.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(1), specifically provides, in part, that any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

451.    Defendants knowingly presented or caused to be presented to the Hawaii Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Haw. Rev. Stat. § 661-21(a)(1).

452.     The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-THREE:

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(2)

453.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

454.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(2), specifically provides, in part, that any person who:

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

455.    Defendants knowingly made, used and caused to be made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Hawaii, in violation of Haw. Rev. Stat. § 661-21(a)(2).

456.    The State of Hawaii paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT THIRTY-FOUR:

### VIOLATIONS OF THE HAWAII FCA
#### Haw. Rev. Stat. § 661-21(a)(3)

457.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

458.    The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(3), specifically provides, in part, that any person who:

(3) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

. . .

shall be liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages that the State sustains due to the act of that person.

459.     Defendants conspired to defraud the State of Hawaii by getting false and
fraudulent claims allowed and paid, in violation of Haw. Rev. Stat. § 661-21(a)(3).

460.     The State of Hawaii paid said claims and has sustained damages because of these
acts by the Defendants.

### COUNT THIRTY-FIVE:

### VIOLATIONS OF THE HAWAII FCA
### Haw. Rev. Stat. § 661-21(a)(7)

461.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above
as if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

462.     The Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(7), specifically
provides, in part, that any person who:

 (7) Knowingly makes, uses, or causes to be made or used, a false record or statement to
 conceal, avoid, or decrease an obligation to pay or transmit money or property to the
 state.

 . . .

 shall be liable to the State for a civil penalty of not less than $5,000 and not more than
 $10,000, plus three times the amount of damages that the State sustains due to the act of
 that person.

463.     Defendants knowingly made, used or caused to be made or used a false record or
statement to conceal their actions and to avoid or decrease an obligation to pay or transmit
money to the state, in violation of Haw. Rev. Stat. § 661-21(a)(7).

464.     The State of Hawaii paid said claims and has sustained damages because of these
acts by the Defendants.

## COUNT THIRTY-SIX:

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3 (a)(1)

465.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

466.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §

175/3(a)(1), specifically provides, in part, that any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State

or member of the Guard a false or fraudulent claim for payment or approval;

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000,

plus 3 times the amount of damages which the State sustains because of the act of that

person.

467.    Defendants knowingly caused to be presented to the Illinois Medicaid program

false and fraudulent claims for payment and approval, claims which failed to disclose the

material violations of the AKA and other laws, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1).

468.    The State of Illinois paid said claims and has sustained damages because of these

acts by the Defendants.

## COUNT THIRTY-SEVEN:

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3(a)(2)

469.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

470.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(2), specifically provides, in part, that any person who:

(2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the State sustains because of the act of that person.

471.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175/3(a)(2).

472.    The State of Illinois paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT THIRTY-EIGHT:

### VIOLATIONS OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT 740 Ill. Comp. Stat. § 175/3(a)(3)

473.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

474.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(3), specifically provides, in part, that any person who:

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000,

plus 3 times the amount of damages which the State sustains because of the act of that

person.

475.    Defendants conspired to defraud the State of Illinois by getting false and

fraudulent claims allowed and paid, in violation of 740 Ill. Comp. Stat. § 175/3(a)(3).

476.    The State of Illinois paid said claims and has sustained damages because of these

acts by the Defendants.

### COUNT THIRTY-NINE:

### VIOLATIONS OF THE ILLINOIS
### WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. § 175/3(a)(7)

477.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

478.    The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §

175/3(a)(7), specifically provides, in part, that any person who:

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to

conceal, avoid or decrease an obligation to pay or transmit money or property to the State

. . .

is liable to the State for a civil penalty of not less than $5,000 and not more than $10,000,

plus 3 times the amount of damages which the State sustains because of the act of that

person.

132

479.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of 740 Ill. Comp. Stat. § 175/3(a)(7).

480.    The State of Illinois paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FORTY:

### VIOLATIONS OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### IC 5-11-5.5(1)

481.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

482.    The Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(1) (2005) specifically provides, in part, that any person who:

presents a false claim to the state for payment or approval  . . . shall be liable to the state for civil penalties [of at least $5,000 per occurrence] and three times the amount of damages that the state sustains because of the act of that person.

483.    Defendants knowingly presented or caused to be presented to the Indiana Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of IC 5-11-5.5-2(b)(1).

484.    The State of Indiana paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FORTY-ONE:

### VIOLATIONS OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### IC 5-11-5.5(2)

485.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

486.    The Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(2) (2005) specifically provides, in part, that any person who:

> makes or uses a false record or statement  to obtain payment or approval of a false claim from the state   . . . shall be liable to the state for civil penalties [of at least $5,000 per occurrence] and three times the amount of damages that the state sustains because of the act of that person.

487.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Indiana, in violation of IC 5-11-5.5-2(b)(2).

488.    The State of Indiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-TWO:

### VIOLATIONS OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### IC 5-11-5.5(7)

489.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

490.    The Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(7) (2005) specifically provides, in part, that any person who:

conspires with another person to perform an act [prohibited by the Act]. . . shall be liable to the state for civil penalties [of at least $5,000 per occurrence] and three times the amount of damages that the state sustains because of the act of that person.

491.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of IC 5-11-5.5-2(b)(7).

492.    The State of Indiana paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FORTY-THREE:

### VIOLATIONS OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### IC 5-11-5.5(6)

493.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

494.    The Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(6) (2005), specifically provides, in part, that any person who:

makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state. . . shall be liable to the state for civil penalties [of at least $5,000 per occurrence] and three times the amount of damages that the state sustains because of the act of that person.

495.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of IC 5-11-5.5-2(b)(6).

496.    The State of Indiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-FOUR:

### VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
### IOWA CODE §685.2(1)(a)

497.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

498.    The Iowa False Claims Act, §685.1 *et seq.* specifically provides, in part, that a person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

"Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

499.    Defendants knowingly presented or caused to be presented to the Iowa Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Ia. Code. § 685.2(1)(a).

500.    The State of Iowa paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-FIVE:

### VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
### IOWA CODE §685.2(1)(b)

501.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

502.     The Iowa False Claims Act, §685.1 *et seq.* specifically provides, in part, that a person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

"Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

503.     Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Iowa, in violation of Ia. Code. § 685.2(1)(b).

504.     The State of Iowa paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FORTY-SIX:

### VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
### IOWA CODE §685.2(1)(c)

505.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

506.     The Iowa False Claims Act, §685.1 *et seq.* specifically provides, in part, that a person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

"Conspires to commit a violation of [the Iowa False Claims Act.]"

507.     Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting

false and fraudulent claims allowed and paid, in violation of Ia. Code. § 685.2(1)(c).

508.    The State of Iowa paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-SEVEN:

### VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
### IOWA CODE §685.2(1)(g)

509.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

510.    The Iowa False Claims Act, §685.1 *et seq.* specifically provides, in part, that a person is liable to the state for a civil penalty of not less than five thousand dollars and not more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

> "Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

511.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Ia. Code. § 685.2(1)(g).

512.    The State of Iowa paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-EIGHT:

### VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE

## PROGRAMS INTEGRITY LAW
### 46 La. Rev. Stat. c. 3 § 438.3A

513.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

514.    The Louisiana False Claims Act/Medical Assistance Programs Integrity Law ("Louisiana FCA"), 46 La. Rev. Stat. c. 3 § 438.3A, specifically provides, in part, that: "No person shall knowingly present or cause to be presented a false or fraudulent claim".

515.    Defendants knowingly presented or caused to be presented to the Louisiana Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of 46 La. Rev. Stat. c. 3 § 438.3A.

516.    The State of Louisiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FORTY-NINE:

## VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### 46 La. Rev. Stat. c. 3 § 438.3B

517.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

518.    The Louisiana FCA, 46 La. Rev. Stat. c. 3 § 438.3B, specifically provides, in part, that:

No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds.

519.     Defendants knowingly engaged in misrepresentation and made, used and caused to be made and used, false records and statements to obtain or attempt to obtain payment from or get false and fraudulent claims paid and approved by the State of Illinois, in violation of 46 La. Rev. Stat. c. 3 § 438.3B.

520.     The State of Louisiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY:

## VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
## 46 La. Rev. Stat. c. 3 § 438.3C

521.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

522.     The Louisiana FCA, 46 La. Rev. Stat. c. 3 § 438.3C, specifically provides, in part, that:

No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

523.     Defendants conspired to defraud the State of Louisiana by getting false and fraudulent claims allowed and paid, in violation of 46 La. Rev. Stat. c. 3 § 438.3C.

524.     The State of Louisiana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-ONE:

## VIOLATIONS OF THE LOUISIANA FALSE CLAIMS ACT/MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

## 46 La. Rev. Stat. c. 3 § 438.2A(1)

525.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

526.    Louisiana FCA, 46 La. Rev. Stat. c. 3 § 438.2A(1), specifically provides that:

"No person shall solicit, receive, offer or pay any remuneration, including but not limited to kickbacks, bribes, rebates, or … payments, directly or indirectly, overtly or covertly, in cash or in kind, for the following . ..

(1) In return for referring an individual to a health care provider, …for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs."

527.    In addition, the Louisiana FCA, supra, section 438.3 provides that:

"No person shall knowingly present of cause to be presented a false or fraudulent claim…shall knowingly engage in misrepresentation to obtain, or attempt to obtain payment from medical assistance program funds…shall conspire to defraud, or attempt to defraud, the medical assistance programs… ."

528.    Furthermore, the Louisiana FCA, supra, section 438.4 provides that:

"No person shall knowingly make, use or cause to be made or used a false, fictitious, or misleading statement on any form used for the purpose of certifying or qualifying any person for eligibility … to receive any good, service, or supply under the medical assistance programs which that person is not eligible to receive."

529.    Defendants solicited, received, offered and/or paid remuneration, including but not limited to kickbacks, bribes, and gifts, directly or indirectly, overtly or covertly, in cash or in

kind, in return for prescribing or arranging the prescribing of drugs which are paid for by the
Louisiana Medicaid program, in violation of 46 La. Rev. Stat. c. 3 § 438.2A(1).

530.    The State of Louisiana paid said claims and has sustained damages because of
these acts by the Defendants.

### COUNT FIFTY-TWO:

### VIOLATIONS OF THE MARYLAND FALSE CLAIMS ACT OF 2010
### Md. Health-General Code Ann. §2-602(a)(1)

531.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above
as if each were stated herein in their entirety and said allegations are incorporated by reference.

532.    The Maryland False Claims Act of 2010, Md. Health-General Code Ann. § 2-601
*et seq.* specifically provides, in part,  that a person is liable to the state for a civil penalty of not
more than ten thousand dollars, plus three times the amount of damages which the state sustains
because of the act of that person if that person:

"Knowingly present[s] or cause[s] to be presented a false or fraudulent claim for
approval."

533.    Defendants knowingly presented or caused to be presented to the Maryland
Medicaid program false claims for payment and approval, claims which failed to disclose the
material violations of the AKA and other laws, in violation of Md. Health-General Code Ann. §
2-602(a)(1).

534.    The State of Maryland paid said claims and has sustained damages because of
these acts by the Defendants.

### COUNT FIFTY-THREE:

### VIOLATIONS OF THE MARYLAND FALSE CLAIMS ACT OF 2010
### Md. Health-General Code Ann. §2-602(a)(2)

535.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

536.    The Maryland False Claims Act of 2010, Md. Health-General Code Ann. § 2-601 *et seq.* specifically provides, in part,  that a person is liable to the state for a civil penalty of not more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

"Knowingly make[s], use[s] or cause[s] to be made or used a false record or statement material to a false or fraudulent claim."

537.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Maryland, in violation of Md. Health-General Code Ann. § 2-602(a)(2).

538.    The State of Maryland paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-FOUR:

### VIOLATIONS OF THE MARYLAND FALSE CLAIMS ACT OF 2010
### Md. Health-General Code Ann. §2-602(a)(3)

539.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

540.    The Maryland False Claims Act of 2010, Md. Health-General Code Ann. § 2-601 *et seq.* specifically provides, in part,  that a person is liable to the state for a civil penalty of not

more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

"Conspires to commit a violation under [the Maryland False Claims Act of 2010.]"

541.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Md. Health-General Code Ann. § 2-602(a)(3).

542.    The State of Maryland paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-FIVE:

### VIOLATIONS OF THE MARYLAND FALSE CLAIMS ACT OF 2010
### Md. Health-General Code Ann. §2-602(a)(7)

543.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

544.    The Maryland False Claims Act of 2010, Md. Health-General Code Ann. § 2-601 *et seq.* specifically provides, in part,  that a person is liable to the state for a civil penalty of not more than ten thousand dollars, plus three times the amount of damages which the state sustains because of the act of that person if that person:

"Knowingly make[s], use[s], or cause[s] to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the state."

545.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Md. Health-General Code Ann. § 2-602(a)(7).

546.    The State of Maryland paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FIFTY-SIX:

### VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(1)

547.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

548.    The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(1), specifically provides, in part, that any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

549.    Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid program false and fraudulent claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Mass. Gen. Laws Ch. 12, § 5B(1).

550.    The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FIFTY-SEVEN:

## VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(2)

551.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

552.    The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(2), specifically provides, in part, that any person who:

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

553.    Defendants knowingly made, used and caused to be made and used, false records and statements to obtain payment and approval of claim by the Commonwealth of Massachusetts, in violation of Mass. Gen. Laws Ch. 12, § 5B(2).

554.    The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT FIFTY-EIGHT:

## VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(3)

555.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

556.     The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(3), specifically provides, in part, that any person who:

"(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person."

557.     Defendants conspired to defraud the Commonwealth of Massachusetts through the allowance and payment of fraudulent claims in violation of Mass. Gen. Laws Ch. 12, § 5B(3).

558.     The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIFTY-NINE:

### VIOLATIONS OF THE MASSACHUSETTS FCA
### Mass. Gen. Laws Ch. 12, § 5B(8)

559.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

560.     The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(8),

147

specifically provides, in part, that any person who:

"(8) knowingly makes, uses, or causes to be made or used, a false record or statement to

conceal, avoid, or decrease an obligation to pay or to transmit money or property to the

commonwealth;

. . .

shall be liable to the commonwealth or political subdivision for a civil penalty of not less

than $5,000 and not more than $10,000 per violation, plus three times the amount of

damages, including consequential damages, that the commonwealth or political

subdivision sustains because of the act of that person."

561.     Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit

money to the state, in violation of Mass. Gen. Laws Ch. 12, § 5B(8).

562.     The Commonwealth of Massachusetts paid said claims and has sustained

damages because of these acts by the Defendants.

## COUNT SIXTY:

## VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
## MI ST Ch. 400.607(2)

563.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated by reference.

564.     The Michigan Medicaid False Claims Act, MI ST Ch. 400.607(2) and MI ST Ch.

400.612 specifically provides, in part, that any person:

"shall not make or present or cause to be made or presented a claim . . . that he or she

knows falsely represents that the goods or services for which the claim is made were

medically necessary in accordance with professionally accepted standards

. . . [and that such person]

who receives a benefit that the person is not entitled to receive by reason of fraud or making a fraudulent statement or knowingly concealing a material fact, or who engages in any conduct prohibited by this statute, shall forfeit and pay to the state the full amount received, and for each claim a civil penalty of not less than $5,000.00 or more than $10,000.00 plus triple the amount of damages suffered by the state as a result of the conduct by the person."

565.    Defendants knowingly presented or caused to be presented to the Mich. Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of MI ST Ch. 400.607(2).

566.    The State of Michigan paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIXTY-ONE:

### VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### MI ST Ch. 400.603

567.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

568.    The Michigan Medicaid False Claims Act, MI ST Ch. 400.603 and MI ST Ch. 400.612 specifically provides, in part, that any person:

"shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits… [or] for use in determining rights to a Medicaid benefit [and such person] having knowledge of the occurrence of an event affecting …[the] initial or continued right of any other person on whose behalf he

149

has applied...shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled

 . . . [and that such person]

who receives a benefit that the person is not entitled to receive by reason of fraud or making a fraudulent statement or knowingly concealing a material fact, or who engages in any conduct prohibited by this statute, shall forfeit and pay to the state the full amount received, and for each claim a civil penalty of not less than $5,000.00 or more than $10,000.00 plus triple the amount of damages suffered by the state as a result of the conduct by the person."

569.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Michigan, in violation of MI ST Ch. 400.603.

570.    The State of Michigan paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIXTY-TWO:

## VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
## MI ST Ch. 400.606

571.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

572.    The Michigan Medicaid False Claims Act, MI ST Ch. 400.606 and MI ST Ch. 400.612  specifically provides, in part, that any person who:

"shall not enter into an agreement, combination, or conspiracy to defraud the state by

obtaining or aiding another to obtain the payment or allowance of a false claim

. . . [and that such person]

who receives a benefit that the person is not entitled to receive by reason of fraud or

making a fraudulent statement or knowingly concealing a material fact, or who engages

in any conduct prohibited by this statute, shall forfeit and pay to the state the full amount

received, and for each claim a civil penalty of not less than $5,000.00 or more than

$10,000.00 plus triple the amount of damages suffered by the state as a result of the

conduct by the person."

573.    Defendants conspired to submit a false claim to Government Health Care

Programs and to deceive Government Health Care Programs for the purpose of getting

false and fraudulent claims allowed and paid, in violation of MI ST Ch. 400.606.

574.    The State of Michigan paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT SIXTY-THREE:

## VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
## MI ST Ch. 400.607(3)

575.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

576.    The Michigan Medicaid False Claims Act, MI ST Ch. 400.607(3) and MI ST Ch.

400.612 specifically provides, in part, that any person:

"shall not knowingly make, use, or cause to be made or used a false record or statement

to conceal, avoid, or decrease an obligation to pay or transmit money or property to the

state pertaining to a claim presented under the social welfare act

. . . [and that such person]

who receives a benefit that the person is not entitled to receive by reason of fraud or

making a fraudulent statement or knowingly concealing a material fact, or who engages

in any conduct prohibited by this statute, shall forfeit and pay to the state the full amount

received, and for each claim a civil penalty of not less than $5,000.00 or more than

$10,000.00 plus triple the amount of damages suffered by the state as a result of the

conduct by the person."

577.    Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit

money to the state, in violation of MI ST Ch. 400.607(3).

578.    The State of Michigan paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT SIXTY-FOUR:

## VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. §15C.02(a)(1)

579.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated by reference.

580.    The Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq. specifically

provides, in part, that a person is liable to the state or the political subdivision for a civil penalty

of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times

the amount of damages that the state or the political subdivision sustains because of the act of that person, if the person:

"Knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval."

581.    Defendants knowingly presented or caused to be presented to the Minnesota Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Minn. Stat. § 15C.02(a)(1).

582.    The State of Minnesota paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT SIXTY-FIVE:

### VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT
#### Minn. Stat. §15C.02(a)(2)

583.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

584.    The Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq. specifically provides, in part, that a person is liable to the state or the political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person, if the person:

"Knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision."

585.    Defendants knowingly made, used and caused to be made and used, false records

and statements to get false and fraudulent claims paid and approved by an agency of the State of Minnesota, in violation of Minn. Stat. § 15C.02(a)(2).

586. The State of Minnesota paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT SIXTY-SIX:

### VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. §15C.02(a)(3)

587. Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

588. The Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq. specifically provides, in part, that a person is liable to the state or the political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person, if the person:

"Knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim."

589. Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Minn. Stat. § 15C.02(a)(3).

590. The State of Minnesota paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIXTY-SEVEN:

### VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT
#### Minn. Stat. §15C.02(a)(7)

591.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

592.    The Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq. specifically provides, in part, that a person is liable to the state or the political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person, if the person:

"Knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision."

593.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Minn. Stat. § 15C.02(a)(7).

594.    The State of Minnesota paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIXTY-EIGHT:

### VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT
#### Montana Code § 17-8-403(a)

595.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

596.    The Montana False Claims Act, Montana Code § 17-8-401 *et seq.* specifically provides, in part, that any person may be liable to a governmental entity for a civil penalty of not less than $5,000 and not more than $10,000 plus three times the amount of damages that a governmental entity sustains because of the person's act, along with expenses, costs, and attorney fees, if the person:

"Knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval."

597.    Defendants knowingly presented or caused to be presented to the Montana Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Montana Code § 17-8-403(a).

598.    The State of Montana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SIXTY-NINE:

### VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT
### Montana Code § 17-8-403(b)

599.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

600.    The Montana False Claims Act, Montana Code § 17-8-401 *et seq.* specifically provides, in part, that any person may be liable to a governmental entity for a civil penalty of not less than $5,000 and not more than $10,000 plus three times the amount of damages that a governmental entity sustains because of the person's act, along with expenses, costs, and attorney fees, if the person:

"Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity."

601.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Montana, in violation of Montana Code § 17-8-403(b).

602.    The State of Montana paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVENTY:

### VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT
### Montana Code § 17-8-403(c)

603.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

604.    The Montana False Claims Act, Montana Code § 17-8-401 *et seq.* specifically provides, in part, that any person may be liable to a governmental entity for a civil penalty of not less than $5,000 and not more than $10,000 plus three times the amount of damages that a governmental entity sustains because of the person's act, along with expenses, costs, and attorney fees, if the person:

"Conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity."

605.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Montana Code § 17-8-403(c).

606.     The State of Montana paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT SEVENTY-ONE:

### VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT
### Montana Code § 17-8-403(g)

607.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

608.     The Montana False Claims Act, Montana Code § 17-8-401 *et seq.* specifically provides, in part, that any person may be liable to a governmental entity for a civil penalty of not less than $5,000 and not more than $10,000 plus three times the amount of damages that a governmental entity sustains because of the person's act, along with expenses, costs, and attorney fees, if the person:

"Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors."

609.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Montana Code § 17-8-403(g).

610.     The State of Montana paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT SEVENTY-TWO:

### VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. § 357.040(1)(a)

158

611.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

612.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(a), specifically provides, in part, that a person who:

> With or without specific intent to defraud, does any of the following listed acts is liable to the state or a political subdivision, whichever is affected, for three times the amount of damages sustained by the state or political subdivision because of the act of that person, for the costs of a civil action brought to recover those damages and for a civil penalty of not less than $2,000 or more than $10,000 for each act:
>
> (a) Knowingly presents or causes to be presented a false claim for payment or approval.

613.    Defendants knowingly presented or caused to be presented to the Nevada Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Nev. Rev. Stat. § 357.040(1)(a).

614.    The State of Nevada paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVENTY-THREE:

### VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. § 357.040(1)(b)

615.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

616.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(b), specifically provides, in part, that a person who:

"With or without specific intent to defraud, does any of the following listed acts is liable

to the state or a political subdivision, whichever is affected, for three times the amount of

damages sustained by the state or political subdivision because of the act of that person,

for the costs of a civil action brought to recover those damages and for a civil penalty of

not less than $2,000 or more than $10,000 for each act:

. . .

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement

to obtain payment or approval of a false claim."

617.     Defendants knowingly made, used and caused to be made and used, false records

and statements to obtain payment and approval of false claims, in violation of Nev. Rev. Stat. §

357.040(1)(b).

618.     The State of Nevada paid said claims and has sustained damages because of these

acts by the Defendants.

### COUNT SEVENTY-FOUR:

### VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. 357.040(1)(c)

619.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

620.     The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(c), specifically

provides, in part, that a person who:

"With or without specific intent to defraud, does any of the following listed acts is liable

to the state or a political subdivision, whichever is affected, for three times the amount of

damages sustained by the state or political subdivision because of the act of that person,

160

for the costs of a civil action brought to recover those damages and for a civil penalty of

not less than $2,000 or more than $10,000 for each act:

. . .

(c) Conspires to defraud by obtaining allowance or payment of a false claim."

621.    Defendants conspired to defraud the State of Nevada by obtaining allowance and

payment of false claims, in violation of Nev. Rev. Stat. 357.040(1)(c).

622.    The State of Nevada paid said claims and has sustained damages because of these

acts by the Defendants.

### COUNT SEVENTY-FIVE:

### VIOLATIONS OF THE NEVADA FCA
### Nev. Rev. Stat. 357.040(1)(g)

623.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

624.    The Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(g), specifically

provides, in part, that a person who:

"With or without specific intent to defraud, does any of the following listed acts is liable

to the state or a political subdivision, whichever is affected, for three times the amount of

damages sustained by the state or political subdivision because of the act of that person,

for the costs of a civil action brought to recover those damages and for a civil penalty of

not less than $2,000 or more than $10,000 for each act:

. . .

(g) knowingly makes or uses, or causes to be made or used, a false record or statement to

conceal, avoid or decrease an obligation to pay or transmit money or property to the

161

state...."

625.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Nev. Rev. Stat. 357.040(1)(g).

626.     The State of Nevada paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVENTY-SIX:

## VIOLATIONS OF THE NEW HAMPSHIRE FCA
## N.H. RSA §§ 167:61-b I. (a)

627.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

628.     The New Hampshire Medicaid False Claims Act, N.H. RSA §§ 167:61-b et seq. specifically provides, in part, that by certain acts a person commits an unlawful act and shall be liable to the state for a civil penalty (of not less than $5,000 and not more than $10,000) and three times the amount of damages that the state sustains because of the act if that person:

"presents, or causes to be presented, to the state a claim for payment under the

Medicaid program knowing that such claim is false or fraudulent claim."

629.     Defendants knowingly presented or caused to be presented to the New Hampshire Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of N.H. RSA § 167:61-b I. (a).

630.     The State of New Hampshire paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVENTY-SEVEN:

## VIOLATIONS OF THE NEW HAMPSHIRE FCA

## N.H. RSA §§ 167:61-b I.(b)

631.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

632.   The New Hampshire Medicaid False Claims Act, N.H. RSA §§ 167:61-b et seq. specifically provides, in part, that by certain acts a person commits an unlawful act and shall be liable to the state for a civil penalty (of not less than $5,000 and not more than $10,000) and three times the amount of damages that the state sustains because of the act if that person:

> "makes, uses or causes to be made or used a record or statement to get a false or
> fraudulent claim under the Medicaid program paid for or approved by the state
> knowing such record or statement is false"

633.   Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of New Hampshire, in violation of N.H. RSA § 167:61-b I.(b).

634.   The State of New Hampshire paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT SEVENTY-EIGHT:

## VIOLATIONS OF THE NEW HAMPSHIRE FCA
## N.H. RSA §§ 167:61-b (I)(c)

635.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

636.   The New Hampshire Medicaid False Claims Act, N.H. RSA §§ 167:61-b et seq.

specifically provides, in part, that by certain acts a person commits an unlawful act and shall be liable to the state for a civil penalty (of not less than $5,000 and not more than $10,000) and three times the amount of damages that the state sustains because of the act if that person:

"conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent."

637.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of N.H. RSA § 167:61-b I.(c).

638.    The State of New Hampshire paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT SEVENTY-NINE:

### VIOLATIONS OF THE NEW HAMPSHIRE FCA
### N.H. RSA §§ 167:61-b I (e)

639.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

640.    The New Hampshire Medicaid False Claims Act, N.H. RSA §§ 167:61-b et seq. specifically provides, in part, that by certain acts a person commits an unlawful act and shall be liable to the state for a civil penalty (of not less than $5,000 and not more than $10,000) and three times the amount of damages that the state sustains because of the act if that person:

"makes, uses, or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false…"

641.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of N.H. RSA § 167:61-b I.(e).

642.     The State of New Hampshire paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTY:

### VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT
### New Jersey Stat. § 2A:32C-3(a)

643.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

644.     The New Jersey False Claims Act, New Jersey Stat. § 2A:32C-1 *et seq.* specifically provides, in part, that a person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act for each false or fraudulent claim, plus three times the amount of damages which the State sustains, if the person:

"Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval."

645.     Defendants knowingly presented or caused to be presented to the New Jersey Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of N.J. Stat. § 2A:32C-3(a).

646.     The State of New Jersey paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTY-ONE:

## VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT
## New Jersey Stat. § 2A:32C-3(b)

647.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

648.    The New Jersey False Claims Act, New Jersey Stat. § 2A:32C-1 *et seq.* specifically provides, in part, that a person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act for each false or fraudulent claim, plus three times the amount of damages which the State sustains, if the person:

"Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State."

649.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of New Jersey, in violation of N.J. Stat. § 2A:32C-3(b).

650.    The State of New Jersey paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTY-TWO:

## VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT
## New Jersey Stat. § 2A:32C-3(c)

651.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

166

652.    The New Jersey False Claims Act, New Jersey Stat. § 2A:32C-1 *et seq.*
specifically provides, in part, that a person shall be jointly and severally liable to the State for a
civil penalty of not less than and not more than the civil penalty allowed under the federal False
Claims Act for each false or fraudulent claim, plus three times the amount of damages which the
State sustains, if the person:

"Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by
the State."

653.    Defendants conspired to submit a false claim to Government Health Care
Programs and to deceive Government Health Care Programs for the purpose of getting
false and fraudulent claims allowed and paid, in violation of N.J. Stat. § 2A:32C-3(c).

654.    The State of New Jersey paid said claims and has sustained damages because of
these acts by the Defendants.

## COUNT EIGHTY-THREE:

### VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT
### New Jersey Stat. § 2A:32C-3(g)

655.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above
as if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

656.    The New Jersey False Claims Act, New Jersey Stat. § 2A:32C-1 *et seq.*
specifically provides, in part, that a person shall be jointly and severally liable to the State for a
civil penalty of not less than and not more than the civil penalty allowed under the federal False
Claims Act for each false or fraudulent claim, plus three times the amount of damages which the
State sustains, if the person:

"Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State."

657.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of N.J. Stat. § 2A:32C-3(g).

658.    The State of New Jersey paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT EIGHTY-FOUR:

### VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. §§ 27-14-4A and N.M. Stat. §§ 27-14-4B

659.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

660.    The New Mexico Medicaid False Claims Act, §§ 27-14-1 *et seq.* specifically provides, in part, that by certain acts "a person commits an unlawful act and shall be liable to the state for three times the amount of damages that the state sustains because of the act if that person":

"4A. presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claims is false or fraudulent claim;

4B. presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program"

661.    Defendants knowingly presented or caused to be presented to the New Mexico Medicaid program false claims for payment and approval, claims which failed to disclose the

168

material violations of the AKA and other laws, in violation of N.M. § 27-14-4A and N.M. § 27-14-4B.

662.    The State of New Mexico paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTY-FIVE:

## VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
## N.M. Stat. §§ 27-14-4C

663.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

664.    The New Mexico Medicaid False Claims Act, §§ 27-14-1 *et seq.* specifically provides, in part, that by certain acts "a person commits an unlawful act and shall be liable to the state for three times the amount of damages that the state sustains because of the act if the person":

"4C. makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false."

665.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of New Mexico, in violation of N.M. § 27-14-4C.

666.    The State of New Mexico paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT EIGHTY-SIX:

## VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT

### N.M. Stat. §§ 27-14-4D

667.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

668.    The New Mexico Medicaid False Claims Act, §§ 27-14-1 *et seq.* specifically provides, in part, that by certain acts "a person commits an unlawful act and shall be liable to the state for three times the amount of damages that the state sustains because of the act if the person".

669.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of N.M. § 27-14-4D.

670.    The State of New Mexico paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT EIGHTY-SEVEN:

### VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. §§ 27-14-4E

671.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

672.    The New Mexico Medicaid False Claims Act, §§ 27-14-1 *et seq.* specifically provides, in part, that by certain acts "a person commits an unlawful act and shall be liable to the state for three times the amount of damages that the state sustains because of the act if the person":

"4E. makes, uses, or causes to be made or used a record or statement to conceal, avoid or

decrease an obligation to pay or transmit money or property to the state, relative to the

Medicaid program, knowing that such record or statement is false…"

673.    Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit

money to the state, in violation of N.M. § 27-14-4E.

674.    The State of New Mexico paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT EIGHTY-EIGHT:

## VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT
## N.Y. C.L.S. St. Fin. § 189(1)(a)

675.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated by reference.

676.    The New York False Claims Act, N.Y. C.L.S. St. Fin. § 187 *et seq.*, specifically

provides, in part, that any person who:

"Knowingly presents, or causes to be presented a false or fraudulent claim for payment or

approval . . . shall be liable to the state or a local government, as applicable, for a civil

penalty of not less than six thousand dollars and not more than twelve thousand dollars,

plus three times the amount of all damages, including consequential damages, which the

state or local government sustains because of the act of that person."

677.    Defendants knowingly presented or caused to be presented to the New York

Medicaid program false claims for payment and approval, claims which failed to disclose the

material violations of the AKA and other laws, in violation of N.Y. C.L.S. St. Fin. § 189(1)(a).

678.    The State of New York paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT EIGHTY-NINE:

### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. C.L.S. St. Fin. § 189(1)(b)

679.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

680.    The New York False Claims Act, N.Y. C.L.S. St. Fin. § 187 *et seq.*, specifically provides, in part, that any person who:

"Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person."

681.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of New York, in violation of N.Y. C.L.S. St. Fin. § 189(1)(b).

682.    The State of New York paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT NINETY:

### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. C.L.S. St. Fin. § 189(1)(c)

683.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

684.    The New York False Claims Act, N.Y. C.L.S. St. Fin. § 187 *et seq.*, specifically provides, in part, that any person who:

"Conspires to commit a violation of [the New York False Claims Act] . . . shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person."

685.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of N.Y. C.L.S. St. Fin. § 189(1)(c).

686.    The State of New York paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT NINETY-ONE:

### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. C.L.S. St. Fin. § 189(1)(g)

687.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

688.    The New York False Claims Act, N.Y. C.L.S. St. Fin. § 187 *et seq.*, specifically provides, in part, that any person who:

"Knowingly makes, uses, or causes to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the state or a local

government shall be liable to the state or a local government, as applicable, for a civil

penalty of not less than six thousand dollars and not more than twelve thousand dollars,

plus three times the amount of all damages, including consequential damages, which the

state or local government sustains because of the act of that person."

689.    Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit

money to the state, in violation of N.Y. C.L.S. St. Fin. § 189(1)(g).

690.    The State of New York paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT NINETY-TWO:

### VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Art. 52 §1-607(a)(1)

691.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated by reference.

692.    The North Carolina False Claims Act, N.C. Art. 52, § 1-605 *et seq.* specifically

provides, in part, that a person who commits any of the following acts also shall be liable to the

State for the costs of a civil action brought to recover any of those penalties or damages and shall

be liable to the State for a civil penalty of not less than five thousand five hundred dollars

($5,500) and not more than eleven thousand dollars ($11,000) for each violation if the person:

"Knowingly presents or causes to be presented a false or fraudulent claim for payment or

approval."

693.    Defendants knowingly presented or caused to be presented to the North Carolina

Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of N.C. Art. 52, § 1-607(a)(1).

694.    The State of North Carolina paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT NINETY-THREE:

### VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Art. 52 §1-607(a)(2)

695.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

696.    The North Carolina False Claims Act, N.C. Art. 52, § 1-605 *et seq.* specifically provides, in part, that a person who commits any of the following acts also shall be liable to the State for the costs of a civil action brought to recover any of those penalties or damages and shall be liable to the State for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation if the person:

"Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

697.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of North Carolina, in violation of N.C. Art. 52, § 1-607(a)(2).

698.    The State of North Carolina paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT NINETY-FOUR:

### VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT

## N.C. Art. 52 §1-607(a)(3)

699.    Relator restates and realleges the allegations contained in Paragraphs 1-324
above as if each were stated herein in their entirety and said allegations are incorporated herein
by reference.

700.    The North Carolina False Claims Act, N.C. Art. 52, § 1-605 *et seq.* specifically
provides, in part, that a person who commits any of the following acts also shall be liable to the
State for the costs of a civil action brought to recover any of those penalties or damages and shall
be liable to the State for a civil penalty of not less than five thousand five hundred dollars
($5,500) and not more than eleven thousand dollars ($11,000) for each violation if the person:

"Conspires to commit a violation of [the North Carolina False Claims Act.]"

701.    Defendants conspired to submit a false claim to Government Health Care
Programs and to deceive Government Health Care Programs for the purpose of getting
false and fraudulent claims allowed and paid, in violation of N.C. Art. 52, § 1-607(a)(3).

702.    The State of North Carolina paid said claims and has sustained damages because
of these acts by the Defendants.

## COUNT NINETY-FIVE:

## VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT
## N.C. Art. 52 §1-607(a)(7)

703.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above
as if each were stated herein in their entirety and said allegations are incorporated herein by
reference.

704.    The North Carolina False Claims Act, N.C. Art. 52, § 1-605 *et seq.* specifically
provides, in part, that a person who commits any of the following acts also shall be liable to the
State for the costs of a civil action brought to recover any of those penalties or damages and shall

be liable to the State for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation if the person:

"Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

705.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of N.C. Art. 52, § 1-607(a)(7).

706.    The State of North Carolina paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINETY-SIX:

## VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### Okla. Stat. Title 63, § 5053.1 (B)(1)

707.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

708.    The Oklahoma Medicaid False Claims Act, Okla. Stat. Title 63, § 5053.1 *et seq.*, specifically provides, in part, that any person who:

"Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval. . . is liable to the State of Oklahoma for a civil penalty of not less than Five Thousand Dollars ($5,000.00) and not more than Ten Thousand Dollars ($10,000.00) . . . plus three times the amount of damages which the state sustains because of the act of that person."

709.    Defendants knowingly presented or caused to be presented to the Oklahoma

177

Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Okla. Stat. Title 63, § 5053.1(B)(1).

710.    The State of Oklahoma paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINETY-SEVEN:

### VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### Okla. Stat. Title 63, § 5053 (B)(2)

711.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

712.    The Oklahoma Medicaid False Claims Act, Okla. Stat. Title 63, § 5053.1 *et seq.*, specifically provides, in part, that any person who:

"Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state. . . is liable to the State of Oklahoma for a civil penalty of not less than Five Thousand Dollars ($5,000.00) and not more than Ten Thousand Dollars ($10,000.00) . . . plus three times the amount of damages which the state sustains because of the act of that person."

713.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Oklahoma, in violation of Okla. Stat. Title 63, § 5053.1(B)(2).

714.    The State of Oklahoma paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINETY-EIGHT:

178

## VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### Okla. Stat. Title 63, § 5053 (B)(3)

715.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

716.    The Oklahoma Medicaid False Claims Act, Okla. Stat. Title 63, § 5053 *et seq.*, specifically provides, in part, that any person who:

"Conspires to defraud the state by getting a false or fraudulent claim allowed or paid. . . is liable to the State of Oklahoma for a civil penalty of not less than Five Thousand Dollars ($5,000.00) and not  more than Ten Thousand Dollars ($10,000.00) . . .  plus three times the amount of damages which the state sustains because of the act of that person."

717.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Okla. Stat. Title 63, § 5053.1(B)(3).

718.    The State of Oklahoma paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT NINETY-NINE:

## VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### Okla. Stat. Title 63, § 5053 (B)(7)

719.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

720.    The Oklahoma Medicaid False Claims Act, Okla. Stat. Title 63, § 5053 *et seq.*, specifically provides, in part, that any person who:

"Knowingly makes, uses, or causes to be made or used, a false record or statement to

conceal, avoid, or decrease an obligation to pay or transmit money or property to the

state. . . is liable to the State of Oklahoma for a civil penalty of not less than Five

Thousand Dollars ($5,000.00) and not  more than Ten Thousand Dollars ($10,000.00) . . .

plus three times the amount of damages which the state sustains because of the act of that

person."

721.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Okla. Stat. Title 63, § 5053.1(B)(7).

722.    The State of Oklahoma paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED:

## VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. Gen. Laws. § 9-1.1-3(a)(1)

723.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

724.    The Rhode Island State False Claims Act, R.I. Gen. Laws. § 9-1.1-1 *et seq.*, specifically provides, in part, that any person who:

"Knowingly presents, or causes to be presented, to an officer or employee of the state or a

member of the guard a false or fraudulent claim for payment or approval . . . is liable to

the state for a civil penalty of not less than five thousand dollars ($ 5,000) and not more

than ten thousand dollars (\$ 10,000). . . . plus three (3) times the amount of damages which the state sustains because of the act of that person . . ."

725.    Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of R.I. Gen. Laws. § 9-1.1-3(a)(1).

726.    The State of Rhode Island paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED ONE:

## VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. Gen. Laws. § 9-1.1-3(a)(2)

727.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

728.    The Rhode Island State False Claims Act, R.I. Gen. Laws. § 9-1.1-1 *et seq.* specifically provides, in part, that any person who:

"Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state . . . is liable to the state for a civil penalty of not less than five thousand dollars (\$ 5,000) and not more than ten thousand dollars (\$ 10,000). . . . plus three (3) times the amount of damages which the state sustains because of the act of that person . . ."

729.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Rhode Island, in violation of R.I. Gen. Laws. § 9-1.1-3(a)(2).

730.   The State of Rhode Island paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED TWO:

### VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. Gen. Laws. § 9-1.1-3(a)(3)

731.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

732.   The s Rhode Island State False Claims Act, R.I. Gen. Laws. § 9-1.1-1 *et seq.* specifically provides, in part, that any person who:

"Conspires to defraud the state by getting a false or fraudulent claim allowed or paid . . .

is liable to the state for a civil penalty of not less than five thousand dollars ($ 5,000) and

not more than ten thousand dollars ($ 10,000). . . . plus three (3) times the amount of

damages which the state sustains because of the act of that person . . ."

733.   Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of R.I. Gen. Laws. § 9-1.1-3(a)(3).

734.   The State of Rhode Island paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED THREE:

### VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. Gen. Laws. § 9-1.1-3(a)(7)

735.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

736.    The Rhode Island State False Claims Act, R.I. Gen. Laws. § 9-1.1-1 *et seq.*,

specifically provides, in part, that any person who:

> "Knowingly makes, uses, or causes to be made or used, a false record or statement to
> conceal, avoid or decrease an obligation to pay or transmit money or property to the state,
> is liable to the state for a civil penalty of not less than five thousand dollars ($ 5,000) and
> not more than ten thousand dollars ($ 10,000). . .  . plus three (3) times the amount of
> damages which the state sustains because of the act of that person . . . "

737.    Defendants knowingly made, used or caused to be made or used a false record or

statement to conceal their actions and to avoid or decrease an obligation to pay or transmit

money to the state, in violation of R.I. Gen. Laws. § 9-1.1-3(a)(7).

738.    The State of Rhode Island paid said claims and has sustained damages because of

these acts by the Defendants.

## COUNT ONE HUNDRED FOUR:

### VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(A)

739.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

740.    The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-

182(a)(1)(A), specifically provides, in part, that any person who:

> (A) Presents, or causes to be presented, to the state a claim for payment under the
>
> Medicaid program knowing such claim is false or fraudulent;
>
> . . .
>
> is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and

not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person.

741.    Defendants knowingly presented or caused to be presented to the Tennessee Medicaid program claims for payment under the Medicaid program knowing such claims were false and fraudulent, claims which failed to disclose the material violations of the AKA and other laws, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

742.    The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT ONE HUNDRED FIVE:

### VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(B)

743.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

744.    The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B), specifically provides, in part, that any person who:

"Makes, uses, or causes to made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

. . .

is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person."

745.    Defendants made, used and caused to be made and used, records and statements

to get false and fraudulent claims under the Medicaid program paid and approved by the State of Tennessee knowing such records and statements were false, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

746.    The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT ONE HUNDRED SIX:

### VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(C)

747.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

748.    The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C), specifically provides, in part, that any person who:

"Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent;

. . .

is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person."

749.    Defendants conspired to defraud the State of Tennessee by getting claims allowed and paid under the Medicaid program knowing such claims were false and fraudulent, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

750.    The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

185

## COUNT ONE HUNDRED SEVEN:

### VIOLATIONS OF THE TENNESSEE MEDICAID FCA
### Tenn. Code Ann. § 71-5-182(a)(1)(D)

751.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

752.     The Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(D), specifically provides, in part, that any person who:

> "Makes, uses, or causes to be made or sued, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program knowing such record or statement is false;
>
> . . .
>
> is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), plus three (3) times the amount of damages which the state sustains because of the act of that person."

753.     Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

754.     The State of Tennessee paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED EIGHT:

### VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(1)-(2)

755.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

756.   The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001(1), specifically provides, in part, that a person commits an unlawful act if the person:

"knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

(A) on an application for a contract, benefit, or payment under the Medicaid program; or

(B) that is intended to be used to determine a person's eligibility for a benefit or payment under the Medicaid program."

757.   The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001(2)(B), specifically provides, in part, that a person commits an unlawful act if the person:

"knowingly or intentionally conceals or fails to disclose an event: (B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized… ."

758.   Defendants knowingly and intentionally caused to be made false statements and misrepresentations of material facts on applications for payment under the Texas Medicaid program, claims which failed to disclose the material violations of the AKA and other laws, in violation of Tex. Hum. Res. Code § 36.002 (1)-(2).

759.   The State of Texas paid said claims and has sustained damages, to the extent of its portion of Medicaid losses from Medicaid claims filed in Texas, because of these acts by the Defendants.

<u>COUNT ONE HUNDRED NINE:</u>

187

## VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(4)(B)

760.     Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

761.     The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002(4)(B), specifically provides, in part, that a person commits an unlawful act if the person:

"knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

. . .

(B) Information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program"

762.     Defendants by knowingly and intentionally causing to be made, inducing, and seeking to induce the making of false statements and misrepresentations of material facts concerning information required to be provided by state and federal law, rule, regulation and provider agreements pertaining to the Medicaid program, are in violation of Tex. Hum. Res. Code § 36.002(4)(B).

763.     The State of Texas paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED TEN:

## VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(5)

764.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

765.   The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002(5), specifically provides, in part, that a person commits an unlawful act if the person:

"except as authorized under the Medicaid program, knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program . . . ."

766.   Defendants knowingly and intentionally paid and received kickbacks, gifts, money, or other consideration as a condition of service to a Medicaid recipient, in violation of Tex. Hum. Res. Code §36.002(5).

767.   The State of Texas paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED ELEVEN:

### VIOLATIONS OF TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(9)

768.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

769.   The Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002(9), specifically provides, in part, that a person commits an unlawful act if the person:

"knowingly or intentionally enters into an agreement, combination, or conspiracy to

189

defraud the state by obtaining or aiding another person in obtaining an unauthorized

payment or benefit from the Medicaid program . . . ."

770.   Defendants knowingly and intentionally conspired to defraud the State of Texas

by aiding another person in obtaining an unauthorized payment from the Medicaid program, in

violation of Tex. Hum. Res. Code §36.002(9).

771.   The State of Texas paid said claims and has sustained damages, to the extent of its

portion of Medicaid losses from Medicaid claims filed in Texas, because of these acts by the

Defendants.

### COUNT ONE HUNDRED TWELVE:

### VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(1)

772.   Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by

reference.

773.   The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(1),

specifically provides, in part, that any person who:

"Knowingly presents, or causes to be presented, to an officer or employee of the

Commonwealth a false or fraudulent claim for payment or approval;

. . .

shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not

more than $10,000, plus three times the amount of damages sustained by the

Commonwealth."

774. Defendants knowingly presented or caused to be presented, to the Virginia

Medicaid program false and fraudulent claims for payment and approval, claims which failed to

disclose the material violations of the AKA and other laws, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

775.    The Commonwealth of Virginia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED THIRTEEN:

## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
## Va. Code Ann. § 8.01-216.3(A)(2)

776.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

777.    The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(2), specifically provides, in part, that any person who:

> "Knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth;
>
> . . .
>
> shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the Commonwealth."

778.    Defendants knowingly made, used and caused to made and used, false records and statements to get false and fraudulent claims paid and approved by the Commonwealth of Virginia, in violation of Va. Code Ann. §8.01-216.3(A)(2).

779.    The Commonwealth of Virginia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED FOURTEEN:

## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(3)

780.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

781.    The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(3), specifically provides, in part, that any person who:

"Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid;

. . .

shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the Commonwealth."

782.    Defendants conspired to defraud the Commonwealth of Virginia by getting false and fraudulent claims allowed and paid, in violation of Va. Code Ann. § 8.01-216.3(A)(3).

783.    The Commonwealth of Virginia paid said claims and has sustained damages because of these acts by the Defendants.

### COUNT ONE HUNDRED FIFTEEN:

## VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(7)

784.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

785.    The Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(7),

specifically provides, in part, that any person who:

> "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Commonwealth;
>
> . . .
>
> shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the Commonwealth."

786.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Va. Code Ann.§ 8.01-216.3(A)(7).

787.    The Commonwealth of Virginia paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED SIXTEEN:

## VIOLATIONS OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
## R.C.W. § 74.09.202(1)(a)

788.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

789.    The Washington Medicaid Fraud False Claims Act, R.C.W. § 74.09.201 *et seq.* specifically provides  in part, that a person is liable to the government entity for a civil penalty of not less than five thousand five hundred dollars and not more than eleven thousand dollars, plus three times the amount of damages which the government entity sustains because of the act of that person, if the person:

"Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

790.    Defendants knowingly presented or caused to be presented to the Washington Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of R.C.W. § 74.09.202(1)(a).

791.    The State of Washington paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED SEVENTEEN:

## VIOLATIONS OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT R.C.W. § 74.09.202(1)(b)

792.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

793.    The Washington Medicaid Fraud False Claims Act, R.C.W. § 74.09.201 *et seq.* specifically provides  in part, that a person is liable to the government entity for a civil penalty of not less than five thousand five hundred dollars and not more than eleven thousand dollars, plus three times the amount of damages which the government entity sustains because of the act of that person, if the person:

"Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

794.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Washington, in violation of R.C.W. § 74.09.202(1)(b).

795.    The State of Washington paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED EIGHTEEN:

### VIOLATIONS OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT R.C.W. § 74.09.202(1)(c)

796.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

797.    The Washington Medicaid Fraud False Claims Act, R.C.W. § 74.09.201 *et seq.* specifically provides  in part, that a person is liable to the government entity for a civil penalty of not less than five thousand five hundred dollars and not more than eleven thousand dollars, plus three times the amount of damages which the government entity sustains because of the act of that person, if the person:

"Conspires to commit one or more of the violations [of the Washington Medicaid Fraud False Claims Act.]"

798.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of R.C.W. § 74.09.202(1)(c).

799.    The State of Washington paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED NINETEEN:

### VIOLATIONS OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT R.C.W. § 74.09.202(1)(g)

800.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above

as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

801.    The Washington Medicaid Fraud False Claims Act,  R.C.W. § 74.09.201 *et seq.* specifically provides  in part, that a person is liable to the government entity for a civil penalty of not less than five thousand five hundred dollars and not more than eleven thousand dollars, plus three times the amount of damages which the government entity sustains because of the act of that person, if the person:

> "Knowingly makes, uses, or causes to be made or used, a false record or statement
> material to an obligation to pay or transmit money or property to the government entity,
> or knowingly conceals or knowingly and improperly avoids or decreases an obligation to
> pay or transmit money or property to the government entity."

802.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of R.C.W. § 74.09.202(1)(g).

803.    The State of Washington paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED TWENTY:

### VIOLATIONS OF THE WISCONSIN FALSE CLAIMS ACT
### Wisc. Stat. § 20.931(2)(a)

804.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated by reference.

805.    The Wisconsin False Claims Act, Wisc. Stat. § 20.931, specifically provides in part that any person is liable to this state for 3 times the amount of the damages sustained by this

state because of the actions of the person, and shall forfeit not less than $5,000 nor more than $10,000 for each violation if said person:

"Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance."

806.    Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of the AKA and other laws, in violation of Wisc. Stat. § 20.931(2)(a).

807.    The State of Wisconsin paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED TWENTY-ONE:

### VIOLATIONS OF THE WISCONSIN FALSE CLAIMS ACT
### Wisc. Stat. § 20.931(2)(b)

808.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

809.    The Wisconsin False Claims Act, Wisc. Stat. § 20.931, specifically provides in part that any person is liable to this state for 3 times the amount of the damages sustained by this state because of the actions of the person, and shall forfeit not less than $5,000 nor more than $10,000 for each violation if said person:

"Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance."

810.    Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by an agency of the State of Wisconsin, in violation of Wisc. Stat. § 20.931(2)(b).

811.    The State of Wisconsin paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED TWENTY-TWO:

### VIOLATIONS OF THE WISCONSIN FALSE CLAIMS ACT
### Wisc. Stat. § 20.931(2)(c)

812.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

813.    The Wisconsin False Claims Act, Wisc. Stat. § 20.931, specifically provides in part that any person is liable to this state for 3 times the amount of the damages sustained by this state because of the actions of the person, and shall forfeit not less than $5,000 nor more than $10,000 for each violation if said person:

"Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program."

814.    Defendants conspired to submit a false claim to Government Health Care Programs and to deceive Government Health Care Programs for the purpose of getting false and fraudulent claims allowed and paid, in violation of Wisc. Stat. § 20.931(2)(c).

815.    The State of Wisconsin paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT ONE HUNDRED TWENTY THREE:

### VIOLATIONS OF THE WISCONSIN FALSE CLAIMS ACT
### Wisc. Stat. § 20.931(2)(g)

816.    Relator restates and realleges the allegations contained in Paragraphs 1-324 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

817.    The Wisconsin False Claims Act, Wisc. Stat. § 20.931, specifically provides in part that any person is liable to this state for 3 times the amount of the damages sustained by this state because of the actions of the person, and shall forfeit not less than $5,000 nor more than $10,000 for each violation if said person:

> "Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program."

818.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal their actions and to avoid or decrease an obligation to pay or transmit money to the state, in violation of Wisc. Stat. § 20.931(2)(g).

819.    The State of Wisconsin paid said claims and has sustained damages because of these acts by the Defendants.

*   *   *

820.    Under all Counts set forth above, Relator and all Plaintiffs both seek all damages available at law and in the premises, including, but not limited to, treble damages, civil penalties of $5,500.00 to $11,000.00 per false claim, any greater amounts allowed by statute, as well as attorneys' fees, costs, expenses, and interest.

821.    Under all Counts set forth above, Relator seeks the maximum available relator's share of each Government's recovery.

822.    WHEREFORE, the U.S.A., California, Colorado, Connecticut, Delaware, District

of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts,

Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York,

North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Wisconsin pray that

judgment be entered in their favor, and against Defendants Novartis, AG; Novartis Corporation;

Novartis Pharmaceuticals Corporation; Genentech, Inc.; the Roche Group; and Roche Holdings,

Inc., jointly and solidarily.

## JURY DEMAND

Plaintiff/Relator, for herself, the U.S.A., and the States, hereby demands a jury trial on all

Counts.


Respectfully submitted:


Steven F. Grover, Esq. (Fla. Bar # 131296)
Admitted Pro Hac Vice
STEVEN F. GROVER, P.A.
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel.: 954-356-0005
Fax: 954-356-0010
E-mail: stevengfgrover@gmail.com

s/ Jennifer B. Koiles


Jennifer B. Koiles (Mass. Bar # 632017)
Jennifer B. Koiles & Associates
70 Washington St., Suite 402
Salem, MA 01970
Tel.: 978-744-7774
Fax: 978-745-6757
E-mail: jkoiles@koileslaw.com

s/ Seth Lehrman

Seth Lehrman (Fla. Bar # 132896)
Gary Farmer (Fla. Bar # 914444)
Admitted Pro Hac Vice
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Tel.: 954-524-2820
Fax: 954-524-2822
Email: gary@pathtojustice.com
seth@pathtojustice.com

s/ James P. Gitkin

_____

James P. Gitkin, Esq. (Fla. Bar # 70001)
Admitted Pro Hac Vice
SALPETER GITKIN
200 S. Andrews Ave., Suite 503
Fort Lauderdale, FL 33301-1864
Tel. 954-467-8622
Fax. 954-467-8623
Email: jim@salpetergitkin.com

*Attorneys for Plaintiff/Relator
Allison Kelly*

*CERTIFICATE OF SERVICE*

*I hereby certify that a copy of the foregoing was
served on the U.S.A., all States named herein, and
the District of Columbia, by U.S. Mail, properly
addressed and first-class postage prepaid, on this
8th day of June, 2012.*

Steven F. Grover